NONCONFIDENTIAL

2014-1154

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, AND GANG YAN DIAMOND PRODUCTS, INC.,

Plaintiffs-Appellants,

and

BOSUN TOOLS GROUP CO. LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

DIAMOND SAWBLADES MANUFACTURERS COALITION,

Defendant-Appellee,

and

WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., QINGDAO SHINHAN DIAMOND INDUSTRIAL CO., LTD.,

Defendants

---

Appeal from the United States Court of International Trade in consolidated case no. 09-00511, Senior Judge R. Kenton Musgrave.

---

BRIEF OF PLAINTIFFS-APPELLANTS ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, AND GANG YAN DIAMOND PRODUCTS, INC.

Herbert C. Shelley
Michael T. Gershberg
Christopher G. Falcone
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

Jeffrey S. Neeley
Stephen W. Brophy
BARNES, RICHARDSON &
COLBURN, LLP
11 Dupont Circle, NW, Suite 500
Washington, DC  20036
(202) 483-0070

Dated: February 21, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Advanced Technology & Materials v. United States
No.  14-1154

## CERTIFICATE OF INTEREST

Counsel for Appellants, Advanced Technology & Materials Co., Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc., certifies the following:

1.      The full name of every party or amicus represented by me is:

Advanced Technology & Materials Co., Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The Central Iron & Steel Research Institute owns more than 10 percent of Advanced Technology & Materials Co., Ltd.  The Central Iron & Steel Research Institute is in turn wholly owned by the State-owned Assets Supervision and Administration Commission of the State Council of the People's Republic of China.

Advanced Technology & Materials Co., Ltd.  owns more than 10 percent of Beijing Gang Yan Diamond Products Company.  Advanced Technology & Materials Co., Ltd. is a publicly held company listed on the Shenzhen Stock Exchange.

Beijing Gang Yan Diamond Products Company owns more than 10 percent of Gang Yan Diamond Products, Inc.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Herbert C. Shelley, Esq., Michael T Gershberg, Esq., and Christopher G. Falcone, Esq. of the law firm of Steptoe & Johnson LLP, as well as Jeffrey S. Neeley and Stephen W. Brophy of the law firm Barnes, Richardson & Colburn, LLP represented the Appellants at the Court of International Trade.  Mr. Shelley, Mr. Gershberg, Mr. Falcone, Mr. Neeley and Mr. Brophy expect to appear in this proceeding.

<table>
<tr><td>_____12/12/2013_____<br>Date</td><td>___/s/ Herbert C. Shelley__<br>Herbert C. Shelley<br>STEPTOE & JOHNSON LLP<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>Telephone: 202-429-8146<br>Fax: 202-429-3902<br>Email: hshelley@steptoe.com</td></tr>
</table>

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF RELATED CASES .................................................................1

STATEMENT OF JURISDICTION .................................................................2

STATEMENT OF THE ISSUE .................................................................3

STATEMENT OF THE CASE .................................................................3

STATEMENT OF FACTS .................................................................4

SUMMARY OF THE ARGUMENT ................................................... 17

ARGUMENT ................................................................................. 19

I.    STANDARD OF REVIEW ................................................... 19

II.    COMMERCE'S SEPARATE RATE DETERMINATION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE, AND THE TRADE COURT REJECTED IT BASED ON A MISAPPLICATION OF THE STANDARD OF REVIEW ................. 23

    A.    The Trade Court Impermissibly Substituted Its Judgment for ................................................................... 24

    B.    BGY Established the Absence of *De Jure* Government Control ................................................................... 27

        1.    Commerce's *De Jure* Analysis Was Supported by Substantive Evidence ................................. 27

        2.    The CIT Reweighed the Evidence of Absence of *De Jure* Control ................................................. 33

    C.    BGY Established the Absence of *De Facto* Government Control ................................................................... 36

        1.    Commerce's *De Facto* Analysis Was Supported by Substantial Evidence ................................. 36

        2.    The CIT Reweighed the Evidence of Absence of *De Facto* Control ................................................. 43

III.    COMMERCE'S SEPARATE RATE DETERMINATION WAS CONSISTENT WITH ITS LONG-STANDING PRACTICE, WHICH THE CIT EFFECTIVELY ALTERED ................................. 45

A.  The CIT Disregarded the Basic Fact that Commerce's
    Separate Rate Test Focuses on the Exporting Entity ................... 46

B.  The CIT Disregarded Commerce Precedent That
    Government Ownership Is Not Dispositive of Government
    Control ............................................................................................ 51

C.  The CIT Rejected Commerce's Long-Standing
    Interpretation of Relevant Chinese Laws ...................................... 55

CONCLUSION AND RELIEF SOUGHT ......................................................... 57

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 4, 15, 26, 34, and 44-45 describes the CIT's confidential second remand order; the material omitted on pages 4 through 6 describes BGY's and AT&M's corporate structure and ownership; and the material omitted in the footnote on page 5 and on pages 6, 13, and 37 describes BGY's and AT&M's sales and income information.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abbott Labs. v. United States,
573 F.3d 1327 (Fed. Cir. 2009)............................................................ 57

Advanced Technology & Materials Co., Ltd. v. United States,
938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) .............................. passim

Advanced Technology & Materials Co., Ltd. v. United States,
CIT Slip Op. 2011 (Ct. Int'l Trade Oct. 12, 2011) ..................... passim

Advanced Technology & Materials Co., Ltd. v. United States,
CIT Slip Op. 2012 (Ct. Int'l Trade Nov. 30, 2012)..................... passim

Altx, Inc. v. United States,
370 F.3d 1108 (Fed. Cir. 2004).................................................... 27, 57

Am. Airlines, Inc. v. United States,
551 F.3d 1294 (Fed. Cir. 2008)........................................................... 57

Am. Silicon Techs. v. United States,
261 F.3d 1371 (Fed. Cir. 2001)........................................................... 20

AMS Assocs., Inc. v. United States,
737 F.3d 1338 (Fed. Cir. 2013)........................................................... 19

Atchison, Topeka & Santa Fe Ry. Co. v Wichita Bd. of Trade,
412 U.S. 800 (1973).............................................................................. 54

Chevron, U.S.A. v. Natural Resources Defense Council,
467 U.S. 837 (1984).............................................................................. 21

Consolo v. Fed. Mar. Comm'n,
383 U.S. 607 (1966)........................................................................ 20, 27

East Sea Seafoods, LLC v. United States,
703 F. Supp. 2d 1336 (Ct. Int'l Trade 2010) ..................................... 24

Fujitsu Gen. Ltd. v. United States,
    88 F.3d 1034 (Fed. Cir. 1996)..................................................... 21, 24

Hangzhou Spring Washer Co., Ltd. v. United States,
    387 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) ................................. 22

Hontex Enters., Inc. v. United States,
    248 F. Supp. 2d 1323 (Ct. Int'l Trade 2003) ................................. 47

INS v. Elias- Zacarias,
    502 U.S. 478 (2002)........................................................................ 20

Koyo Seiko Co. v. United States,
    36 F.3d 1565 (Fed. Cir. 1994).......................................................... 22

Luoyang Bearing Corp. v. United States,
    358 F. Supp. 2d 1296 (Ct. Int'l Trade 2005) ............................. 10, 46

Marsan Gida Sanayi Ve Ticaret A.S. v. United States,
    CIT Slip Op. 2011 (Ct. Int'l Trade Feb. 16, 2011)..................... 22, 24

Mitsubishi Heavy Indus., Ltd. v. United States,
    275 F.3d 1056 (Fed. Cir. 2001)........................................................ 19

Mittal Steel Point Lisas Ltd. v. United States,
    548 F.3d 1375 (Fed. Cir. 2008)........................................................ 19

Nippon Steel Corp. v. United States,
    458 F.3d 1345 (Fed. Cir. 2006)................................................... 20, 25

NSK Corp. v. U.S. Int'l Trade Comm'n,
    2013 U.S. App. LEXIS 21715 (Fed. Cir. Oct. 25, 2013) ................. 20

NSK Corp. v. U.S. Int'l Trade Comm'n,
    716 F.3d 1352 (Fed. Cir. 2013)........................................................ 25

PSC VSMPO–AVISMA Corp. v. United States,
    688 F.3d 751 (Fed. Cir. 2012)........................................................ 21

Qingdao Taifa Group Co. v. United States,
    637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ................................. 51

Rio Grande, El Paso and Santa Fe R. Co. v. Dep't of Energy,
   234 F.3d 1 (Fed. Cir. 2000)................................................................ 20

Suramerica de Aleaciones Laminadas, CA. v. United States,
   966 F.2d 660 (Fed. Cir. 1992)........................................................... 26

Thai Pineapple Pub. Co. v. United States,
   187 F.3d 1362 (Fed. Cir. 1999)........................................................ 23

Timken Co. v. United States,
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ......................................... 20

Universal Camera Corp. v. NLRB,
   340 U.S. 474 (1951).......................................................................... 20

Viraj Group, Ltd. v. United States,
   343 F.3d 1371 (Fed. Cir. 2003)........................................................ 26

Wheatland Tube Co. v. United States,
   495 F.3d 1355 (Fed. Cir. 2007)................................................ 22, 25

**Department Of Commerce Proceedings**

Certain Circular Welded Carbon Quality Steel Line Pipe from the People's
   Republic of China, 74 Fed. Reg. 14,514 (Dep't Commerce March 31,
   2009) ................................................................................................. 42

Certain Cut-to-Length Carbon Steel Plate From the People's Republic of
   China, 75 Fed. Reg. 8,301 (Dep't Commerce Feb. 24, 2010)........... 43

Certain Paper Clips From The People's Republic of China, 59 Fed. Reg.
   25,885 (Dep't Commerce May 18, 1994).............................................8

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into
   Modules, from the People's Republic of China, 77 Fed. Reg. 63,791
   (Dep't Commerce Oct. 17, 2012) ..................................................... 42

De Facto Criteria for Establishing a Separate Rate in Antidumping
   Proceedings Involving Non-Market Economy Countries, 78 Fed. Reg.
   40,430 (Dep't Commerce July 5, 2013) ........................................... 51

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006), *as amended*, 71 Fed. Reg. 35,864 (June 22, 2006)........................................... passim

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 78 Fed. Reg. 36,166 (Dep't Commerce June 17, 2013), *as amended*, 78 Fed. Reg. 42,930 (July 18, 2013) .................................................. 14

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 70 Fed. Reg. 71,121 (Dep't Commerce Dec. 29, 2005) .................. 11, 13

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 78 Fed. Reg. 11,143 (Dep't Commerce Feb. 15, 2013) ......................... 14

*Foundry Coke From the People's Republic of China*, 66 Fed Reg. 13,885 (Dep't Commerce Mar. 8, 2001).................................................................. 40, 52

*Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China*, 71 Fed. Reg. 54,269 (Dep't Commerce Sept. 14, 2006) .......................................................... 9, 31, 43

*Honey From the People's Republic of China*, 69 Fed. Reg. 77,184 (Dep't Commerce Dec. 27, 2004) ...................................................................... 28

Import Administration Policy Bulletin 05.1: Separate-Rates Practice and Applicatioan of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (Apr. 5, 2005) ...................... passim

*Notice of Implementation of Determinations Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Orders*, 78 Fed. Reg. 18,958 (Dep't Commerce Mar. 28, 2013) ........................................................................................................ 14

*Persulfates From the People's Republic of China*, 62 Fed. Reg. 27,222 (Dep't Commerce May 19, 1997)........................................................... 8, 11, 48

*Separate Rates Practice in Antidumping Proceedings Involving Non-Market Economy Countries*, 69 Fed. Reg. 24,119 (Dep't Commerce May 3, 2004) .................................................................................................... 23

*Separate-Rates Practice in Antidumping Proceedings Involving Non-Market Economy Countries*, 69 Fed. Reg. 56,188 (Dep't Commerce Sept. 20, 2004) .................................................................................................... 23

Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585
 (Dep't Commerce May 2, 1994)................................................................ passim

Structural Steel Beams From the People's Republic of China, 66 Fed. Reg.
 67,197 (Dep't Commerce Dec. 28, 2001)................................................... 40, 52

Synthetic Indigo from the People's Republic of China, 65 Fed. Reg. 25,706
 (Dep't Commerce May 3, 2000)........................................................... 10, 30, 52

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From
 the People's Republic of China. 62 Fed. Reg. 6173 (Dep't Commerce
 Feb. 11, 1997) .......................................................................................... 51

Utility Scale Wind Towers From the People's Republic of China, 77 Fed.
 Reg. 75,992 (Dep't Commerce Dec. 26, 2012) .......................................... 31, 42

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).................................................................... 119

19 U.S.C. § 3538 .......................................................................................2

28 U.S.C. § 1295(a)(5) ...............................................................................2

28 U.S.C. § 1581(c)....................................................................................2

28 U.S.C. § 2107(b) ...................................................................................2

**Rules**

Fed. R. App. P. 4(a)(1)(B)...........................................................................2

Fed. Cir. R. 47.5 .........................................................................................1

# STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiffs-Appellants, Advanced Technology & Materials Co., Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc. ("AT&M"), states the following:

1.  This Court has previously considered an appeal of the U.S. Court of International Trade's ("CIT") issuance of a preliminary injunction in the same civil action in Case No. 2013-1305. The Court's decision was issued without a published opinion. See Advanced Technology & Materials Co., Ltd. v. United States (Fed. Cir. November 13, 2013) (Circuit Judges Lourie, Bryson, and O'Malley). This Court has also previously considered appeals involving the underlying antidumping duty investigation in Case Nos. 2010-1024 and 2010-1090. See Diamond Sawblades Mfrs. Coalition v. United States, 626 F.3d 1374, 1375 (Fed. Cir. December 9, 2010) (Circuit Judges Lourie, Bryson, and Dyk). This Court has also considered an appeal involving the material injury determination by the U.S. International Trade Commission in the underlying investigation in Case Nos. 2009-1274 and 2009-1275. See Diamond Sawblades Mfrs. Coalition v. United States, 612 F.3d 1348 (Fed. Cir. July 6, 2010) (Circuit Judges Bryson, Linn, and Dyk).

2.      Counsel is aware of three cases currently pending at the CIT that may be directly affected by this Court's decision in this case. These cases are appeals of determinations made by the U.S. Department of Commerce ("Commerce") in administrative reviews of the antidumping duty order at issue in this appeal and a decision under Section 129 of the Uruguay Round Agreements Act, 19 U.S.C. § 3538. See Diamond Sawblades Mfrs. Coalition v. United States (CIT Court No. 13-00078) (POR 1); Diamond Sawblades Mfrs. Coalition v. United States (CIT Court No. 13-00241) (POR 2); Diamond Sawblades Mfrs. Coalition v. United States (CIT Court No. 13-00168) (Section 129).

## STATEMENT OF JURISDICTION

The CIT had exclusive subject matter jurisdiction over this action under 28 U.S.C. § 1581(c). The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(5), which empowers this Court to review final decisions of the CIT.

This appeal was timely filed on December 6, 2013, i.e., within 60 days of the CIT's final opinion and judgment of October 11, 2013. 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUE

Whether the CIT erred by substituting its judgment for Commerce's and effectively ordering Commerce to reverse its determination to grant AT&M a separate rate.

## STATEMENT OF THE CASE

AT&M appeals from Advanced Technology & Materials Co., Ltd. v. United States, 938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) ("AT&M III") (JA0001-9), which sustained Commerce's second remand redetermination – issued under protest – pursuant to Advanced Technology & Materials Co., Ltd. v. United States, CIT Slip Op. 2011-122 (Ct. Int'l Trade Oct. 12, 2011) ("AT&M I") (JA0010-36) and Advanced Technology & Materials Co., Ltd. v. United States, CIT Slip Op. 2012-147 (Ct. Int'l Trade Nov. 30, 2012) ("AT&M II") (JA0037-76).[1]

Both AT&M and Petitioner Diamond Sawblades Manufacturers' Coalition ("DSMC") challenged aspects of Commerce's final antidumping duty determination regarding its investigation of diamond sawblades from the People's Republic of China. See Diamond Sawblades and Parts Thereof From the People's Republic of China, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) ("Final

---

[1] AT&M II is published at 885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012). We cite to the slip opinion instead of the reporter in order to ensure consistency between the confidential and non-confidential versions of the appendix, because the confidential version of AT&M II is only available in slip opinion format.

Confidential Material Deleted

Determination") (JA0112-118), <u>as amended</u>, 71 Fed. Reg. 35,864 (June 22, 2006) (JA0119-120).

In <u>AT&M I</u>, the CIT remanded the Final Determination for Commerce to reconsider and further explain its decision to grant the AT&M Entity a separate rate. Commerce then issued its first remand redetermination, providing the requested additional explanation for its separate rate decision. In <u>AT&M II</u>, the CIT [

] and remanded for Commerce to reconsider the AT&M Entity's entitlement to a separate rate and answer specific questions posed by the trade court. In its second remand redetermination, issued under protest, Commerce changed its position and determined that the AT&M Entity was not entitled to a separate rate. The CIT affirmed Commerce's second remand redetermination in <u>AT&M III</u>.

## STATEMENT OF FACTS

### Company Background

Beijing Gang Yan Diamond Products Company ("BGY") is a Chinese producer and exporter of diamond sawblades. It was a respondent in Commerce's antidumping duty investigation of diamond sawblades and parts thereof from China. BGY owns [     ]% of its affiliated U.S. distributor, Gang Yan Diamond Products, Inc. ("GYDP"). BGY Section A Questionnaire Response (Aug. 25,

**Confidential Material Deleted**

2005) at 13 (JA0184). BGY is in turn owned [      ]% by Advanced Technology & Materials Co., Ltd. ("AT&M"). Id. at Exh. A-14 (JA0192). AT&M is a large public company with subsidiaries producing many products, and is listed on the Shenzhen Stock Exchange. BGY Supplemental Section A Questionnaire Response (Sept. 20, 2005) at 2 (JA0196).[2] AT&M also owns [      ]% of Yichang HXF ("HFX"), a producer of the steel cores that are used in diamond sawblade production. BGY Section A Response at 13 (JA0184). AT&M itself is not a producer or exporter of diamond sawblades.

Shareholders in AT&M during the period of investigation ("POI") included several well-known foreign-invested companies, as well as numerous Chinese investment funds. BGY Supplemental Section A Response at Exh. SA-11 (JA0225-226). The largest shareholder in AT&M during the POI was Central Iron & Steel Research Institute ("CISRI"). CISRI's shareholding in AT&M decreased from [            ] during the POI. CISRI is owned by the State-Owned Assets Supervision and Administration Commission ("SASAC"), a Chinese government agency that owns many diverse companies. CISRI is not itself part of the Chinese government, although it is a company "owned by all the people" under

---

[2] BGY represents only [      ]% of AT&M's revenue. See BGY Section A Response at Exh. A-5 (JA0186) (BGY 2004 income of RMB [          ]; BGY Supplemental Questionnaire Response at Exh. S-2 (Dec. 5, 2005) (JA0230) (AT&M 2004 income of RMB [              ]).

Chinese laws. See id. at 2 (JA0196). Neither CISRI nor SASAC produces or exports diamond sawblades.

About [      ]% of BGY's U.S. sales are constructed export price ("CEP") sales made through its affiliated U.S. importer, GYDP. See BGY Supplemental Section A Response at Exh. SA-1 (JA0201). Mr. Paul Shen, a U.S. citizen, directly or indirectly owns [      ]% of GYDP. Id. at 7 (JA0198). He is responsible for all of GYDP's activities, including setting U.S. sales prices. See Verification of the Sales and Factors Response of Gang Yan Diamond Products, Inc. at 5 (March 27, 2006) (JA0238). The exporter of record for all of BGY's CEP sales was Cliff (Tianjin) International, Ltd. ("Cliff"), which is indirectly owned [      ]% by Mr. Shen. See BGY Supplemental Section A Response at 1, 4, 7 (JA0195, 0197-98).

**Separate Rate Standards**

In an antidumping investigation involving a non-market economy country, Commerce begins with a presumption that all respondents are subject to governmental control and should be assigned a single country-wide dumping margin unless an exporter demonstrates the absence of both *de jure* and *de facto* governmental control over its export activities. See Import Administration Policy Bulletin 05.1 ("Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries") (Apr. 5,

2005), citing Bicycles from the People's Republic of China, 61 Fed. Reg. 19,026, 19,027 (Dep't Commerce April 30, 1996).  If an exporter demonstrates this independence with respect to its export activities, it is eligible for a separate rate apart from the country-wide rate.  Commerce's separate rate and country-wide rate policies are not part of the antidumping statute or regulations.  They were developed entirely through Commerce's practice and formalized in Policy Bulletin 05.1.

Commerce considers the following criteria in determining the absence of *de jure* government control over a respondent's export activities:  "1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; 2) any legislative enactments decentralizing control of companies; and 3) any other formal measures by the government decentralizing control of companies."  Policy Bulletin 05.1; Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994).

As part of its *de jure* analysis, Commerce has had to evaluate relevant Chinese laws and their relation to government control over exporters.  One of the most important laws in this regard is the Company Law of the PRC ("Company Law"), which has applied to public companies in China since it took effect on July 1, 1994.  Because the Company Law serves to separate corporate management from shareholder ownership, since its inception, Commerce has considered it

sufficient to establish an absence of *de jure* control over companies subject to the Company Law. See, e.g., Persulfates From the People's Republic of China, 62 Fed. Reg. 27,222, 27,227 (Dep't Commerce May 19, 1997) ("AJ and Wuxi submitted to the Department copies of the 1988, 1992, and 1993 {Company Law} laws under which they were organized. Each of these laws establishes the absence of *de jure* control in that they grant these companies the right to negotiate prices and sell products, make production decisions, make investment decisions and form joint ventures."); Certain Paper Clips From The People's Republic of China, 59 Fed. Reg. 25,885, 25,886-87 n.1 (Dep't Commerce May 18, 1994) (prelim.) ("Although not yet in effect this {Company Law} lends support to a finding of an absence of *de jure* governmental control. As this investigation continues, we will consider any additional information on publicly traded enterprises and the implementation of the Company Law."), unchanged in final determination, 59 Fed. Reg. 51,168, 51,170 (Oct. 7, 1994).

For cases where SASAC is involved, Commerce has also evaluated the impact of Decree of the State Council of the People's Republic of China No. 378: Interim Regulations on Supervision and Management of State-owned Assets of Enterprises ("Interim Regulations"), issued on May 27, 2003. As the name implies, the Interim Regulations govern the supervision and management of state-owned enterprises such as CISRI. In every case since the Interim Regulations

8

were issued, Commerce has determined that they do not serve to centralize control over affected companies or reverse the decentralizing effect of the Company Law. See e.g., Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China, 71 Fed. Reg. 54,269, Decision Mem. at cmt. 3 (Dep't Commerce Sept. 14, 2006) (rejecting allegation that the Interim Regulations "undermine the independence of {state-owned enterprises} under the Company Law of the PRC").

Under the separate rate test, Commerce then considers the following criteria in determining the absence of *de facto* government control over a respondent's export activities: "1) whether the export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses." Policy Bulletin 05.1; Silicon Carbide from the People's Republic of China, 59 Fed. Reg. at 22,586-87.

Policy Bulletin 05.1 is clear that the separate rate test focuses on the exporter "at the individual firm level," and not on any other corporate entity. See e.g., AT&M II, Slip Op. 2012-147 at 8 ("There is no dispute that the focus of the

9

separate rates test here is the AT&M entity's export operations, that Commerce's test applies only to exporters . . . ."); <u>Luoyang Bearing Corp. v. United States</u>, 358 F. Supp. 2d 1296, 1304 (Ct. Int'l Trade 2005) ("The separate rates analysis focuses on the exporter's activities and the exporter's ability to set the United States price for its sales of the subject merchandise.").

Commerce's consistent policy has been that government ownership (even 100% government ownership) does not preclude an exporter from eligibility for a separate rate. <u>See</u> <u>Synthetic Indigo from the People's Republic of China</u>, 65 Fed. Reg. 25,706 (Dep't Commerce May 3, 2000) (Commerce "does not consider state-owned enterprise ownership as one of the criteria for determining eligibility for separate rates"). At least as early as 1994, Commerce determined that companies "owned by all the people" under Chinese law (as CISRI is) may be eligible for a separate rate as long as they show *de jure* and *de facto* independence. <u>See</u> <u>Silicon Carbide from the People's Republic of China</u>, 55 Fed. Reg. at 22,585.

## Administrative Proceedings

BGY fully participated in the antidumping duty investigation, as well as in each subsequent administrative review. It completed all required questionnaire and supplemental questionnaire responses. This information was fully and successfully verified by Commerce during a six-day verification of BGY, AT&M, and Cliff in China, as well as a three-day verification of GYDP in the United States.

In the investigation, Commerce collapsed BGY with AT&M and HXF for purposes of applying a single antidumping cash deposit rate, and referred to the companies collectively as the "AT&M Entity." Commerce decided that these companies met its regulatory collapsing criteria – i.e., that BGY, HXF, and AT&M are affiliated companies, BGY and HXF are both producers of identical products, no retooling would be necessary in order to restructure manufacturing priorities, and there is significant potential for manipulation of price or production between the parties. See Diamond Sawblades and Parts Thereof From the People's Republic of China, 70 Fed. Reg. 71,121, 77,125 (Dep't Commerce Dec. 29, 2005) ("Preliminary Determination") (JA0110). The designation of a single entity relates solely to the calculation of a dumping margin and assignment of a single cash deposit rate. It is entirely unrelated to the separate rate test and BGY's export activities. See Persulfates from the People's Republic of China, 62 Fed. Reg. 27,222, Decision Mem. at cmt. 2 ("The Department has a long-standing methodology for determining whether companies in a nonmarket economy are entitled to a separate rate. That methodology is separate and distinct from the 'collapsing' methodology in both focus and function.").

Based on the separate rate criteria above, Commerce determined that the AT&M Entity was entitled to a separate rate because BGY had established an absence of de jure and de facto government control. In the Section A response and

Supplemental Section A response, BGY and AT&M provided detailed factual and legal reasons why CISRI's ownership of AT&M stock (minority ownership by the end of the POI) did not lead to a conclusion of state control over the export activities of BGY. BGY and AT&M also placed on the record detailed information showing the ownership of all of the companies at issue and responding to Commerce's specific questions. The information provided was evaluated by Commerce and was verified in detail. In the BGY Verification Report, Commerce discussed the main documents that it reviewed and found no evidence of state control with regard to the exports of diamond sawblades. See Verification of the Sales and Factors Response of Beijing Gang Yan at 7 (March 27, 2006) ("BGY Verification Report") at 8-11 (JA0233-236). During the investigation, the DSMC had the opportunity to contradict AT&M's factual and legal arguments by pointing to any specific evidence, but did not do so.

Based on the verified evidence and consistent with its long-standing practice, Commerce found that the AT&M companies were entitled to a separate rate. In particular, any theoretical control by SASAC over CISRI did not result in either *de jure* or *de facto* control by the Chinese government over the export activities of BGY (three levels down the corporate chain). See Issues and Decision Memorandum accompanying Final Determination ("Decision Mem.") at 58 (JA0123). GYDP was not collapsed into the AT&M Entity. Nor did Commerce

make any findings of government control over GYDP, a U.S. company responsible for [     ]% of BGY's U.S. sales.

Commerce also analyzed the relevant Chinese laws – including the Securities Law of the PRC, Company Law, Code of Corporate Governance ("Code"), and the Interim Regulations – "and found no evidence of any legislative or other restrictions on any of the export activities of the AT&M single entity." Id.

Commerce issued a negative preliminary determination for the AT&M Entity, calculating a 0.11% (de minimis) dumping margin. See Preliminary Determination, 70 Fed. Reg. at 71,134 (JA0111). This negative determination was reversed in the Final Determination, in which Commerce calculated a 2.50% dumping margin for the AT&M Entity, which was revised to 2.82% in the amended final determination. Final Determination, 71 Fed. Reg. at 29,309 (JA0118); Amended Final Determination, 71 Fed. Reg. at 35,865 (JA0120). These rates are barely over the de minimis threshold of two percent. They are based on BGY's export sales data and surrogate value data for normal value.

In the first and second administrative reviews under this order, the AT&M companies again participated as a respondent. Commerce continued to find that the AT&M Entity is entitled to a separate rate. In both reviews, the AT&M Entity received a de minimis margin, calculated with its own export sales data and surrogate value data for normal value. See Diamond Sawblades and Parts Thereof

From the People's Republic of China, 78 Fed. Reg. 11,143 (Dep't Commerce Feb. 15, 2013) (POR 1); Diamond Sawblades and Parts Thereof From the People's Republic of China, 78 Fed. Reg. 36,166 (Dep't Commerce June 17, 2013), as amended, 78 Fed. Reg. 42,930 (July 18, 2013) (POR 2).[3]

**CIT Proceedings**

AT&M and the DSMC both challenged the Final Determination in the investigation at the CIT. Among other issues, AT&M contested Commerce's selection of surrogate values for steel inputs, and the DSMC contested Commerce's separate rate determination. Commerce requested a voluntary remand to reconsider the surrogate value issue.

In AT&M I, the CIT remanded the Final Determination for Commerce to further explain its separate rate decision, including the potential for government

---

[3] Commerce also revoked the antidumping order with respect to the AT&M Entity effective March 22, 2013, in order to comply with an adverse World Trade Organization decision regarding the use of zeroing. See Certain Frozen Warmwater Shrimp From the People's Republic of China and Diamond Sawblades and Parts Thereof From the People's Republic of China: Notice of Implementation of Determinations Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Orders, 78 Fed. Reg. 18,958 (Dep't Commerce Mar. 28, 2013). However, as a result of the CIT's decisions in this case, it has also enjoined the exclusion of the AT&M Entity from the antidumping duty order, and the Section 129 decision is also on appeal at the CIT. Therefore, but for the CIT's decisions at issue here regarding whether the AT&M Entity qualified to obtain a separate rate, it would already have been revoked from the order prospectively.

control through CISRI's part ownership of AT&M. The CIT also granted Commerce a voluntary remand on the surrogate value issue.

In its first remand redetermination, Commerce further supported its original separate rate decision. It thoroughly evaluated the evidence, including the relevant Chinese laws, and explained how the facts – consistent with its long-standing policy and practice – established an absence of government control. Commerce also revised the surrogate value used for steel inputs. As a result, Commerce calculated a de minimis dumping margin for the AT&M Entity. See First Remand Redetermination at 28 (JA0152). If this first remand redetermination had been affirmed by the CIT – as it should have been under the proper standard of review – the AT&M Entity would have been excluded from the antidumping duty order *ab initio*.

In AT&M II, the CIT impermissibly rejected Commerce's separate rate decision in its entirety. In fact, the CIT [

], even though it was based on verified evidence and supported by consistent agency practice. The trade court stepped into the role of fact-finder, forcing upon the agency its preferred separate rate methodology and interpretation of the evidence. The CIT ignored a full record supporting the AT&M Entity's de minimis dumping margin, and sought to change Commerce's separate rate criteria and practice by mandating a top-down review of corporate

ownership (rather than a bottom-up review from the individual firm level) and speculating that there may be government control based on indirect government ownership. The trade court also remanded Commerce's surrogate value decision for further explanation.

Left with no other option in light of the CIT's decision, Commerce issued its second remand redetermination under protest. Commerce determined that the AT&M Entity was not entitled to a separate rate. However, Commerce limited this determination to a finding that "AT&M did not choose its own management autonomously." Second Remand Redetermination at 9 (JA0161). Specifically, Commerce found, "consistent with the Court's analysis," that government control could be passed on through CISRI, that CISRI influenced the selection of AT&M's management through its board members, and that AT&M's President and Vice Chairman was the Chairman of BGY. Id. at 8-9 (JA0160-61). Commerce did not determine that CISRI is part of the government of China, and made no findings on AT&M's actual control over the export activities of BGY. Notably, Commerce maintained its positions on the effect of relevant Chinese laws, its *de jure* control analysis, and its analysis of the other *de facto* control criteria. Commerce determined that the surrogate value issue was moot and did not address it further.

The CIT affirmed Commerce's second remand redetermination in AT&M III. Despite evidence of the AT&M Entity's de minimis dumping margin based on

verified record evidence, this result relegated the AT&M Entity to the country-wide pool subject to a punitive adverse facts available ("AFA") rate of 164.09%. See Final Determination, 71 Fed. Reg. at 29,309 (JA0118). This appeal was timely filed.

## SUMMARY OF THE ARGUMENT

The CIT misapplied the applicable standard of review and improperly substituted its judgment for that of Commerce. Commerce thoroughly evaluated a complete record of verified evidence and concluded that the AT&M Entity was entitled to a separate rate. Since the separate rate test is not required by statute or regulation, and was instead developed entirely through agency practice, its application is due especially broad deference by the courts. Yet the CIT failed to grant such deference to Commerce's separate rate decision. Rather, the CIT rejected Commerce's analytical framework and long-standing practice, and reweighed the evidence in favor of its preferred interpretations. The CIT's judgment should be reversed for this error.

Over the past two decades, Commerce has developed and imposed an established practice in making separate rate determinations. In particular, it has implemented a consistent policy with respect to three aspects of the methodology: (1) the separate rate test focuses on the exporter at the individual firm level; (2) government-ownership in the exporter is not dispositive of government control;

and (3) the application of certain Chinese laws, including the Company Law, is

sufficient to establish an absence of *de jure* control. Commerce applied these long-

standing policies in this case and determined that the AT&M Entity was eligible

for a separate rate because BGY established an absence of government control.

This decision was supported by copious, verified evidence. In particular,

Commerce found that any theoretical control by SASAC over CISRI did not result

in either *de jure* or *de facto* control by the Chinese government over the export

activities of BGY three levels down the corporate chain. Nor did Commerce find

Chinese government control over American-owned GYDP or Cliff, its affiliated

exporter.

However, the CIT rejected Commerce's decision, by including its own

separate rate criteria and analysis of the evidence. The CIT disregarded the

agency's long-standing practices, either explicitly or by effectively requiring

Commerce to change them. The trade court consistently failed to accord

Commerce the broad deference owed to decisions of an expert agency. It

reweighed the same evidence carefully considered by Commerce and simply

substituted its preferred interpretations and factual conclusions. Contrary to

Commerce policy and practice, the CIT mandated an arbitrary top-down review of

BGY's ownership chain and speculated that there may be government control

based on indirect government ownership. In doing so, the CIT ignored a complete

record supporting the AT&M Entity's near-de minimis dumping margin (revised to de minimis in the first remand redetermination) and relegated the cooperative company to the country-wide, punitive rate of 164.09%.

Commerce's original separate rate determination was supported by substantial evidence. By misapplying the standard of review and forcing Commerce to reverse its decision, the CIT committed legal error. Accordingly, the judgment of the CIT should be reversed and Commerce's original separate rate determination reinstated.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court "review{s} decisions of the trade court without deference, applying the same substantial evidence standard of review that the trade court itself applies in reviewing Commerce's determinations." AMS Assocs., Inc. v. United States, 737 F.3d 1338, 1338 (Fed. Cir. 2013). This Court "will uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law." Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008); 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB,

340 U.S. 474, 477 (1951).  Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966); Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001).

Furthermore, "{i}t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."  Timken Co. v. United States, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988), aff'd 894 F.2d 385 (Fed. Cir. 1990). Rather, when Congress has entrusted an agency to administer a statute in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  INS v. Elias- Zacarias, 502 U.S. 478, 483-84 (2002).  "A party challenging {an agency's} determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'"  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006), quoting Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

This Court also reviews the CIT's substantial evidence decisions without deference to the trade court.  See NSK Corp. v. U.S. Int'l Trade Comm'n, 2013 U.S. App. LEXIS 21715 at 4 (Fed. Cir. Oct. 25, 2013) (concurring in denial of

petition for rehearing en banc), citing Rio Grande, El Paso and Santa Fe R. Co. v. Dep't of Energy, 234 F.3d 1, 6 (Fed. Cir. 2000) ("Because we review the agency action on the identical basis as did the district court, no particular deference is accorded to the conclusions of the district court.").

In particular, courts owe Commerce maximum deference regarding its separate rate methodology because the established test is not required by statute or regulation. Rather, its practice of granting separate rates (and the specific criteria applied) were developed through agency practice and later formalized in a policy bulletin. In the absence of clear statutory language, Commerce decisions are due broad deference under Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-45 (1984). See PSC VSMPO–AVISMA Corp. v. United States, 688 F.3d 751, 764 (Fed. Cir. 2012) (in the absence of statutory requirements, this Court defers to Commerce's "reasonable interpretation of the statutes and regulations it administers."); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering the anti-dumping law."). Regarding deference to Commerce policies developed organically to administer the antidumping statute, rather than mandated by statute or regulation, this Court has stated:

> This deference is both greater than and distinct from that accorded the
> agency in interpreting the statutes it administers, because it is based

on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.

Id. In such cases, courts "will not question Commerce's methodology '{a}s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose.'" Marsan Gida Sanayi Ve Ticaret A.S. v. United States, CIT Slip Op. 2011-20 at 17 (Ct. Int'l Trade Feb. 16, 2011), quoting Hangzhou Spring Washer Co., Ltd. v. United States, 387 F. Supp. 2d 1236, 1240 (Ct. Int'l Trade 2005).

This Court has stated that that Commerce's methodologies are "presumptively correct." Thai Pineapple Pub. Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999). Since Commerce is the "master of antidumping law," "reviewing courts must accord deference to the agency in its selection and development of proper methodologies." Id. "Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994).

Finally, deference to Commerce's separate rate determination is further strengthened because it was made in accordance with a formal agency practice. Commerce's separate rate methodology, embodied in Policy Bulletin 05.1, was issued pursuant to public notice-and-comment. See Separate Rates Practice in

Antidumping Proceedings Involving Non-Market Economy Countries, 69 Fed.

Reg. 24,119 (Dep't Commerce May 3, 2004); Separate-Rates Practice in

Antidumping Proceedings Involving Non-Market Economy Countries, 69 Fed.

Reg. 56,188 (Dep't Commerce Sept. 20, 2004). "The Supreme Court

unequivocally held in *United States v. Mead Corp.* . . . that an agency's statutory

interpretation 'qualifies for *Chevron* deference' if the interpretation is the result of

the agency's formal notice-and-comment rulemaking process." Wheatland Tube

Co. v. United States, 495 F.3d 1355, 1360 (Fed. Cir. 2007).

## II.  COMMERCE'S SEPARATE RATE DETERMINATION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE, AND THE TRADE COURT REJECTED IT BASED ON A MISAPPLICATION OF THE STANDARD OF REVIEW

Commerce's original separate rate determination – supplemented by its first

remand redetermination – was supported by substantial evidence, and should be

sustained based on the proper standard of review and level of deference. It

properly analyzed the criteria for *de jure* and *de facto* independence from the

Chinese government, and reasonably concluded that the AT&M Entity was entitled

to a separate rate based on the verified evidence in the record of such independence

with respect to its export activities.

The CIT misapplied the applicable standard of review in its decisions below,

and its judgment should be reversed for this patent error. The trade court

consistently and blatantly failed to accord Commerce the broad deference owed to

decisions of an expert agency, and substituted its own conclusions for those of Commerce. Commerce provided more than substantial evidence to support its separate rate determination. The evidence was copious, complete, and verified. The CIT just refused to accept the weight given to that evidence by Commerce, the expert fact-finder.

## A. The Trade Court Impermissibly Substituted Its Judgment for That of Commerce

The separate rate analysis is entirely within Commerce's discretion. The concept of separate rates does not appear anywhere in the antidumping statute or regulations. It was wholly developed through Commerce practice and policy. As such, it is the sort of decision to which courts owe maximum deference – i.e., deference this Court has considered "both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise." Fujitsu Gen., 88 F.3d at 1039. The CIT has further explained this level of deference regarding the successor-in-interest analysis, which also "was not explicitly created by statute or by regulation, but is an agency practice designed to facilitate the proper implementation of the {trade} laws." Marsan Gida Sanayi Ve Ticaret A.S., CIT Slip Op. 2011-20 at 17, quoting East Sea Seafoods, LLC v. United States, 703 F. Supp. 2d 1336, 1352 (Ct. Int'l Trade 2010). "Thus, the successor-in-interest analysis is precisely the type of methodology Commerce is tasked with identifying and applying and the Court

24

must not direct Commerce on how to create that methodology. Rather, the Court must defer to Commerce's methodology if it is reasonable." Id.

In this case, however, the CIT impermissibly directed Commerce how to make its separate rate determination, failing to defer to Commerce's well-settled methodology and supported reasoning. Time and again, the CIT second-guessed Commerce's methodologies and rejected the agency's conclusions, substituting its own based on the same evidence. This clearly violates the standard of review.

In a recent case involving the U.S. International Trade Commission, another expert agency, this Court stated: "Under the substantial evidence standard, when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the {agency}." NSK Corp. v. U.S. Int'l Trade Comm'n, 716 F.3d 1352, 1366 (Fed. Cir. 2013), quoting Nippon Steel Corp., 458 F.3d at 1358. "'It is the Commission's task to evaluate the evidence it collects during its investigation,'" and decisions "'such as the weight to be assigned to a particular piece of evidence, lie at the core of that evaluative process.'" Id., quoting Nippon Steel Corp., 458 F.3d at 1350. A court "must not substitute its own judgment for that of the agency even if the court might have preferred another interpretation and even if the agency's interpretation is not the only reasonable one." Wheatland Tube Co. v. United States, 495 F.3d 1355, 1360-61 (Fed. Cir. 2007).

Here, the CIT disregarded the reasonable results of Commerce's evaluative process in favor of evidentiary interpretations that it preferred. It went so far as to state that it "simply seeks to discern the reasonableness of a determination, *and the wisdom to do so*." AT&M II, Slip Op. 2012-147 at 32 (emphasis added) (JA0068). Yet "{t}he court's duty is not to weigh the wisdom of Commerce's legitimate policy choices." Suramerica de Aleaciones Laminadas, CA. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992). The trade court impermissibly disregarded the expert agency's policy choices, leaving Commerce with no option but to reverse its separate rate decision in the second remand redetermination. In fact, the CIT's second remand order even [

]. The trade court seemed to understand its overreach, prompting it to sprinkle its opinions with defensive statements to the contrary:

- "As to what that implies for purposes of remand, no opinion is here expressed, except that the court emphasizes it is not here substituting judgment for that of Commerce on these issues or insisting upon application of the separate rates test in a certain way in contravention of *Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S. Ct. 1046, 117 L. Ed. 2d 239 (1992)." AT&M II, Slip Op. 2012-147 at 32 (JA0068).

- "Unlike *Viraj Group*, however, and as further discussed below, this matter does not involve 'a contrary position forced upon it by the court.'" AT&M III, 938 F. Supp. 2d at 1344 n.2, quoting Viraj Group, Ltd. v. United States, 343 F.3d 1371 (Fed. Cir. 2003) (JA0002).

- "The court only stated that the First Remand Redetermination could not be sustained as articulated; it expressed no opinion whatsoever on the 'weight' the Interim Regulations should be given in the broader *de jure* and *de facto*

26

analysis. With respect to 'control over export activities,' the opinion merely drew attention to those provisions that facially appeared to have some bearing on that analysis in order to elicit from Commerce further clarification and/or re-analysis on remand. On remand, Commerce was entirely free to explain any analytical error in the opinion or clarify its own earlier analyses in order to aid the court's understanding." Id. at 1345-46 (JA0003-4).

- "Consistent with the standard of review on these administrative determinations, such an observation by the court is properly construed as dicta, not a 'holding' or *ratio decidendi*. More precisely, the opinion only attempted circumspect examination of whether the substantial evidence of record supported Commerce's conclusions on the Interim Regulations through juxtaposition of them against the undiscussed and seemingly contradictory evidence of record." Id. at 1346-47 (JA0004).

The CIT doth protest too much.

While the CIT may have second-guessed Commerce's interpretation of the record evidence discussed below, that does not detract from the reasonableness of Commerce's determination. See Consolo, 383 U.S. at 620 ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (agency decision may be affirmed if "it is reasonable and supported by the record as a whole, even if some evidence detracts from the {agency's} conclusion").

## B. BGY Established the Absence of *De Jure* Government Control

### 1. Commerce's *De Jure* Analysis Was Supported by Substantive Evidence

Commerce considers the following criteria in determining the absence of *de jure* government control over a respondent's export activities: "1) an absence of

restrictive stipulations associated with an individual exporter's business and export licenses; 2) any legislative enactments decentralizing control of companies; and 3) any other formal measures by the government decentralizing control of companies." Policy Bulletin 05.1; <u>Silicon Carbide from the People's Republic of China</u>, 59 Fed. Reg. at 22,587.

In this case, Commerce examined these factors and the detailed evidence provided by BGY and AT&M. It "conducted a detailed verification of the operational management and control of the AT&M single entity, including an examination of the AT&M single entity's companies' respective business licenses, export licenses, the Securities Law of the PRC, the Company Law of the PRC, and the Code of Corporate Governance, and found no evidence of any legislative or other restrictions on any of the export activities of the AT&M single entity." Decision Mem. at 58 (JA0123). In particular, Commerce "has consistently found an absence of *de jure* control when a company's operations were governed by the Company Law of the PRC, and when it supplied business licenses and export licenses, each of which have been found to demonstrate an absence of restrictive stipulations and decentralization of control of the company." <u>Id.</u>, citing <u>Honey From the People's Republic of China</u>, 69 Fed. Reg. 77,184, 77,186-87 (Dep't Commerce Dec. 27, 2004) (prelim.), <u>unchanged in final results</u>, 70 Fed. Reg. 38,873 (Dep't Commerce July 6, 2005); <u>see also</u> First Remand Redetermination at

4 & n. 18 (listing, e.g., six cases in which the Company Law, Code of Corporate Governance, and similar laws "have previously been accepted as evidence of *de jure* government control") (JA0128).

Commerce thoroughly verified BGY's evidence of absence of *de jure* government control. It examined the original business licenses and certificates of approval from BGY, AT&M, and HXF. It examined the effect of relevant Chinese laws. The companies are subject to the Company Law, which "require the separation of ownership and operational management, and the establishment of fiduciary responsibilities." BGY Verification Report at 8 (JA0233). AT&M is also subject to the Securities Law, which "requires companies to protect shareholder interests . . . to prevent public companies from being controlled by the majority shareholder. Further, officials noted that AT&M is required to maintain a separation between the majority stockholder and the management of the business." Id. Commerce verified that "BGY has no relationship with any government entity." Id. at 9 (JA0234).

The DSMC's argument on *de jure* control is entirely focused on SASAC's Interim Regulations, which concern its supervision of state-owned enterprises such as CISRI. While no party contests that CISRI is a state-owned enterprise, its ownership or oversight by SASAC has never been considered control in the separate rate analysis. See Synthetic Indigo from the People's Republic of China,

65 Fed. Reg. 25,706 (Dep't Commerce May 3, 2000) (Commerce "does not

consider state-owned enterprise ownership as one of the criteria for determining

eligibility for separate rates").  Yet the DSMC claims that the Interim Regulations

show SASAC's control over the conduct of CISRI, which somehow translates to

control over the export activities of BGY, two levels down the corporate chain, and

U.S. sales by GYDP, still another level down the corporate chain.  Commerce

evaluated the Interim Regulations, and reasonably found them not to be probative.

"The information submitted by Petitioner addresses a theoretical control by

SASAC over CISRI, rather than any control of the PRC government at any level

over the numerous individual export decisions of the AT&M single entity that took

place during the POI."  Decision Mem. at 58 (JA0123).

Commerce went further in its First Remand Redetermination, evaluating the

various provisions of the Interim Regulations.  "{A}fter considering the entirety of

the Interim Regulations . . ., the Department determines that the Interim

Regulations continue to allow state-owned enterprises to operate with autonomy

over their business operations."  First Remand Redetermination at 22 (JA0146).

This conclusion is consistent with Commerce's practice, which continues to find,

many years after the Interim Regulations were issued, that they do not serve to

recentralize control of companies owned by SASAC.  See Utility Scale Wind

Towers From the People's Republic of China, 77 Fed. Reg. 75,992, Decision

Mem. at cmt. 6 (Dep't Commerce Dec. 26, 2012) ("The Department has found that the Interim Regulations provide for a separation of government functions from enterprise management and affirm the operational autonomy of companies operating under SASAC."); <u>Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China</u>, 71 Fed. Reg. 54,269, Decision Mem. at cmt. 3 (Dep't Commerce Sept. 14, 2006) (rejecting allegation that the Interim Regulations "undermine the independence of {state-owned enterprises} under the Company Law of the PRC").

Notwithstanding the Interim Regulations, and due to the protections of the Company Law, "CISRI is free to enjoy its rights as a shareholder of ATM and conduct its business relations with the ATM Entity without control or interference from the PRC government." First Remand Redetermination at 22 (JA0146). Commerce's reasoned explanation, supported by consistent agency practice, that the relevant Chinese laws taken together do not indicate government control over BGY's export activities, is supported by substantial evidence.

For over two decades, Commerce has consistently found that the Company Law demonstrates an absence of *de jure* control. Here again, Commerce evaluated the various provisions of the Company Law and came to the same conclusion:

> Moreover, the Department finds that the Company Law institutes a company structure in which daily business operations, selection of management, and distribution of profits are not under the control of the shareholders, but rather are decided upon by the Board of

31

> Directors and the General Manager as dictated by the law. Therefore, in this case, although CISRI may be a majority shareholder in ATM, the Department finds that the Company Law ensures the rights of all shareholders, protects the autonomy of ATM as an independent company, and creates a barrier between the shareholder, including CISRI, and the decisions governing day-to-day business operations.

First Remand Redetermination at 24 (JA0148).

Commerce's analysis of the Code of Corporate Governance provides additional support for its finding that BGY operates without *de jure* control despite CISRI's indirect stake in the company. See id. Commerce found that the Code protects the rights of minority shareholders, limits the powers of majority shareholders, and reinforces the independence of public companies from their controlling shareholders. In particular, "majority shareholders must consult with all shareholders to appoint senior management and are forbidden from hindering day-to-day decisions and business activities." Id. "Thus, the Code ensures that CISRI's role in ATM is necessarily limited and that the other shareholders hold a voice and the right to vote over issues affecting the company." Id.

Finally, Commerce found that CISRI is managed as a company "owned by all the people," in accordance with its Articles of Association. Commerce "has had a long-standing practice of upholding the decision that 'owned by all the people' indicates that the PRC government has developed its control over the company to the employees and that the respondent is eligible for a separate rate as long as it

can demonstrate an absence of *de jure* and *de facto* control." First Remand Redetermination at 5 (JA0129). In line with this long-standing practice, Commerce found that "because the PRC government has devolved its control of CISRI to the employees, it cannot pass on such control through CISRI's majority shareholder ownership of ATM." Id. Therefore, CISRI's management structure itself further supports Commerce's finding of the BGY's *de jure* independence from the Chinese government.

### 2. The CIT Reweighed the Evidence of Absence of *De Jure* Control

The CIT simply disagreed with Commerce's weighing of this evidence and refused to accept Commerce's expert conclusions regarding the absence of *de jure* control over BGY's export activities. We note that prior to this case, no court had ever so much as questioned Commerce's policy and practice regarding the effect of these Chinese laws on the separate rate test.

Regarding the Company Law, the CIT second-guessed Commerce's well-settled policy that the application of such law indicates an absence of *de jure* control over a public company. "{T}he court remains unclear why Commerce has concluded, in effect, that the Company Law restricts the PRC Government from implementation of its own Interim Regulations and from becoming a company's controlling shareholder and acting in furtherance of such control of the company." AT&M II, Slip Op. 2012-147 at 17 (JA0053). The CIT deemed Commerce's

interpretation of Article 17 of the Company Law to be "a misreading." <u>Id.</u> at 12

n.7 (JA0048). "The court also fails to understand from the evidence of record that

AT&M's articles of association, the Code, and the Company Law create legal

'barriers' separating AT&M and CISRI as concluded by Commerce." <u>Id.</u> at 21

(JA0057).

Similarly, regarding the effect of the Code, the CIT substituted its

conclusions for those of Commerce. "The court fails to understand how

Commerce interprets these provisions to curtail in any manner a controlling

shareholder's *de jure* control of a company." <u>Id.</u> at 19 (JA0055). "{I}t is unclear

how Commerce reads Article 20 as effectively limiting the controlling

shareholder's powers when, for example, the controlling shareholder could simply

call a shareholders meeting to comply with relevant provision(s)." <u>Id.</u>

Perhaps mostly importantly for this case, the CIT failed to defer to

Commerce's reasoned analysis of the Interim Regulations. The CIT rejected

Commerce's entire interpretation of the Interim Regulations, and its second

remand order included pointed (and leading) questions on them, including why

Commerce did not consider the Interim Regulations [

] Confidential Order at 2 (JA0075).

The trade court also stated that Commerce's position that SASAC's promulgation of the Interim Regulations did not alter CISRI's corporate form "does not make sense." AT&M II, Slip Op. 2012-147 at 8 (JA0044). "The court fails to discern from the record why {Commerce's interpretation of the Interim Regulations} is the case, as various provisions among the Interim Regulations directly conflict with these observations. The latter reasoning also rests on a slippery slope." Id. at 10 (JA0046). The Court stated outright that "Commerce's analytical assumptions are not based on common or business sense . . . ." Id. at 13 (JA0049). It attacked "Commerce's interpretation of the Interim Regulations" as "prevent{ing} it from acknowledging a *de jure* prospect of 'governmental control' of AT&M or determining the full *de facto* actuality of CISRI's and AT&M's management . . . ." Id.

Finally, the CIT rejected as "faulty logic" Commerce's "long standing" position with respect to "owned by all the people" companies "that the PRC Government has 'devolved' control to them." Id. at 9 (JA0045). Contrary to decades of Commerce practice, the CIT decided that "logic would seem to dictate that when the PRC government is the majority shareholder, much of the governmental control that supposedly 'devolved' by virtue of the Company Law was actually re-allocated (if it ever left) to the government by virtue of

shareholding on behalf of 'all of the people.'"  AT&M I, Slip Op. 2011-122 at 18 (JA0027).

It simply is not the CIT's role to re-evaluate evidence that has long been considered and verified by Commerce.

**C.    BGY Established the Absence of *De Facto* Government Control**

**1.    Commerce's *De Facto* Analysis Was Supported by Substantial Evidence**

Commerce considers the following criteria in determining the absence of *de facto* government control over a respondent's export activities:  "1) whether the export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses."  Policy Bulletin 05.1; Silicon Carbide from the People's Republic of China, 59 Fed. Reg. at 22,586-87.

BGY established that it satisfies all of these criteria.  See Decision Mem. at 58 ("The Department found no evidence at verification that the PRC government exercised any control over the daily operations of BGY, nor any indication in BGY's corporate documents that the PRC government has the authority to exert

36

any such control.") (JA0123); Separate Rate Memorandum (Dec. 20, 2005) at 5 (JA0180).

First, BGY certified that its export prices are neither set by nor subject to the approval of a government agency. See BGY Section A Response at 9 (JA0183). It also submitted evidence that the company independently negotiates prices, including original price lists and the cost breakdowns used to create those price lists. Commerce verified this evidence, including the BGY's standard price list, which is revised each year based on production cost projections. Commerce also verified that BGY's pricing is not subject to influence by outside entities. See BGY Verification Report at 10 (JA0235). In fact, [      ]% of BGY's U.S. sales are CEP sales, for which GYDP – owned and controlled by a U.S. citizen – sets the U.S. sales price. See BGY Supplemental Section A Response at 7, Exh. SA-1 (JA0198, 0201).

Second, BGY presented evidence showing the absence of government control over its negotiation and signing of contracts, including documentation of price negotiations on U.S. sales and purchases of raw materials. See BGY Supplemental Section A Response at Exh. SA-7 (JA0211-217). Commerce verified BGY's sales process, including the fact that its General Manager, Mr. Chen, makes all final decisions on new contracts. See BGY Verification Report at 10 (JA0235). CEP sales contracts, in turn, are independently negotiated and signed

by U.S. citizens at GYDP.  See BGY Supplemental Section A Response at 13 (JA0199).

Third, BGY and AT&M presented evidence that they independently select their own management and boards of directors, including appointment letters and board resolutions.  See BGY Section A Response at Exhs. A-8 and A-9 (JA0187-90); BGY Supplemental Section A Response at Exh. SA-6 (JA0207-209).  Commerce verified this evidence, including the fact that BGY's President is selected by the Board of Directors and all management positions are set forth by the President and General Manager and then approved by the board.  See BGY Verification Report at 11(citing business plans, R&D projections, production and expansion targets, and board meeting minutes demonstrating independent selection of management) (JA0236).  Commerce also verified that AT&M's management is approved by its Board of Directors, as shown in board meeting minutes, and that it is not required to submit any financial statements or reports to any government entity.  See id.

Fourth, BGY provided financial statements and board resolutions demonstrating the independent distribution of profit by BGY and AT&M.  See BGY Supplemental Section A Response at Exhs. SA-5 and SA-8 (JA0203-205, JA0219-223).  Commerce verified original payment documents showing a transfer of U.S. dollar receipts to BGY's bank account and the conversion to Chinese

currency, which tied to the corresponding bank ledger. See BGY Verification Report at 11 (JA0236).

Despite this verified evidence, the DSMC argues that state-owned CISRI's ownership stake in AT&M results in *de facto* government control over AT&M's selection of its management. Commerce considered this argument, but found that it did not overcome the evidence of BGY's independence from government control over its export activities. While four members of AT&M nine-member board were CISRI representatives, "these four individuals are a minority on the board of directors, of which two other members are representatives of AT&M, and three additional members are independently appointed by the stock exchange committee." Decision Mem. at 59 (JA0124), citing BGY Verification Report at 9.

Commerce further evaluated this issue in its First Remand Determination, and provided substantial evidence for its conclusion that the Chinese government did not exercise control over BGY's export activities through the shareholder ownership chain involving CISRI and SASAC. To begin with, as described above, Commerce found that CISRI – as a company "owned by all the people" – cannot pass on government control to AT&M through its stock ownership. See First Remand Redetermination at 5 (JA0129). Commerce also described past cases in which companies were eligible for separate rates despite Chinese government ownership up the corporate chain. See, e.g., Structural Steel Beams From the

People's Republic of China, 66 Fed. Reg. 67,197, 67,199 (Dep't Commerce Dec. 28, 2001) (prelim.), unchanged in final determination, 67 Fed. Reg. 35,479 (Dep't Commerce May 20, 2002) (granting separate rate to exporter that was 63% owned by a holding company that in turn was wholly-owned by a provincial government because it "demonstrated an absence of de jure control and without specific evidence pointing to de facto control"); Foundry Coke From the People's Republic of China, 66 Fed Reg. 13,885, 13,886-87 (Dep't Commerce Mar. 8, 2001) (prelim.), unchanged in final determination, 66 Fed. Reg. 39,487 (Dep't Commerce July 30, 2001) (granting separate rate to exporters majority-owned by companies that are in turn owned by the government, and an exporter majority-owned by a provincial government agency).

Similarly, in this case, there was no evidence that the Chinese government exercised de facto control over BGY's export activities through CISRI's ownership stake in AT&M. The DSMC argued that the government controlled the selection of management and distribution of profits, relying on CISRI's part ownership of AT&M (minority ownership by the end of the POI) and its representation on AT&M's board.[4] Yet the evidence did not bear out this argument. Regarding the

---

[4] The DSMC's arguments for de jure and de facto control are essentially the same – i.e., that government control passes through CISRI to AT&M because the Interim Regulations re-centralized control of SASAC-owned companies. The contentions above are really de jure arguments under a de facto guise. If there is no de jure control because AT&M's management is legally separated from its

selection of management, Commerce cited the verified evidence discussed above. While AT&M's board selects its general management and CISRI has the option to nominate candidates for AT&M's board, "the votes of the remaining shareholders can veto the appointment of the candidate should they so chose {sic}." First Remand Redetermination at 8 (JA0132), <u>citing</u> BGY Supplemental Section A Response at Exh. SA-10. Commerce also examined AT&M's minority shareholder rights and the independence of its management and board of directors. "Thus, the Department finds that several barriers existed between AT&M's majority shareholder, CISRI, and the management of day-to-day operations governing exports. <u>Id.</u> at 20 (JA0144).

Moreover, it is important to clarify a factual error on the record, due to an inaccurate translation. Under AT&M's Articles of Association, CISRI is not the only shareholder able to nominate directors. In fact, any shareholder with at least 10% ownership (on an individual or combined basis) may nominate directors of AT&M.

Regarding the distribution of profits, Commerce cited financial statements showing the lack of government control over AT&M's cash flow and profit allocation, as well as AT&M board meeting minutes in which the distribution of

---

ownership (as Commerce found even in the second remand redetermination), then it is not possible for the Chinese government to exercise *de facto* control over AT&M's selection of management.

profits was discussed and voted upon.  See id. at 8 (JA0132), citing BGY

Supplemental Section A Response at Exh. SA-5, SA-22.

In fact, in several instances, Commerce has awarded separate rates to

respondents indirectly owned in part by SASAC.  See Utility Scale Wind Towers

From the People's Republic of China, 77 Fed. Reg. 75,992, Decision Mem. at cmt.

6 (despite intertwined boards and management of the respondent and SASAC-

owned enterprise, the evidence was inadequate "to base a finding that CXS's

export activities are controlled by the government because ownership and/or

theoretical control by the government is not sufficient to deny a separate rate");

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,

from the People's Republic of China, 77 Fed. Reg. 63,791, Decision Mem. at cmt.

6.A (Dep't Commerce Oct. 17, 2012) ("While Chinese law may provide SASAC a

role with overseeing the overall regulation, development and structure of a state-

owned sector, and also provide SASAC with the rights of an investor, there is

nothing on the record to indicate that SASAC's reach extended as a matter of law

to such day-to-day activities as export pricing of the companies in question.");

Certain Circular Welded Carbon Quality Steel Line Pipe from the People's

Republic of China, 74 Fed. Reg. 14,514, Decision Mem. at cmt. 11 (Dep't

Commerce March 31, 2009) ("Petitioners have not provided evidence on the

record of actual government control of individual export decisions of Pangang

42

Beihai during the POI, or evidence demonstrating that SASAC actually controlled the selection of Pangang Beihai's management."); <u>Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China</u>, 75 Fed. Reg. 8,301, Decision Mem. at cmt. 1 (Dep't Commerce Feb. 24, 2010); <u>Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China</u>, 71 Fed. Reg. 54,269, Decision Mem. at cmt. 3 ("The information submitted by the Petitioner addresses only potential control by SASAC over {state-owned enterprises}, rather than any actual control of the PRC government over the numerous individual export decisions of TMC and SMC that took place during the POR.").

After a thorough evaluation of verified evidence, Commerce came to the well-supported conclusion that SASAC's indirect attenuated ownership stake in AT&M does not result in *de facto* government control over the export activities of BGY, three levels down the corporate chain, or GYDP. As a result, even a theoretical potential for government control here does not translate into control in practice.

### 2. The CIT Reweighed the Evidence of Absence of *De Facto* Control

Again, the CIT reweighed this evidence and second-guessed Commerce's expert conclusions regarding the absence of *de facto* control over BGY's export activities. On one of the main issues in this case, the CIT stated outright that it

**Confidential Material Deleted**

disagreed with Commerce's evaluation of the evidence: "Can a subsidiary show independence from a majority shareholder on matters concerning management selection and the disposition of profits and assets? Evidence in this matter would seem to compel an answer in the negative." <u>AT&M I</u>, Slip Op. 2011-122 at 24 (JA0033).

The CIT also stated that "{t}he record excerpts provided by the parties, however, do not evince information that would permit construal" of whether Commerce was correct that five AT&M directors were not "'involved in CISRI's business functions in any way.'" <u>AT&M II</u>, Slip Op. 2012-147 at 23 (JA0059). The trade court did not beat around the bush in its rejection of Commerce's expert analysis supported by verified evidence: "Commerce concludes there is no degree of 'control' or influence whatsoever by SASAC over CISRI or AT&M or by CISRI over AT&M, and that appears to be based on flawed analysis." <u>Id.</u> at 28 (JA0064).

Its second remand order, which [

], also included pointed questions indicating its rejection of Commerce's expert conclusions. The CIT asked whether [

Confidential Material Deleted

]

Confidential Order at 2 (JA0075). In effect, the CIT disregarded Commerce's analysis and substituted its own judgment of the relevant issues and evidence, as well as its preferred interpretations.

## III. COMMERCE'S SEPARATE RATE DETERMINATION WAS CONSISTENT WITH ITS LONG-STANDING PRACTICE, WHICH THE CIT EFFECTIVELY ALTERED

Commerce's separate rate jurisprudence is well-established by decades of consistent practice. Its original separate rate determination in this case was squarely in line with this practice – both the relevant criteria and analysis thereof. Yet, the CIT did not just reject Commerce's conclusion in this case. It rejected the entire analytical framework. It rejected decades of agency policy, and absent statutory and regulatory limitations, the CIT impermissibly tried to change Commerce's separate rate methodology wholesale.

In particular, Commerce's analysis and conclusion were supported by three fundamental aspects of its separate rate jurisprudence: (1) limitation of the separate rate analysis to the exporting entity; (2) the fact that government ownership is not dispositive of government control; and (3) its long-standing interpretation of certain Chinese laws. Yet the CIT rejected these well-settled parts of Commerce practice, effectively requiring alteration of a formally established policy that is entirely a subject of agency expertise and discretion. The CIT itself

best stated its indifference to Commerce's policy and precedent, contrary to the

proper deferential standard of review:  "Appeal to tradition may simply indicate

ossification, undeserving of deference . . . ."  AT&M II, Slip Op. 2012-147 at 9

(citing cases where statutory authority, which does not exist here, outweighs

administrative practice) (JA0045).

### A.    The CIT Disregarded the Basic Fact that Commerce's Separate Rate Test Focuses on the Exporting Entity

Commerce properly limited its original separate rate analysis to the relevant

exporters – BGY (for diamond sawblades) and HXF (for cores).  The CIT

effectively required Commerce to change this focus from the proper bottom-up

review to a top-down review starting at the ultimate corporate parent.

In its Final Determination, Commerce stated that "{i}t is the Department's

practice to examine controls over the investment, pricing, and output decision-

making process at the individual firm level, and not the activities of its owner or its

owner's parent company."  Decision Mem. at 57 (JA0122).  This is an accurate

statement of Commerce's Policy Bulletin 05.1, which applies the separate rate test

to exporting entities "at the individual firm level."  See e.g., AT&M II, Slip Op.

2012-147 at 8 ("There is no dispute that the focus of the separate rates test here is

the AT&M entity's export operations, that Commerce's test applies only to

exporters, and that CISRI is not an exporter . . . .") (JA0044); Luoyang Bearing

Corp. v. United States, 358 F. Supp. 2d 1296, 1304 (Ct. Int'l Trade 2005) ("The

46

separate rates analysis focuses on the exporter's activities and the exporter's ability to set the United States price for its sales of the subject merchandise.").

It is important to clarify that BGY and HFX were the relevant respondents in this investigation. As the exporters of subject merchandise, BGY and HXF were also the proper subjects of Commerce's separate rate determination. Neither AT&M, CISRI, nor SASAC exported subject merchandise during the POI. See Decision Mem. at 59 (JA0124). Commerce collapsed BGY with AT&M and HXF for purposes of applying a single antidumping cash deposit rate (due to their affiliation), and referred to the companies collectively as the "AT&M Entity." Yet, Commerce and the courts have long recognized the distinction between the separate rate and collapsing tests, as well as the policies behind them:

> The Department has a long-standing methodology for determining whether companies in a nonmarket economy are entitled to a separate rate. That methodology is separate and distinct from the "collapsing'" methodology in both focus and function. On the one hand, the separate rates test focuses specifically on whether there is government control of a nonmarket company's export activities. On the other hand, the "collapsing" methodology focuses on the relationship between two or more affiliated companies, not their relationship vis-a-vis the government or other entities.

Persulfates from the People's Republic of China, 62 Fed. Reg. 27,222, Decision Mem. at cmt. 2; see also Hontex Enters., Inc. v. United States, 248 F. Supp. 2d 1323, 1337 (Ct. Int'l Trade 2003) ("{T}he export activities of two or more NME exporters, even though independent of central government control, may be intertwined by other means such that, as in market economy cases, it is appropriate

47

to treat such exporters as a single entity and to determine a single weighted-average margin for that entity.") (quoting Commerce memo).  While BGY and AT&M were collapsed for purposes of applying a single deposit rate, they may not be considered one and the same for selling or export purposes.

In particular, AT&M itself was not a respondent in this investigation.  In fact, since AT&M is not an exporter or producer of subject merchandise, its inclusion in the collapsed entity is functionally irrelevant in this case.  Only BGY and HXF (the exporters at the "individual firm level") – which happen to be part of the so-called AT&M Entity – were properly the focus of Commerce's separate rate test.  See Decision Mem. at 59 ("Because AT&M is a single entity including BGY and HXF, and BGY and HXF have demonstrated a *de facto* independence from government control, we find that the AT&M single entity has demonstrated a *de facto* independence from government control with respect to its export activities.") (JA0124).

Without due deference to Commerce's long-standing practice, the CIT seemingly rejected Commerce's policy (embodied in Policy Bulletin 05.1) that the separate rate test is targeted at the exporter's activities at the individual firm level.  In its original determination, Commerce stated the truism that an investigation of the "decision-making process at the individual firm level" does not concern the "activities of its owner or its owner's parent company."  Decision Mem. at 57

(JA0122). Illogically, the CIT did not view the "individual firm" limitation as precluding broader review up the corporate chain. It sought to distinguish the "first part of the Department's stated investigational practice, which concerns firm-level decision making" from the "second part, *i.e.*, 'and not the activities of its owner or its owners' parent company.'" AT&M I, Slip Op. 2011-122 at 24-25 (JA003-34). In fact, contrary to consistent Commerce precedent and without citing a single supporting decision, the CIT decided that the separate rate test should *require* broader review of government control up the corporate chain. See id. at 23 (faulting "the Department's refusal to make findings on the parent company") (JA0032). The CIT was "mystified" by Commerce's approach of limiting its government control analysis to the AT&M Entity. Id.

Because Commerce's second remand redetermination was based on the CIT's analysis, it was confused and imprecise regarding the relevant corporate entities. Commerce first stated that "given that CISRI was wholly-owned by SASAC, government control had the potential to pass from SASAC through to the AT&M Entity via CISRI and the question then must necessarily turn to whether this potential is exercised here." Second Remand Redetermination at 8 (JA0160). However, Commerce's conclusion was logically flawed and factually unsupported. It found that "CISRI, which is 100 percent SASAC-owned, exerted influence over the selection of AT&M's management. Thus, the record evidence demonstrates

that AT&M did not choose its management autonomously." Id. at 9 (JA0161). Even if this influence did exist, it only establishes one control relationship, whereas three are needed. Moreover, Commerce needed to evaluate government control over *BGY's* selection of management (as the exporter), not *AT&M's*.

Specifically, CISRI is not the same as the government of China, and BGY is not the same as AT&M or the AT&M Entity. SASAC's ownership of CISRI does not indicate government control over CISRI (see Section III.B, infra). Nor does AT&M's majority ownership of BGY (or an overlapping board member) indicate AT&M's control over BGY's export activities. To establish *de facto* government control in this case, one would have to show that control actually passed from SASAC to CISRI to AT&M to BGY's export activities. The second remand redetermination did not even attempt to do this. It made a case for CISRI's influence over AT&M's selection of management. But AT&M is not the exporter subject to the separate rate analysis. While Commerce mentioned SASAC and BGY briefly, it never tied them to the chain of control.

Although the CIT paid lip service to the fact that only exporting entities are technically subject to the separate rate test, its judgment effectively and impermissibly changed Commerce policy and practice. It required Commerce to evaluate the separate rate criteria from the top of the corporate chain, as opposed to the bottom (i.e., "individual firm level"). In doing so, the CIT changed

Commerce's long established separate rate criteria, essentially requiring
respondents to show independence from government control, beginning at the top
and going down every level of the corporate chain.

### B. The CIT Disregarded Commerce Precedent That Government Ownership Is Not Dispositive of Government Control

While all parties agree in theory that government ownership is not
dispositive under the separate rate test, the CIT's reasoning in this action makes it
impossible in practice to show independence from government control in the case
of state ownership.

Yet, as the CIT itself recognized, "{i}t is now well established that
'government ownership is not dispositive' of government control. . . . Firms that
are wholly owned by the PRC government are not barred, per se, from a separate
rate." AT&M I, Slip Op. 2011-122 at 14-15 (JA0023-24), quoting Qingdao Taifa
Group Co. v. United States, 637 F. Supp. 2d 1231, 1244 (Ct. Int'l Trade 2009); see
also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From
the People's Republic of China; 62 Fed. Reg. 6173, 6175 (Dep't Commerce Feb.
11, 1997) (noting that Commerce has "rejected {its prior} position that state
ownership per se eliminates the possibility of a company gaining a separate rate").
Commerce just recently re-affirmed this position. See De Facto Criteria for
Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market
Economy Countries, 78 Fed. Reg. 40,430, 40,433 (Dep't Commerce July 5, 2013)

("As the Department has stated in the past, we do not believe that ownership by the government, on its own, is sufficient to warrant a determination that the government controls the export activities of a given exporter and/or producer.").

Rather, government-owned firms (even 100% government-owned firms) can still demonstrate an absence of government control. See Foundry Coke From the People's Republic of China, 66 Fed Reg. at 13,886-87 (granting separate rate to exporters majority-owned companies that are in turn owned by the government, and an exporter majority-owned by a provincial government agency); Structural Steel Beams From the People's Republic of China, 66 Fed. Reg. at 67,199 (granting separate rate to exporter that was 63% owned by a holding company that in turn was wholly-owned by a provincial government); Synthetic Indigo from the People's Republic of China, 65 Fed. Reg. at 25,706 (granting separate rate to an exporter minority-owned by a state-owned enterprise, which also appointed five of the exporter's thirteen directors). In fact, as described above, Commerce has granted separate rates to several respondents that are indirectly owned in part by SASAC.

Relying upon its consistent practice, Commerce reasonably determined that SASAC's attenuated ownership stake in BGY was not dispositive, and that BGY had established the absence of *de jure* and *de facto* control. See First Remand Redetermination at 7 ("Thus, this precedent and practice in combination with the

above determination that CISRI is insulated from government control as a company 'owned by all the people,' established that the ATM Entity, as the respondent and the manufacturer and exporter of subject merchandise, is the entity responsible for demonstrating an absence of *de jure* and *de facto* control.") (JA0131).  The CIT noted this long-standing precedent, yet oddly disregarded it – without citing a single contrary decision – because "it is neither explained nor acknowledged as a practice." AT&M I, Slip Op. 2011-122 at 25 (JA0034); see also AT&M II, Slip Op. 2012-147 at 9 n.4 ("The Court here could not previously discern Commerce's parent-subsidiary policy.") (JA0045).

Instead, the CIT rejected Commerce's expert practice as "inconsistent with its recognition, even in this case, that controlling shareholders present a significant potential for manipulation." AT&M I, Slip Op. 2011-122 at 24 (JA0033)).  One can only draw the conclusion that the CIT simply disagreed with Commerce's well-established practice and sought to reverse its implementation in this case, while calling into question its validity in several others. See id. at 26 ("The court, however, cannot decide reasonableness without the Department's full explanation of its practice, which is not evident from this determination (*or any other, for that matter*).") (emphasis added) (JA0025).

Here again, the CIT effectively changed Commerce's policy such that government ownership (at any corporate level) will in fact be dispositive of

government control.  Under the CIT's reasoning, respondents would never be able to show independence from government control in the case of state ownership because shareholders are always involved in appointing board members and boards have influence or control over the selection of management.

Commerce's second remand redetermination – issued under protest and compelled by the CIT's decisions – noted the CIT's position that "CISRI's ownership of AT&M should be considered relevant, despite the Department's long-standing practice of finding that corporate form may insulate a company from government control."  Second Remand Redetermination at 3 (JA0155).  Therefore, it was required to find, "{i}n response to and consistent with the Court's analysis of ownership, . . . that ownership is relevant to the separate rate analysis to the extent that ownership, as well as the degree of ownership, affects *de facto* control." Id.  Moreover, the second remand redetermination went on to find governmental control over AT&M's selection of management, even though CISRI is not part of the Chinese government.

The  CIT's judgment and Commerce's second remand redetermination represent departures from settled Commerce practice that cannot stand in the absence of reasoned explanation, which has not and cannot be provided here.  See Atchison, Topeka & Santa Fe Ry. Co. v Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (noting "the agency's duty to explain its departure from prior norms. . .

.Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.").

### C. The CIT Rejected Commerce's Long-Standing Interpretation of Relevant Chinese Laws

Commerce's original separate determination was consistent with, and strongly influenced by, its decades-long practice of interpreting relevant Chinese laws. In particular, Commerce has long considered that companies governed by the Company Law are independent of *de jure* government control because these laws require management and operation to be insulated from majority ownership control. See Decision Mem. at 58 ("However, we note that the Department has consistently found an absence of *de jure* control when a company's operations were governed by the Company Law of the PRC . . . .") (JA0123): First Remand Redetermination at 4 & n. 18 (listing, e.g., six cases in which the Company Law, Code of Corporate Governance, and similar laws "have previously been accepted as evidence of de jure government control") (JA0128). Prior to this case, these findings have never been questioned by any court.

In addition, as described in Section II.1 supra, Commerce has consistently found that the Interim Regulations do not serve to recentralize control of companies owned by SASAC.

Yet the CIT gave no credence to this well-reasoned and consistent practice and sought to change Commerce policy based on its own evidentiary analysis. The trade court stated that it "fails to understand from the evidence of record that AT&M's articles of association, the Code, and the Company Law create legal 'barriers' separating AT&M and CISRI as concluded by Commerce." AT&M II, Slip Op. 2012-147 at 21 (JA0057); see also Section II.2, supra.

Commerce's criteria for evaluating the absence of *de jure* control include the existence of laws or formal measures decentralizing control of companies. Based on years of experience and many verifications, Commerce considers the Company Law to be one such measure. The CIT's decisions are nothing short of a complete rejection of that policy. The trade court's opinions cannot be read merely to require additional analysis of these laws based on the specific facts of this case. These laws have been in effect for many years without change, and have been applied to stated-owned enterprises several times. The only possible conclusion is that the CIT impermissibly mandated a wholesale revision of Commerce's separate rate methodology to no longer consider the Company Law indicative of an absence of *de jure* control, and to consider the Interim Regulations as recentralizing control.

Commerce's policies and practices in this regard merit enhanced deference because they are so long-standing and consistent. See, e.g., Abbott Labs. v. United

States, 573 F.3d 1327, 1333 (Fed. Cir. 2009) ("{I}t is certainly true that a

longstanding interpretation is entitled to greater deference."); Am. Airlines, Inc. v.

United States, 551 F.3d 1294, 1302 (Fed. Cir. 2008) ("The government is correct

that the reasonableness of an agency interpretation is supported when it has been

consistent over time.").

It may be possible that certain aspects of the Company Law or Interim

Regulations could be interpreted to detract from Commerce's conclusion.

However, this fact does not affect the viability of Commerce' separate rate

determination as a reasonable decision supported by record evidence.  See Altx,

Inc., 370 F.3d at 1121.  Commerce engaged in its evaluative process and the CIT

may not change the agency's policies and conclusions based on its independent

assessment of the evidence.

## CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, the judgment of the CIT should be reversed

and remanded with instructions to enter judgment ordering:

1)  that Commerce's first remand redetermination with respect to its separate

rate analysis be reinstated;

2)  that the determination to grant the AT&M Entity a separate rate be

reinstated; and

3) that the final antidumping margin for the AT&M Entity determined by Commerce in its first remand redetermination be reinstated.

Respectfully submitted,

/s/ Herbert C. Shelley
Herbert C. Shelley
Michael T. Gershberg
Christopher G. Falcone
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, DC 20036
(202) 429-3000

Jeffrey S. Neeley
Stephen W. Brophy
BARNES, RICHARDSON &
COLBURN, LLP
11 Dupont Circle, NW, Suite 500
Washington, DC 20036
(202) 483-0070

Counsel to AT&M

Dated: February 21, 2014

# ADDENDUM



**ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, and GANG YAN DIAMOND PRODUCTS, INC., Plaintiffs, BOSUN TOOLS GROUP CO. LTD, Plaintiff-Intervenor, v. UNITED STATES, Defendant, and DIAMOND SAWBLADES MANUFACTUR-ERS COALITION, WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., and QINGDAO SHINHAN DIAMOND INDUSTRIAL. CO., LTD., Defend-ant-Intervenors.**

**Consol. Court No. 09-00511**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

*938 F. Supp. 2d 1342*; *2013 Ct. Intl. Trade LEXIS 130*; *SLIP OP. 2013-129*; *35 Int'l Env't Rep. (BNA) 2095*

**October 11, 2013, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Advanced Tech. & Materials Co. v. United States, 2013 U.S. App. LEXIS 22869 (Fed. Cir., Nov. 13, 2013)*

**PRIOR HISTORY:** *Advanced Tech. & Materials Co. v. United States, 2013 U.S. App. LEXIS 13506 (Fed. Cir., July 2, 2013)*

**DISPOSITION:** [**1]    Sustaining second remand results of antidumping duty investigation of diamond sawblades and parts thereof from the People's Republic of China.

**CASE SUMMARY:**

**OVERVIEW:** ISSUE: Department of Commerce's finding on the remaining prong of the de facto analysis that plaintiff did not demonstrate autonomy from the Peoples Republic of China (PRC) government in selection of management. HOLDINGS: [1]-While plaintiff strongly disagreed with the Remand Redetermination, the court had previously addressed similar points raised and perceived no reason to alter its prior opinion; [2]-A discussion at issue was based on a lack of evidence of record to rebut the presumption of government control, which was in accordance with the purported separate rate test, and therefore logical; [3]-The analogy to direct U.S. government involvement in U.S. corporations did not persuade that Commerce's presumption of state control in non-market economies could be concluded unreasonable,

[4]-The court was unable to find application of the PRC-wide rate to plaintiff on remand improper.

**OUTCOME:** The court sustained the second results of remand sub nom. Final Results of Redetermination Pursuant to Remand Order: Diamond Sawblades and Parts Thereof from the People's Republic of China.

**LexisNexis(R) Headnotes**

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > General Overview*
[HN1] Whatever their motivation, both the collapsing and separate rate tests obviously overlap on such matters as level(s) of ownership, the extent to which companies are directed by the same employees or board members, and interdependency of intertwined operations such as through involvement in production and pricing decisions or financing, et cetera. Compare *19 C.F.R. § 351.401(f)* with *Sparklers From the People's Republic of China, 56 Fed. Reg. 20588 (May 6, 1991).*

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > General Overview*
[HN2] These are two distinct legal concepts: a separate adverse facts available (AFA) rate applies to a respond-

ent who has received a separate rate but has otherwise failed to cooperate fully whereas the (Peoples Republic of China)-wide rate applies to a respondent who has not received a separate rate.

***Evidence > Inferences & Presumptions > Presumptions > General Overview***
***International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > General Overview***

[HN3] The Department of Commerce's permissible determination that a respondent is part of the (Peoples Republic of China)-wide entity means that inquiring into that respondent's separate sales behavior ceases to be meaningful. As losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control, applying a countrywide adverse facts available (AFA) rate without individualized findings of failure to cooperate is no different from applying such a countrywide AFA rate without individualized corroboration.

**COUNSEL:** Jeffrey S. Neeley, Michael S. Holton and Stephen W. Brophy, Barnes, Richardson & Colburn, of Washington DC, for the plaintiffs.

Melissa M. Devine, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of Counsel on the brief was Nathaniel J. Halvorson, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

Daniel B. Pickard and Maureen E. Thorson, Wiley Rein, LLP, of Washington DC, for defendant-intervenor Diamond Sawblades Manufacturers Coalition.

**JUDGES:** Before: R. Kenton Musgrave, Senior Judge.

**OPINION BY:** R. Kenton Musgrave

**OPINION**

[*1343] Musgrave, Senior Judge: Before the court are the second results of remand ("Second Remand Redetermination" or "RR2") from the U.S. Department of Commerce, International Trade Administration ("Commerce" or "Department") on the investigation into sales from the People's Republic of China ("PRC") of [**2] [*1344] diamond sawblades and parts thereof at less than fair value ("LTFV"). *See* Slip Op. 12-147 (Sep. 30, 2012).[1] The Second Remand Redetermination indicates

it is conducted "under protest"[2] in determining the AT&M entity[3] ineligible for an antidumping duty rate separate from the PRC-wide rate after Commerce found AT&M did not choose its own management autonomously from the PRC state. *RR2* at 20. This redetermination mooted the only other issue remanded for further explanation or reconsideration, *i.e*, surrogate valuation of 30CrMo steel inputs.

> 1    *36 CIT    , 885 F. Supp. 2d 1343. See also Diamond Sawblades and Parts Thereof From the People's Republic of China, 71 Fed. Reg. 29303 (May 22, 2006)* (final LTFV determination) ("*Final Determination*"), *as amended, 71 Fed. Reg. 35864 (June 22, 2006).* The period of investigation ("POI") is October 1, 2004, through March 31, 2005.
> 2    *See, e.g.,* Second Remand Redetermination at 3, n.8, referencing *Viraj Group, Ltd. v. United States, 343 F.3d 1371 (Fed. Cir. 2003).* Unlike *Viraj Group,* however, and as further discussed below, this matter does not involve "a contrary position forced upon it by the court." *See 343 F.3d at 1376*; *see also* DSMC's Comments on Second Remand Redetermination at 17-19.
> 3    The [**3] original respondent was Beijing Gang Yan Diamond Products Company ("BGY"). During the course of the underlying investigation Commerce learned that BGY was affiliated with AT&M, which in turn was part owner of Yichang HXF Circular Saw Industrial Co., Ltd. ("HXF"), another exporter of diamond sawblades. *See* BGY's Supp. Section A QR, dated September 20, 2005. Finding all three companies to be affiliated, Commerce collapsed them to a single "AT&M entity." *See* Memorandum to the File dated Dec. 20, 2005, PDoc 481 ("Collapsing Memorandum").

The defendant and the petitioners-plaintiff, Diamond Sawblades Manufacturers Coalition ("DSMC") argue for sustaining those results, while the three respondents comprising the collapsed "AT&M entity," Advanced Technology & Materials, Co., Ltd. ("AT&M"), BGY, and Gang Yan Diamond Products, Inc., argue for further remand. The Second Remand Redetermination complies with the order of remand and will therefore be sustained.

*I. Background*

Immediate background is here provided, and familiarity with prior proceedings is presumed. The court previously examined the analysis, statements and conclusions of the First Remand Redetermination in the context of the available [**4] information of record and remanded, *inter alia,* the separate rate redetermination for

the AT&M entity. Holding that the redetermination could not be sustained on the bases articulated by Commerce, it appeared to the court that important aspects of the problem had not been considered, and explanations counter to the evidence of record had been offered. *See generally 885 F. Supp. 2d 1343*. Those concerns may be reduced to the following: (1) Commerce's interpretation of "autonomy" in the selection-of-management prong of the separate rates test and its regard of the "ownership" of separate rate applicants for that purpose; (2) Commerce's analysis of the three PRC laws and regulations of record; (3) the factual bases for Commerce's analysis of the AT&M entity; and (4) Commerce's articulation of the separate rate test generally, the relationship between *de jure* and *de facto* analyses, and specific questions arising therefrom as identified in the court's order. Remanding these concerns for reconsideration and clarification, the court concluded as follows:

> As to what that implies for purposes of remand, *no opinion is here expressed*, except that the court emphasizes it is *not here substituting* [**5] *judgment for that of Commerce on these issues or insisting* [*1345] *upon application of the separate rates test in a certain way* in contravention of *Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S. Ct. 1046, 117 L. Ed. 2d 239 (1992)*. The court simply seeks to discern the reasonableness of a determination, and the wisdom to do so. If necessary, upon remand Commerce may re-open the administrative record to gather additional information.

*885 F. Supp. 2d at 1363* (italics added).

II. Second Remand Redetermination

In the Second Remand Redetermination, Commerce's *de facto* analysis concluded that the AT&M entity did not rebut the presumption of state control and is therefore not eligible for a separate rate. *See, e.g., RR2* at 3, n.8 & 13. Commerce first explained that "CISRI held a majority share in AT&M at the outset of the period of investigation" and "given that CISRI was wholly-owned by SASAC, government control had the potential to pass from SASAC through to the AT&M Entity via CISRI" and thus "the question then must necessarily turn to whether this potential is exercised here." *Id.* at 8. Commerce then explained that "CISRI placed four of its senior officials . . . on AT&M's board", that "these four board members were active in the selection [**6] of AT&M's management", and that of "the five AT&M board members that were not CISRI officials, all were

nonetheless nominated by CISRI." *Id.* at 8-9. Commerce addressed the additional evidence regarding AT&M's and BGY's management, *see id.*, and concluded that "record evidence demonstrates that AT&M did not choose its own management autonomously." *Id.* Thus, Commerce determined that the "AT&M Entity is part of the [PRC]-wide entity and does not qualify for a separate rate." *Id.* The result of this determination mooted further consideration of the other issue on remand, the surrogate valuation of 30CrMo steel inputs.

III. *Discussion*

A. Separate Rate Analysis

As prelude, neither DSMC nor AT&M urges further remand based upon Commerce's *de jure* analysis or its decision that the valuation of steel inputs is moot. Further, Commerce did not make any *de facto* findings as to two of the four prongs, namely, whether the export prices are set by or subject to approval by a Chinese government agency or whether AT&M has authority to negotiate and sign contracts. *See generally* Remand Redetermination. As to the prong analyzing whether AT&M retains the proceeds of its export sales and makes independent decisions [**7] regarding disposition of profits or financing of losses, Commerce determined that "[t]he record holds little evidence as to how interrelated finances between AT&M and CISRI influenced export functions." *Id.* at 21. No party contests this finding; the only issue before the court is Commerce's finding on the remaining prong of the *de facto* analysis that AT&M did not demonstrate autonomy from the PRC government in its selection of management.

As further prelude, there are several interpretive nits to which the Second Remand Redetermination's analysis draws attention, which are aside from its findings. For example, in addition to note 2, *supra*, Commerce files disagreement with the "rejection" of its First Remand Redetermination "regarding the full effects of the SA-SAC Interim Regulations (and the weight it should be given) in the broader *de jure* and *de facto* analysis, especially with respect to control over export activities, that comprises the Department's separate rate test and the impact of ownership here, and are conducting the remand under protest". *RR2* at 20 n.47; *see infra*. The court only stated that the First Remand Redetermination could not be sustained as articulated; it expressed [**8] no opinion whatsoever on [*1346] the "weight" the Interim Regulations should be given in the broader *de jure* and *de facto* analysis. With respect to "control over export activities," the opinion merely drew attention to those provisions that facially appeared to have some bearing on that analysis in order to elicit from Commerce further clarification and/or re-analysis on remand. On remand,

Commerce was entirely free to explain any analytical error in the opinion or clarify its own earlier analyses in order to aid the court's understanding.

In addition, under a section entitled "Court's Analysis of Ownership" [*sic*] the Second Remand Redetermination states that the court "began its analysis by observing that CISRI's[ ] ownership of AT&M should be considered relevant despite the Department's long-standing practice of finding that corporate form *may* insulate a company from government control.[ ]" *RR2* at 3 (italics added, footnotes omitted). That does not quite restate the First Remand Determination's actual statement of that practice; the First Remand Determination stated, in essence, that corporate form, *per se*, entirely insulates a company from government control, whereas the prior opinion only [**9] observed (again) that it is "settled" that government ownership alone is not dispositive of control. *See* Slip Op. 11-122 (Oct. 12, 2011) at 14, referencing *Qingdao Taifa Group Co., Ltd. v. United States, 33 CIT 1090, 1100, 637 F. Supp. 2d 1231, 1242 (2009)*. The opinion then observed that "corporate form in and of itself has never been found to 'demonstrate' insulation from governmental control [and been found dispositive on the absence of *de jure* control], or further *de jure* proof of the absence thereof in accordance with the separate rate test would serve no purpose." *885 F. Supp. 2d at 1350*. That is simply a point of logic, not analysis of ownership. The Second Remand Redetermination seems to disclaim the point, but the redetermination also reflects Commerce's own independent findings notwithstanding, *i.e.*, "[i]n response to and consistent with the Court's analysis . . . the Department finds that ownership is relevant to the separate rates analysis to the extent that ownership, as well as the degree of ownership, affects *de facto* control". *RR2* at 3.

The Second Remand Redetermination also states with regard to the PRC Interim Regulations that the court "*held* that the Department incorrectly [**10] treated the implementation of the Interim Regulations as a form-over-substance change in the law" and "failed to recognize that these regulations *were* an 'obvious declaration of re-centralized *de jure* control'" *RR2* at 4 (italics added). This, too, does not quite restate the case. The quoted observation by the court pertains to Interim Regulation Article 11, which provides that SASAC's "invested enterprises shall accept the supervision and administration conducted by the State-owned assets and administration authority according to law", upon which the court merely opined "[t]his *seems* an obvious declaration of *re*-centralized *de jure* control" (italics added in part). *885 F. Supp. 2d at 1351*. But seeming does not make it so -- that is still for Commerce to decide. *See, e.g., RR2* at 17 ("Pursuant to our examination of the Court's opinion and remand order, we found that the

SASAC law creates the potential for control, as opposed to definitively establishing either the absence of *de jure* government control or complete independence over export activities. Recognizing that the *de jure* evidence in this case did not clearly settle the issue of *de jure* control, we further scrutinized the record [**11] evidence to see if it substantiates an absence of *de facto* control. . . ."). Consistent with the standard of review on these administrative determinations, such an observation by the court is properly construed as dicta, not a "holding" or *ratio* [*1347] *decidendi*. More precisely, the opinion only attempted circumspect examination of whether the substantial evidence of record supported Commerce's conclusions on the Interim Regulations [4] through juxtaposition of them against the undiscussed and seemingly contradictory evidence of record. *See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951)*; *see, e.g., Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994)*.

> [4] *E.g.*, Commerce earlier had concluded that "the Interim Regulations do not automatically demonstrate *de jure* control of a state-owned enterprise[,]" and that the Interim Regulations "set[ ] aside particular protections for the autonomy of companies operating under SASAC, showing that SASAC solely provides oversight and is not intended to direct day-to-day business operations" and does not "interfere [in] or influence" the latter. First Remand Redetermination at 20-21.

Further remand at this point, [**12] however, to readdress these and other like points, appears unlikely to impact the results of remand. The court will therefore proceed. *Cf. SKF USA, Inc. v. United States, 30 CIT 1402, 452 F. Supp. 2d 1335 (2006)* (sustaining remand results after striking misconstrued matters), *vacated on other ground, 512 F.3d 1326, 246 Fed. Appx. 692 (Fed. Cir. 2008)*.

AT&M strongly disagrees with the Remand Redetermination as contrary to Commerce's longstanding practice, as logically unexplained, and as unsupported by the facts of record. It argues that it is not a producer or exporter of subject merchandise or a respondent in this case but is a shareholder in companies that produce such merchandise, that Commerce's approach has been to determine whether the exporters (BGY for diamond sawblades and HXF for cores), which are part of the AT&M entity, have independence with regard to their export activities rather than in some general independence from all governmental influence, and that the fact that Commerce has collapsed the companies for the purpose of applying one antidumping deposit rate does not mean that the companies act as one unit in selling subject

938 F. Supp. 2d 1342, *; 2013 Ct. Intl. Trade LEXIS 130, **;
SLIP OP. 2013-129; 35 Int'l Env't Rep. (BNA) 2095

merchandise or in setting prices but rather Commerce has made [**13] the distinction between the collapsing analysis and the separate rates analysis "very clear". AT&M Comments at 2-3, quoting *Persulfates From the People's Republic of China, 62 Fed. Reg. 27222 (May 19, 1997)* (final determination), issues and decision memorandum at cmt. 2 ("The Department has a longstanding methodology for determining whether companies in a nonmarket economy are entitled to a separate rate. That methodology is separate and distinct from the 'collapsing' methodology in both focus and function. On the one hand, the separate rates test focuses specifically on whether there is government control of a nonmarket company's export activities. On the other hand, the 'collapsing' methodology focuses on the relationship between two or more affiliated companies, not their relationship vis-a-vis the government or other entities. There is no basis for applying a 'collapsing' analysis in this case.").

The court has previously addressed similar points and perceives no reason for altering its prior opinion. *See, e.g.*, *885 F. Supp. 2d at 1349* ("There is no dispute that the focus of the separate rates test here is the AT&M entity's export operations, that Commerce's test applies only to [**14] exporters, and that CISRI is not an exporter, but CISRI is still an owner, and even the AT&M entity agrees consideration of that ownership is relevant.") & *1362 n.21* ([HN1] "Whatever their motivation, both [the collapsing and separate rate] tests obviously overlap on such matters as level(s) of ownership, the extent to which companies are directed by the same employees [*1348] or board members, and interdependency of intertwined operations such as through involvement in production and pricing decisions or financing, *et cetera. Cf. 19 C.F.R. § 351.401(f) with Sparklers From the People's Republic of China, 56 Fed. Reg. 20588 (May 6, 1991)* (final LTFV determination)] . . . at 20589 (respondent's argument 'that there is no evidence of *coordination* among the companies on such matters as price setting, market division, and production practices') (italics added)").

Next, AT&M takes issue with Commerce's *de facto* finding of the absence of independence, characterizing it as based solely on the corporate structure of the companies, the appointment of the officers of the companies, and the voting rights of the companies. AT&M contends there is no discussion of any facts showing the PRC government being involved [**15] in making export-related investment, pricing and output decisions of any producer of subject merchandise affiliated with AT&M, or choosing customers in the United States or in any other market, no discussion of what new standard is being applied, if any, to determine government control or lack thereof, and no discussion of what degree of influ-

ence on such decisions would be necessary for there to be *de facto* control, and it identifies two "logical flaws" in the remand redetermination, the first of which, it argues, is that the redetermination "makes the leap" from "may constitute evidence" to "record evidence demonstrates that AT&M did not choose its own management autonomously" and therefore Commerce found "that the AT&M Entity is part of the PRC-wide entity and does not qualify for a separate rate.'" *See* AT&M Comments at 4. AT&M argues Commerce's discussion does not hang together logically, in that certain facts are said to be of a nature that they "may constitute evidence" but are not stated to actually constitute evidence. AT&M asks why, if Commerce had found that the facts "are" evidence rather than being items that "may constitute" evidence, did Commerce find that they are compelling [**16] evidence?

The defendant's response is telling: "Regardless of its use of the word 'may,' Commerce explicitly found that . . . CISRI (a 100-percent state-owned entity) was 'active in the selection of AT&M's management.'" Def's Resp. at 7, quoting *RR2* at 9. The point is that "because AT&M had not shown autonomy in choosing its own management, Commerce found that AT&M had failed to rebut the presumption of state control." *Id.*, referencing *id.*

Next, AT&M contends there is no discussion of why Commerce made the counterfactual finding that CISRI is the equivalent of the PRC government. "If the Department actually is making a determination that entities such as CISRI are the equivalent of the [PRC] government, then it must offer evidence from the record in support of its conclusion" and explain why the "shareholder of the shareholder of the exporter" can be said to be influencing exports within the meaning of the separate rates test. AT&M Comments at 4.

This argument, however, seems to invert the burden of proof on the presumption. The defendant's response is again telling:

. . . AT&M does not actually take issue with the four prongs making up Commerce's separate rates test. *See generally* AT&M [**17] Comments. To the extent AT&M claims that Commerce did not sufficiently address or analyze the three other prongs, as Commerce explained: "the appointment of company officers and senior managers directly relates to one of the explicit *de facto* criteria and *each* of the *de facto* prongs must be satisfied for a company to get a separate rate." [Second] Remand Redetermination [*1349] at 20 (emphasis added). Commerce determined that -- in the context of this Court's previ-

938 F. Supp. 2d 1342, *; 2013 Ct. Intl. Trade LEXIS 130, **;
SLIP OP. 2013-129; 35 Int'l Env't Rep. (BNA) 2095

ous determinations -- the AT&M entity did not satisfy the management prong with respect to independence from the government, and ended its analysis there. *See id.* at 13.

Def's Resp. at 6 (italics in original).

AT&M next calls attention to the Second Remand Redetermination's statement that "[i]n both [*de jure* and *de facto*] analyses, the central question is whether the control is applied (and not just potential), regardless of the mechanism." *RR2* at 14. AT&M posits that "[t]his is precisely correct and summarizes the approach of the Department for many years." AT&M Comments at 5. AT&M then argues "the discussion . . . with regard to CISRI and AT&M makes no logical sense in light of those announced standards of applied control." However, [**18] the court finds the discussion to be based on a lack of evidence of record to rebut the presumption of government control, which is in accordance with the purported separate rate test, and therefore logical. *See* Import Administration Policy Bulletin 05.1 (Apr. 5, 2005).

AT&M further argues that Commerce failed to explain whether the Second Remand Redetermination constitutes a new practice or the application of Commerce's past practice. AT&M Comments at 5-7. It contends that if Commerce cannot explain its policy, then it must abandon it and not apply separate rates here or in other cases. AT&M complains that CISRI is not the company being reviewed for export pricing, BGY is, and that "there is simply no evidence of record, even if CISRI is government controlled, that CISRI is setting prices or otherwise affecting exports for a company two levels down. Indeed, Petitioner does not even attempt to make this argument." *Id.* at 5-6. More broadly:

> The argument with regard to management also fails because it does not link the selection of management to the [PRC] government, but at most, to a company that Petitioner says is owned by the [PRC] government. Petitioner argues that CISRI selects all [**19] management. The Department then stated: "Thus, record evidence demonstrates that AT&M did not choose its own management autonomously. Therefore, we find that the AT&M Entity is part of the PRC-wide entity and does not qualify for a separate rate."

> What does it mean that the company "does not choose its management auton-

omously"? Neither does General Motors or Apple. All shareholder companies such as GM or Apple or AT&M have their management chosen by a board of directors which are elected by the shareholders. In fact, GM has U.S. government ownership. If the Department is stating that if shareholders who are government-owned choose management, then the government *per se* is setting its export prices and policies, then it must explain how it arrives at this conclusion. It also should explain in detail what facts on the record or what policy leads to this conclusion. If not, and if it is continuing its traditional approach where it looks for factual proof of actual influence on prices, then it should say that.

> Even if it is true that CISRI is choosing top management of the publicly traded company, AT&M, how does this translate two levels down to setting the selling prices for diamond sawblades [**20] by BGY to the United States or otherwise influencing exports? How does the Department think this mechanism works? By Petitioner's own argument, CISRI is not the Chinese government, but rather a state-owned company. Thus, even under the Petitioner's theory of the case, a [*1350] shareholder of AT&M is influencing decisions about who is to be the management of the company, not the Chinese government.

*Id.* at 6-7.

The defendant response is again telling: "AT&M overlooks that Commerce addressed this issue in the [Second] Remand Redetermination, and explained that it was not replacing its prior practice but was altering its analysis under protest given this Court's prior remand orders. *See* [Second] Remand Redetermination at 20, n.47 ('we respectfully disagree with the Court . . . and are conducting the remand under protest. In the First Remand Redetermination, we provided a detailed analysis of how our original decision in the *Final Determination* was correct and supported by record evidence, and we maintain that those determinations were appropriate.')." Def's Resp. at 7 (italics removed in part). Notwithstanding such disclaimer, however, the court fails to discern any "altering" in the Second Remand [**21] Redetermination of the separate rate test, as opposed to a straightforward application of it, as the test purports,

based on the administrative record, and as requested. *See* Import Administration Policy Bulletin 05.1 ("whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management"). The court can agree with AT&M that Commerce has not been more forthcoming in offering a fuller explanation its test and policy, but calling for paying proper attention to the process by which corporate management is chosen is rather the point this aspect of the DSMC's claims, and the analogy to direct U.S. government involvement in U.S. corporations does not persuade that Commerce's presumption of state control in NME economies, and its burdening of respondents with demonstrating the absence of such control, can be concluded unreasonable, at least on the basis of that factually distinguishable analogy.

AT&M lastly argues on the separate rate issue that Commerce's determination is based upon a mistranslation regarding minority shareholder voting rights. AT&M Comments at 7-8 (arguing that PRC law does not preclude minority [**22] shareholders from forming a voting block to out-vote CISRI). The court's previous opinion took the record of PRC law [5] into account, *see also, e.g.*, *885 F. Supp. 2d at 1357-58* & n.15, and Commerce addressed the issue in the Second Remand Redetermination by explaining that even if the law permitted such a voting block, no such voting block formed or took action during the period of investigation in any event. *See RR2* at 21 ("As to the AT&M Entity's argument about the 10-percent ownership threshold for nominating directors, the record contains no evidence of any such group of shareholders joining to nominate a board candidate."). As such, any alleged mistranslation would be moot.

> 5  On this, AT&M also contends Chapter 3, Article 49, of the Code of Corporate Governance for Listed Companies in the PRC requires the appointment of independent directors, Article 50 requires the independent directors to protect the interest of minority shareholders, and "[h]ad CISRI been able to nominate all of the directors, this provision of law would have been violated." The conclusion does not appear valid, however, since nomination and appointment are distinct.

B.  Whether the PRC-Wide Rate Is An "Adverse" [**23] Rate

AT&M argues that Commerce as a matter of law cannot apply an "adverse rate" to the AT&M entity by assigning it the PRC-wide rate -- a rate based on adverse facts available --because the AT&M entity cooperated with Commerce's investigation. [*1351] *See* AT&M Comments at 8-10. But Commerce did not apply adverse

facts available to AT&M, Commerce rather found that AT&M had not rebutted the presumption of state control and assigned it the PRC-wide rate. [HN2] "These are two distinct legal concepts: a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate fully whereas the PRC-wide rate applies to a respondent who has not received a separate rate." *Watanabe Group v. United States, 34 CIT         , , 2010 Ct. Intl. Trade LEXIS 144, Slip Op. 10-139 at 9 n.8 (2010)*, citing *Since Hardware (Guangzhou) Co. v. United States, 34 CIT         , 2010 Ct. Intl. Trade LEXIS 119, Slip Op. 10-108 at 23 (Sep. 27, 2010))*. To the extent AT&M suggests that Commerce may never apply adverse facts available (or, for that matter, facts available) in calculating a PRC-wide rate, its references do not support the proposition.

AT&M also alleges that because it was not found to be separate from the PRC government and because it cooperated in [**24] the proceedings, the PRC-wide entity should be considered cooperative and, therefore, application of the adverse-facts-calculated PRC-wide rate was in error. *See* AT&M Comments at 10-11. The defendant argues AT&M's argument does not take into account that 13 other PRC-wide companies failed to cooperate, Def.'s Resp. at 9, quoting *RR2* at 22, but the rejoinder is inadequate; rather, [HN3] "Commerce's permissible determination that [a respondent] is part of the PRC-wide entity means that inquiring into [that respondent]'s separate sales behavior ceases to be meaningful." *Watanabe, 2010 Ct. Intl. Trade LEXIS 144, Slip Op. 10-139 at 8*. "[A]s losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control, . . . applying a countrywide AFA rate without individualized findings of failure to cooperate is no different from applying such a countrywide AFA rate without individualized corroboration." *Jiangsu Changbao Steel Tube Co., Ltd. v. United States, 36 CIT ,     , 884 F. Supp. 2d 1295, 1312 n.21 (2012)*, referencing *Watanabe, 2010 Ct. Intl. Trade LEXIS 144, Slip Op. 10-139 at 8*. For that reason, this court is unable to find Commerce's application of the PRC-wide [**25] rate to the AT&M entity on remand improper.

C. Presumption of State Control and Countervailing Duties

Finally, AT&M makes a sweeping objection to the presumption of control applied to NME countries, arguing that Commerce should have eliminated its separate rates practice altogether in light of its application of countervailing duties to the PRC. It may be worth setting forth the full argument at length, for future reference:

Case: 14-1154 Case: 14-154 PARTICIPANTS ONLY Document: 78 17 Filed: 02/28/2014 Page: 78 Filed: 02/21/2014

Page 8

938 F. Supp. 2d 1342, *; 2013 Ct. Intl. Trade LEXIS 130, **;
SLIP OP. 2013-129; 35 Int'l Env't Rep. (BNA) 2095

The presumptions underlying the separate rates approach are no longer valid. Indeed, the presumption is backwards, as is apparent from the Department's own words and practice -- the only presumption that is supportable is the presumption that [PRC] companies are not controlled by the [PRC] government [. . .] but that presumption can be overcome by facts on the record.

The Department's presumption that "all firms within a non-market economy country ("NME") are subject to government control and thus should all be assigned a single, countrywide rate unless a respondent can demonstrate an absence of both *de jure* and *de facto* control over its export activities," is contradicted by the Department's decision to change its practice concerning the application of the countervailing [**26] duty law. In particular, the Department found that the "current nature of [PRC]'s economy does not" give rise to the same issues [*1352] that were litigated in *Georgetown Steel*, mainly of which were "Soviet-style economies" that were essentially comprised of a single central authority or central control that would result in presumption of state ownership. *See* Memorandum [. . .], re: *Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China -Whether the Analytical Elements of the Georgetown Steel Opinion are Applicable to China's Present-Day Economy*, dated March 29, 2007, at 4 [. . ..]

A major basis for the Department's conclusions and change in its practice concerning the application of CVD laws was a factual finding "that market forces now determine the prices of more than 90 percent of products traded in China." [*Id.*] at 5. Similarly, the Department found that the China's "current Labor Law grants the right to set more wages above the government-set minimum wage to all enterprise's, including foreign invested enterprises ("FIE"), SOEs and domestic private enterprises." [*Id.* . . .]

These clear findings contradict the [Department]'s presumption in the antidumping [**27] separate rates practice that "all firms within a non-market economy country are subject to government control and thus should all be assigned a single, country-wide rate unless a respondent can demonstrate an absence of both *de jure* and *de facto* control over its export activities." At a minimum, the Department's decision to enforce the CVD laws based on the above conclusions clearly indicates that at least with *de jure* control, interference by the government in a companies' exports activities can no longer simply be presumed, since the 1994 Company Law (as amended in 2006) requires that all companies make all export decisions independent from Chinese governmental control. Moreover, the Department has consistently found an absence of *de jure* control when a company has supplied business licenses and export licenses, each of which have been found to demonstrate an absence of restrictive stipulations and decentralization of control of the company based on the Company Law [. . ..]

Furthermore, the Department's finding "that market forces now determine the prices of more than 90 percent of products traded in China," reverses any *de facto* presumption that China's government controls pricing. [**28] The presumption, by the Department's own reasoning, must be just the opposite -- the only justified presumption is one of government non-interference.

The Department specifically has found that "in recent years that many more companies export activities are independent from the PRC government in comparison with the early- to mid-1990s." [*Id.*] at 10.

The inconsistency between the AD presumption of state control and the factual findings made by the Department to justify CVD proceedings is obvious. The Department's presumption that all firms within a NME are subject to government control and thus should all be assigned a single, country-wide rate, in the AD proceedings is just the opposite of the findings that the Department used to justify bringing CVD cases. A presumption of state control implies that the [PRC] economy is nothing less "than the traditional communist economic system of the

938 F. Supp. 2d 1342, *; 2013 Ct. Intl. Trade LEXIS 130, **;
SLIP OP. 2013-129; 35 Int'l Env't Rep. (BNA) 2095

early 1980s, *i.e.*, the so-called 'Sovi-et-style economies'" that were at issue in *Georgetown Steel*, which the Department clearly now rejects based on its application of CVD law. *See, e.g.*, [*id.*] at 4.

Based on the above, the Department should not have applied the presumption of state control in this review [**29] but instead should be consistent with its findings [*1353] used to justify bringing CVD cases and presume that no such state control exists unless record evidence shows otherwise.

AT&M Comments at 12-15 (citations omitted in part, bracketed editing added).

The court expresses no opinion at this point on whether AT&M's arguments are valid, since, as the defendant points out, this claim appears beyond the scope of the remand. *Cf. RR2* at 22 (observing that "in the underlying investigation, no party challenged our factual finding with respect to the presumption of state control" over companies that did not provide separate rate applications and finding "no basis to change the presumption that the PRC is an NME country based on the record"). For purposes of this matter, at least, the Court of Appeals for the Federal Circuit has affirmed Commerce's application of the presumption to the PRC. *See Sigma Corp. v. United States, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997).*

IV. *Conclusion*

For the above reasons, the court will sustain the second results of remand *sub nom. Final Results of Redetermination Pursuant to Remand Order[:] Diamond Sawblades and Parts Thereof from the People's Republic of China,* dated [**30] May 6, 2013. Judgment will enter accordingly.

/s/ R. Kenton Musgrave

R. Kenton Musgrave, Senior Judge

Dated: October 11, 2013

New York, New York

Slip Op. 11- 122

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, and GANG YAN DIAMOND PRODUCTS, INC., | : |
| | : |
| Plaintiffs, | : |
| | : |
| BOSUN TOOLS GROUP CO. LTD, | : |
| | : |
| Plaintiff-Intervenor, | : |
| | : |
| v. | : Before: R. Kenton Musgrave, Senior Judge |
| | : Consol. Court No. 09-00511 |
| UNITED STATES, | : |
| Defendant, | : **PUBLIC VERSION** |
| | : |
| and | : |
| | : |
| DIAMOND SAWBLADES MANUFACTURERS COALITION, WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., and QINGDAO SHINHAN DIAMOND INDUSTRIAL. CO., LTD., | : |
| | : |
| Defendant-Intervenors. | : |

## OPINION AND ORDER

[Remanding for further explanation on the question of separate rates and granting defendant's consent motion for remand to reconsider surrogate steel values. ]

Dated:  October 12, 2011

*Barnes, Richardson & Colburn* (*Jeffery S. Neeley*, *Michael S. Holton* and *Stephen W. Brophy*) for Plaintiffs.

Consol. Court No. 09-00511                                                                                 Page 2

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Delisa M. Sanchez*); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (*Hardeep K. Josan*), Of Counsel, for Defendant.

*Wiley Rein, LLP* (*Daniel B. Pickard* and *Maureen E. Thorson*) for Diamond Sawblades.

Musgrave, Senior Judge:   This consolidated action concerns the final less than fair value ("LTFV") determination issued by the International Trade Administration, United States Department of Commerce ("Commerce" or "the Department") in the antidumping investigation of diamond sawblades imported from the People's Republic of China.  *See Diamond Sawblades and Parts Thereof From the People's Republic of China*, 71 Fed. Reg. 29303 (May 22, 2006) (final LTFV determination) ("*Final Determination*"), *as amended,* 71 Fed. Reg. 35864 (June 22, 2006). Plaintiffs Advanced Technology & Materials Co. Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc. ("ATM") challenge several aspects of the *Final Determination* including (1) the Department's use of zeroing to calculate the weighted-average dumping margin; (2) the selection of Carborundum financial data to calculate surrogate financial ratios; and (3) the Department's valuation of certain steel inputs.   *See* ATM's Mot. at 1-2. Defendant-Intervenor Diamond Sawblade Manufacturers Coalition ("DSMC") challenges the Department's country of origin determination and its decision to award ATM a separate rate.  ATM and DSMC move for judgment on the agency record, and the Department also moves for voluntary remand to reconsider aspects of its selection of surrogate values for steel used to produce diamond sawblade cores, which moots ATM's third cause of action.[1]

---

[1] Further, the court also need not address ATM's first contention because argument thereon was addressed in Slip Op. 11-105.  To the extent any arguments remain, past precedent of this Court has shown them to be without merit.

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c), under which the Court of International Trade is granted exclusive jurisdiction of any civil action commenced under 19 U.S.C. § 1516a. The court reviews the *Final Determination* on the basis of the agency record. *See* 28 U.S.C. § 2640(b); 19 U.S.C. § 1516a(b)(1)(B)(i). Upon such review, the court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). As requested by the Department and for the reasons set forth below, this matter will be remanded for further consideration.

*Discussion*

I. Surrogate Financial Data

An accurate calculation of normal value necessarily includes selling, general and administrative expenses ("SG&A"), overhead, and profit. For non-market economy producers, Commerce estimates these items by using the financial ratios of a surrogate producer, *i.e.*, a "producer[] of identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.409. Commerce chose India as an appropriate surrogate country for the investigation of PRC producers, but industry-specific information was apparently unavailable at the time of the preliminary determination, and therefore Commerce used financial ratios taken from the *Reserve Bank of India Bulletin* (August 2005) ("RBI data"). The RBI data "include[ ] the experience of 2,201 public limited companies in India, including Tea plantations, Mining & Quarrying, Food Products &

Beverages, Sugar, Edible Oils, Cotton, Paper Products, Chemical Products, Paint, and Medicines." Issues and Decision Memorandum ("Decision Mem.") at 8.

After issuance of the preliminary determination, DSMC placed on the record specific financial reports of two Indian producers of grinding wheels and abrasive products, namely Grindwell Norton, Ltd., ("Norton") and Carborundum Universal Limited ("Carborundum"). After examination of these financial reports, Commerce determined that the Carborundum data were the best choice of the three available data sets (RBI data, Norton, Carborundum), and, accordingly, recalculated the SG&A expenses using Carborundum's financial ratios. Commerce declined to use the Norton financials because that data predated the period of investigation by more than three years.

ATM argues Commerce's choice to use Carborundum's financial data is erroneous because (1) substantial evidence does not support the conclusion that grinding wheels are comparable to diamond sawblades; (2) the record contains no clear indication that Carborundum produced grinding wheels during the financial statement period; and (3) the RBI data are less likely to be distortive and therefore represent the "best available information" required by 19 U.S.C. § 1677b(c)(1) (the Department's valuation "shall be based on the best available information regarding the value of such factors in a market economy country or countries considered to be appropriate"). However, in reviewing the *Final Determination* the question before the court is not "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006). For the reasons discussed below, the

court finds the Department's selection of the Carborundum data was reasonable and is supported by substantial evidence.

       To determine whether two products are comparable, Commerce typically considers whether they had similar physical characteristics, end uses, and production processes. *See*, *e.g.*, ATM's Mot. at 25-33. Contrary to ATM's allegations, however, Commerce did not ignore these factors. The Department observed that diamond sawblades and grinding wheels both physically function as abrasives, that is, "by abrading the materials against which they are placed in a grinding process" instead of cutting the material. Decision Mem. at 8 (referring to description set forth in the original Petition). The Department also recognized differences in the products, *i.e.*, that diamond sawblades use a different abrading component (diamonds) than grinding wheels, and it also observed that all of the respondents produced grinding wheels that use a diamond abrasive. The Department noted that both products are used in the construction and infrastructure industry but disagreed that comparable products necessarily must have identical end users. *Id*. at 8.

       ATM contends that the Department should have considered that the production of diamond sawblades requires expensive raw materials not used in grinding wheels and that these differences would distort the SG&A ratio. While this is a colorable argument, ATM does not point to record evidence to support it. Diamonds or diamond powders may or may not be an expensive material, but all record indications are that they are apparently used in extremely small quantities. The court cannot assume the existence of such distortions when none are immediately apparent. Moreover, it is not necessary for Commerce to "duplicate the exact production experience" of non-

market economy manufacturers, or "undergo an item-by-item accounting" when determining

production costs. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

Next, ATM contends that even assuming grinding wheels are comparable, nothing

in the record indicates Carborundum produced grinding wheels during the financial statement period.

According to ATM, Carborundum's statement noting its efforts "resulted in . . . the development of

new products such as thread grinding wheels" should only support the conclusion that Carborundum

was developing the capability to produce such grinding wheels, not that it actually produced them.

ATM's Mot. at 34-35. The government asserts that the court should reject this argument because

it was never presented at the agency level, and that even if the court were to consider it, the

Department's interpretation of the financial statement language was reasonable. Def's Mot. in

Opp'n at 32.

The court agrees with the government. The comment in the financial statement is

ambiguous at best, and the Department's interpretation of it is not unreasonable. More importantly,

ATM should have raised this question when the matter was before Commerce. The doctrine of

administrative exhaustion of remedies is "appropriate in the antidumping context because it allows

the agency to apply its expertise, rectify administrative mistakes," and advances "the twin purposes

of protecting administrative agency authority and promoting judicial efficiency." *Carpenter Tech.*

*Corp. v. United States*, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006). The Court has,

of course, found exceptions when requiring exhaustion would be futile, a useless formality, or in the

face of a manifestly inadequate remedy, *see, e.g.*, *Alhambra Foundry Co., Ltd. v. United States*, 12

CIT 343, 685 F. Supp. 1252, 1256 (1988), but this is not one of those. The contention ATM

attempts to press is a simple factual matter that could have been resolved with relative ease when the matter was before Commerce, but now that it has moved here, resolution would require far more involvement and undercut Commerce's factual determination process. The court will therefore not consider it further.

Finally, the court must reject the contention that the RBI data present the least distortive financial ratios. Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has discretion to select the best available information for a surrogate value so long as its decision is reasonable. ATM does not persuade that Commerce's selection of Carborundum data over the RBI data was unreasonable, and the court cannot substitute its judgment for that of Commerce.

## II. Country of Origin

DSMC challenges the Department's conclusion that the country of origin for diamond sawblades was the country in which the diamond segments were joined to the core, and it specifically challenges the conclusion that assembly of this nature constituted a "substantial transformation." DSMC contends the Department erred in this regard because (1) "substantial transformation" could not have occurred where the end product (finished sawblades) is in the same class or kind of merchandise as the cores and segments; (2) the Department "did not employ its normal analysis" for substantial transformation and failed to explain the reasons for doing so; and (3) such a conclusion seriously undermines the relief afforded by the order "by permitting the subject merchandise to become non-subject" simply by joining the components in a third country. DSMC's Mot. at 14, 19, 31. For the reasons that follow, the court does not agree.

The scope of an antidumping duty order is "defined by the *type of merchandise* and the *country of origin* (e.g, widgets from Ruritania)" and therefore the determination of where the merchandise is produced or manufactured is a fundamental step in the administration of the antidumping laws. *Ugine and Alz Belgium, N.V., v. United States*, 31 CIT 1536, 1550-51, 517 F. Supp. 2d 1333, 1345 (2007) (quoting and italicizing *Certain Cold Rolled Carbon Steel Flat Products from Argentina*, 58 Fed. Reg. 37062, 37065 (Jul. 9, 1993) (final LTFV determination)). The Department's " 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." *E.I. DuPont de Nemours & Co., v. United States*, 22 CIT 370, 373-74, 8 F. Supp.2d 854, 858 (1998).

The factors used to determine whether "substantial transformation" has taken place include: (1) whether the processed downstream product falls into a different class or kind of merchandise from the upstream product; (2) whether the essential component of the merchandise is substantially transformed in the exporting country; and (3) the extent of processing in the exporting country. Def's. Resp. in Opp'n. at 40 (citing *Erasable Programmable Read Only Memories (EPROMs) From Japan*, 51 Fed. Reg. 39680 (Oct. 30, 1986) (final LTFV determination)) ("*EPROMs*").

In addressing DSMC's arguments, the Department acknowledged that in certain determinations it has placed greater emphasis on whether the downstream product falls into a different class or kind of merchandise, but it asserts that this factor is not controlling because the

determination is essentially made "on a case-by-case basis."  Decision Mem. at 18.  By way of

illustration, the Department discussed two investigations where the difference in "class or kind of

merchandise" was not a point of focus.  *Cf. EPROMs* (above) *with 3.5″ Microdisks and Coated

Media Thereof From Japan*, 54 Fed. Reg. 6433 (Feb. 10, 1989)  (final LTFV determination)

("*Microdisks*").

> In both of the referenced investigations the subject merchandise was defined to

include a finished product as well as components of the finished product.  In *EPROM*s, the subject

merchandise included the EPROM itself ( "a type of memory integrated circuit") as well as the main

components of the *EPROM*, referred to as "processed wafers [and] dice."  In spite of the fact that

EPROMs are in a different class or kind of merchandise from the component wafers and dice, the

Department found that assembly of the wafers and dice did not constitute a substantial

transformation.  The Department reasoned that (1) the processed wafer is not only a major

component of the finished device, it is *the* essential active component that defines the merchandise,

(2) assembly does not add to its essential characteristics, and (3) assembly is fairly unsophisticated

process that could be accomplished with relative ease in a third country.  *EPROM's*, 51 Fed. Reg.

at 39692.

> In *Microdisks* the subject merchandise was defined as "microdisks and coated media

thereof," which again concerns a finished product (microdisks), and a component of the product

(coated media) described as "the flexible recording material used in the finished microdisk." 54 Fed.

Reg. at 6434.  Although microdisks and coated media are in the same class or kind of merchandise,

Commerce concluded that the process of turning coated media into a finished microdisk was a

substantial transformation.  According to the Department, the finishing process (1) was "extremely important to the technical performance levels" of the end product, (2) required "substantial capital outlay and an extremely high degree of technical precision," and  (3) entailed the use of "state of the art equipment and highly trained technical personnel."  The Department noted further that although the coated media comprised "only a small fraction" of the finished microdisk, the finishing process was not "the type of operation that can be set up and undertaken easily in any country."  54 Fed. Reg. at 6434.

The Department's decision in the matter at bar essentially turned on whether the process of assembling diamond segments to cores is more like the process described in *EPROMs* or more like the one in *Microdisks*.  Commerce concluded they were more like the latter.  In so finding, Commerce noted the expense and technical expertise required for welding or brazing the cores to the segments, the importance of that process in relation to the ultimate performance of the sawblade, and the capital investment that would be needed to undertake such an operation.  Of additional weight was its determination that assembly imparted the "essential quality" of the sawblade because the sawblade could not be used until that process occurred.

Although DSMC points to factors supporting the opposite conclusion for each of the findings, it is not the role of the court to reweigh evidence, and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-20 (1966). *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Accordingly, the Department's country of origin determination is sustained.

### III.  Separate Rates

DSMC contends that the Department's separate rates analysis is inadequate and requires remand because the Department failed to consider important aspects of the problem. Specifically, DSMC contends that the Department erred in refusing to consider evidence showing that ATM's majority shareholder, the Central Iron and Steel Institute ("CISRI"), is a state owned enterprise that is wholly owned and controlled by the State Asset Supervision and Administration Commission ("SASAC"), a PRC government agency.

DSMC states that during the investigation it placed on the record evidence indicating, among other things,(1) CISRI controls ATM via its position as majority stockholder and through the sharing of management and directors, (2) CISRI, in turn, is wholly owned by the PRC government agency known as SASAC, (3) CISRI is controlled by SASAC, and (4) Decree No. 378 of the State Council of the PRC[2] that demonstrates the central government's intent to reassert control through SASAC, which is charged  with "exercising full 'ownership' rights with regard to companies under its supervision."  DSMC's Mot. at 8.  DSMC alleges that, in spite of the relevance of this information to the question of the ultimate holder of *de jure* and *de facto* control, Commerce simply rejected it on the ground that it was not the Department's practice to consider whether "parent" companies are government controlled.

The defendant states that Commerce "properly limited its analysis to the activities of [ATM] rather than CISRI and SASAC" because it is the Department's practice to "to examine controls over the investment, pricing, and output decision-making process at the individual firm

---

[2]  DSMC refers to this decree as "Interim Regulations."

level," Def's. Resp. in Opp'n. at 40, and that DSMC is essentially asking Commerce to change its

longstanding policy. The government argues further that the Issues and Decision Memorandum

shows that Commerce fully considered the evidence presented by DSMC, pointing out, for example,

the Department's observation that CISRI representatives "were a minority on [ATM]'s board of

directors, of which others included representatives of [ATM] and members independently appointed

by the stock exchange committee." *Id*. at 41.

In support of the government, ATM contends that the Department's analysis was

rational and supported by past practice, noting that "[e]xporters have not been required to show the

total absence of any governmental involvement . . . [the Department] has, quite logically, focused

on the control over exports since it is this pricing that it believes could be influenced by

governmental interference." ATM points to several determinations where the Department granted

separate rates to companies in similar or identical situations.

ATM also contends that CISRI is not a state-owned enterprise, but an enterprise

"owned by all the people," which does not require a finding of government control. In that regard,

ATM argues that DSMC has pointed to only one piece of evidence on the record that would

otherwise connect the central government with the ATM entity: Decree No. 378 of the State Council.

According to ATM, DSMC failed to "show why the decree on its face" compels a finding of state

control over ATM," and provides its own analysis of the decree to demonstrate that it does not

evince the type of control that would be relevant to a separate-rates analysis. ATM's Resp. in Opp'n.

at 8.

In reviewing the *Final Determination*, the Court must consider, *inter alia*, whether the Department has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). The agency must offer an explanation of the decision that is clear enough to enable judicial review, and cannot "leave vital questions, raised by comments which are of cogent materiality, completely unanswered." *United States v. Nova Scotia Food Prods.,* 568 F.2d 240, 252 (2d Cir.1977). For the reasons set forth below, the *Final Determination* must be remanded to the Department for further explanation.

For a non-market economy ("NME"), "the Department presumes that all companies within the NME country are subject to government control" unless they can demonstrate an absence of both *de jure* and *de facto* government control. *Import Administration Policy Bulletin 05.1.* Under this scheme, exporters found to be under government control are assigned the "PRC-wide" rate because they are assumed to comprise a single exporter under common government control, the "NME entity." *Certain Cut to Length Carbon Steel Plate from Ukraine*, 62 Fed. Reg. 61754, 61758 (Nov. 19, 1997) (final LTFV determination). Commerce explained that the purpose of applying one countrywide rate in this context is to prevent an NME government from later circumventing an antidumping order by controlling the flow of subject merchandise through exporters with the lowest dumping margin, *id.*, and that the policy is purportedly "analogous to [its] practice in market-economy cases of calculating individual dumping rates for affiliated parties unless [it] determine[s] that there is a significant potential for manipulation of pricing or production decisions."

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China,* 62 Fed. Reg. 6173, 6175 (Feb. 11, 1997) (final administrative review results).

Commerce, thus, determines the potential for government control or manipulation of NME firms via the *de jure* and *de facto* test set forth in *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22585 (May 2, 1994) (final LTFV determination). That test is an amplification of the test announced in *Sparklers from the People's Republic of China*, 56 Fed. Reg. 20588 (May 6, 1991) (final LTFV determination) ("*Sparklers*"), in which the Department determined that it will assign separate rates only if the applicant can demonstrate the absence of both *de jure* and *de facto* governmental control over export activities. The presumption of *de jure* control may be rebutted with a showing of (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses, (2) any legislative enactments decentralizing control of companies, and (3) other formal measures by the government decentralizing control of companies. *See Sparklers*, 56 Fed. Reg. at 20589. Regarding *de facto* government control, in accordance with *Silicon Carbide* (which added (3) and (4) of the following), the current presumption may be rebutted if an exporter demonstrates that it (1) sets its own export prices independent of the government and without the approval of a government authority, (2) has the authority to negotiate and sign contracts and other agreements, (3) retains the proceeds from its sales and makes independent decisions regarding the disposition of profits or financing of losses, and (4) has autonomy from the government regarding the selection of management. *See Silicon Carbide*, 59 Fed. Reg. at 22587.

It is now well established that "government ownership by itself is not dispositive" of government control. *Qingdao Taifa Group Co., Ltd., v. United States*, 33 CIT ___, ___, 637 F.

Supp. 2d 1231, 1242 (2009).  Firms that are wholly owned by the PRC government are not barred, *per se*, from a separate rate,  but this was not always the case.  Prior to the *Silicon Carbide* determination, the Department did not allow state-owned companies to receive a separate rate on the ground that "ownership by the central government enables the government to manipulate prices, whether or not it takes advantage of its opportunity to do so during the [period of investigation]." *Certain Compact Ductile Iron Waterworks Fittings and Accessories Thereof from the People's Republic of China*, 58 Fed. Reg. 37908 (July 14, 1993) (final LTFV determination); *Sebacic Acid From the People's Republic of China*, 59 Fed. Reg. 565 (Jan. 5, 1994) (preliminary LTFV determination).

Less than a year later, however, with issuance of *Silicon Carbide* the Department changed its position.  In that determination, the Department found, in light of new information concerning Chinese economic reforms, that PRC-owned companies designated as "owned by all the people" were sufficiently independent from government control to be eligible for a separate rate. The Department explained that "'owned by all the people' is not synonymous with government control . . .  [i]nstead, ownership by the people signifies that no individual can take the company; . . . [t]he company belongs to the community[,] and the company's employees are entrusted with the management of the company."  *Silicon Carbide*, 59 Fed. Reg. at 22586-87 (citations and internal quotes omitted).  The court notes that the respondents in that case were ultimately awarded separate rates premised upon the version of the *Sparklers* test that added the above third and fourth factors to the *de facto* analysis.[3]

_____

[3]  It is also appropriate here to note that the "legislative enactments" providing the basis for
(continued...)

Of course, companies "owned by all the people" are but one of several ownership structures in the PRC. The separate rate application provides for six different types of ownership that apparently have been considered by the Department at one time or another. In this matter, the court's concern is with the ownership structure of ATM and BGY, which are both "limited liability companies."

Pursuant to the Company Law of the People's Republic of China, limited liability companies ("LLC's") are owned by shareholders, and control is allocated within a corporate structure similar to that used in market economies. *See*, *e.g.*, *Company Law of the Peoples Republic of China* (1999 amended) ("Company Law"), Art. 4 (providing that the shareholders of a company "have the right to . . . make major decisions, choose managers, *etc*., in accordance with the amount of capital they have invested in the company") (reproduced at ATM's Resp. In Opp'n., Appx, Ex. SA-4). The Department has determined that under the Company Law, control is devolved from the

---

[3] (...continued)
Commerce's finding of *de jure* independence in that investigation reflect the PRC government's devolution of control. These include the "Law of the People's Republic of China on industrial Enterprises Owned by the Whole People," ("1988 Law") and the "Regulations for Transformation of Operational Mechanism of State-Owned Industrial Enterprises" ("1992 Regulations"). Commerce found that these provisions shifted control of enterprises owned by all the people from the government to the enterprises themselves. According to the 1988 Law, enterprises owned "by the whole people" shall make their own management decisions, be responsible for their own profits and losses, choose their own suppliers, and purchase their own goods and materials. Other provisions in the 1988 Law also indicate that this type of enterprise in theory manages itself independently of the government. The 1992 Regulations provide that these same enterprises can set their own prices (Article IX); make their own production decisions (Article XI); use their own retained foreign exchange (Article XII); allocate profits (Article II); sell their own products without government interference (Article X); make their own investment decisions (Article XIII); dispose of their own assets (Article XV); and hire and fire their employees without government approval (Article XVII). *See Certain Partial-Extension Steel Drawer Slides With Rollers From the People's Republic of China*, 60 Fed. Reg. 29571, 29573 (June 5, 1995) (preliminary LTFV determination).

central government and "rests with the enterprise itself." *Freshwater Crawfish Tail Meat From the People's Republic of China*, 64 Fed. Reg. 8543 (Feb. 12, 1999) (new shipper preliminary review). Commerce has consistently found that governance by the Company Law establishes *de jure* independence from government control.[4]

And yet, under the Company Law, shareholders appear to hold substantial power. For example, Article 38 provides that shareholders vote (1) to decide on the business policy and investment plan of the company, (2) to elect and recall members of the board of directors and to decide on matters concerning the remuneration of directors, (3) to elect and recall supervisors appointed from among the shareholders' representatives, and to decide on matters concerning the remuneration of supervisors, (4) to examine and approve reports of the board of directors, (5) to examine and approve reports of the supervisory board or supervisors, (6) to examine and approve the annual financial budget plan and final accounts plan of the company, (7) to examine and approve plans for profit distribution of the company and plans for making up losses, (8) to adopt resolutions on the increase or reduction of the registered capital of the company, (9) to adopt resolutions on the issuance of company bonds, (10) to adopt resolutions on the assignment of capital contribution by a shareholder to a person other than the shareholders, (11) to adopt resolutions on matters such as the merger, division, transformation, dissolution and liquidation of the company, and (12) to amend the articles of association of the company. Company Law, Art. 38. *See also John D. Osgathorpe,*

---

[4] It is unclear when, or in which investigation, Commerce first analyzed the Company Law. The Company Law was not discussed or mentioned in either the preliminary or final determinations in *Certain Partial-Extension Steel Drawer Slides With Rollers From the People's Republic of China*, 60 Fed. Reg. 54472 (final LTFV determination), which is cited in at least 20 determinations as an example of the Department's "analysis" of that provision.

*A Critical Survey of the People's Republic of China's New Company Law*, 6 Ind. Int'l & Comp. L. 493 (1996); *Joaquin F. Matias, From Work-Units to Corporations: The Role of Chinese Corporate Governance in a Traditional Market Economy*, 12 N.Y. Int'l L. Rev. 1 (1999).

      Although the Company Law delegates no control to the government as a matter of law, it does not preclude the government from being a shareholder, or even a 100 percent shareholder. The potential for shareholder control is recognized in 19 U.S.C. § 1677(33)(E), which defines "affiliated parties" as including "[a]ny person directly or indirectly owning, controlling, or holding with the power to vote, 5 percent or more of the outstanding voting stock . . ." of another organization. 19 U.S.C. § 1677(33)(E). In *Tapered Roller Bearings*, *supra*, the Department expressly rejected the affiliated parties analysis as an inappropriate measure of government control. That decision, however, was premised, in part, upon recognition that "ownership by 'all of the people' is not the type of 'ownership' addressed by section 771(33)." *Tapered Roller Bearings*, 62 Fed. Reg. at 6175 (parentheses omitted). Here, in contrast, the type of ownership involved in an LLC would seem to be precisely the type of ownership addressed by section 771(33). Common ownership is also a factor in the Department's collapsing analysis. *See* 19 C.F.R. § 351.401(f)(2). And as the Department noted in *Tapered Roller Bearings*, "[o]wnership by all of the people signifies . . . that 'no individual can take the company . . . it belongs to the community.' " *Id*. (referencing *Silicon Carbide*, 59 Fed. Reg. at 22586). But logic would seem to dictate that when the PRC government is the majority shareholder, much of the governmental control that supposedly "devolved" by virtue of the Company Law was actually *re-allocated* (if it ever left) to the government by virtue of shareholding on behalf of "all of the people."

Consol. Court No. 09-00511                                                                 Page 19

The Department has addressed the government-as-shareholder problem in relatively few investigations.  Two cases decided shortly after the Company Law went into effect are *Certain Paper Clips From the People's Republic of China*, 54 Fed. Reg. 51168 (Oct. 7, 1994) (final determination) and *Certain Cased Pencils From the People's Republic of China*, 59 Fed. Reg. 55625 (Nov. 8, 1994) (final determination).  In these investigations, the Department's control analysis focused on the "significant" fact that the government did not vote its shares.  *See, e.g.*, *Cased Pencils*, 54 Fed. Reg. at 55627.  This was either because the shares themselves were non-voting shares (*Cased Pencils* ), or because the government entrusted its voting rights to management or the workers (*Paper Clips*).  *See also Disposable Pocket Lighters From the People's Republic of China*, 60 Fed. Reg. 22359, 22360 (May 5, 1995) (final LTFV determination).  The Department explained its reasoning as follows:

> When these companies were owned by all the "people," the central government devolved control of them.  Hence, we focused our examination on whether the change in ownership form to shareholding companies altered that devolution of control.  We found that it did not.  Significantly we found that the government (whether the central government or the Government of Shanghai) did not vote the shares.  Although the government held its shares on behalf of the people, in one case those shares were voted by the company's former general manager (Mr. Lansheng), and in the other by the workers (China First).

*Cased Pencils*, 54 Fed. Reg. at 55627.

The foregoing, albeit lengthy, background is necessary as context for proper consideration of DSMC's contentions concerning the instant *Diamond Sawblades* investigation.  Therein, the Department addressed shareholder control in the context of its decision to collapse BGY, ATM, and HXF into a single entity.  In that analysis, the Department observed that ATM owns [[    ]] percent of BGY and [[      ]] percent of HXF, and that:

> There is significant potential for manipulation due to the common control of [ATM] over BGY and HXF. BGY, [ATM], and HXF have overlapping managers and directors. As stated in the Affiliation section above, in addition to serving as a President and Vice Chairman of the Board of Directors of AT &M, [[        ]] is also the Chairman of the Board and Legal Representative of BGY. Further, two Vice Presidents of [ATM] are also Directors of HXF.

*December 20, 2005 Memorandum from Senior Case Analyst to Director, Affiliation and Treatment as a Single Entity of BGY et. al*, C. R. Doc. 241 ("*Affiliation Memo*") at 8-9.

With the finding that ATM has control over BGY, DSMC presented evidence indicating that ATM, in turn, is controlled by CISRI through the latter's [[  ]] percent majority shareholding of ATM, that the shares are voting shares, that after CISRI the next-largest shareholder holds a [[  ]] percent interest, that [[    ]] of CISRI's board members sit on ATM's nine-member board of directors, and that [[          ]], ATM's President and Vice Chairman of the Board (who is also the Chairman of the Board and legal representative of BGY) also sits on the board of directors at CISRI. Further, the court notes Article 99 of ATM's Articles of Association provides that only shareholders with a minimum [[  ]] percent stake in the company may nominate candidates for the board of directors, and only CISRI meets this requirement. *See* C. R. Doc. 226 at Ex. 1.

In turn, CISRI is 100 percent owned by a PRC government agency, and DSMC contends that CISRI is thus directly controlled by that government agency.

DSMC is not arguing that CISRI itself is an exporter or that it should have been considered in the collapsing analysis. It is asserting that, through CISRI, the chain of shareholder control can be traced to the PRC government, and that the Department should *at least* investigate this possibility and, if true, come to a rational consideration of its implications.

Considering the argument, the court notes that although evidence seems to suggest that CISRI is "owned by the people," the Department has made no finding on the question.  In fact, the Department found the entire issue irrelevant to the analysis, stating:

It is the Department's practice to examine controls over the investment, pricing, and output decision-making process at the individual firm level (*see, e.g., Certain Cut to- Length Carbon Steel Plate from Ukraine: Final Determination of Sales at Less than Fair Value*, 62 FR 61754, 61758 (November 19, 1997); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 62 FR 61276, 61279 (November 17, 1997)), and not the activities of its owner, or its owner's parent company.  Therefore, for this analysis, we will limit our analysis to the activities of the AT&M single entity, rather than CISRI and SASAC.

With respect to the *de jure* criteria listed above, Petitioner has placed on the record interim regulations, which allegedly undermine the independence of BGY and HXF under the Company Law of the PRC. However, we note that the Department has consistently found an absence of *de jure* control when a company's operations were governed by the Company Law of the PRC, and when it supplied business licenses and export licenses, each of which have been found to demonstrate an absence of restrictive stipulations and decentralization of control of the company. *See Honey From the People's Republic of China: Preliminary Results, Partial Rescission, and Extension of Final Results of Second Antidumping Duty Administrative Review*, 69 FR 77184, 77186-87 (December 27, 2004), and unchanged in *Honey from the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 70 FR 38873 (July 6, 2005).

The information submitted by Petitioner addresses a theoretical control by SASAC over CISRI, rather than any control of the PRC government at any level over the numerous individual export decisions of the AT&M single entity that took place during the POI.  In addition, the Department conducted a detailed verification of the operational management and control of the AT&M single entity, including an examination of the AT&M single entity's companies' respective business licenses, export licenses, the Securities Law of the PRC, the Company Law of the PRC, and the Code of Corporate Governance, and found no evidence of any legislative or other restrictions on any of the export activities of the AT&M single entity. Therefore, we find for this final determination that the AT&M single entity has demonstrated a *de jure* absence of government control with respect to its export activities.

Consol. Court No. 09-00511                                                    Page 22

Decision Mem at 56-57.

      Concerning *de facto* control, the Department found that BGY's questionnaire responses indicated that "it negotiated prices, selected management, and distributed profit independently of the government of the PRC," which were confirmed at verification with, *inter alia*, "board meeting minutes demonstrating that management is selected by the Board of Directors." *Id.* at 56. In conclusion, the Department explained that

> because the Department examines companies' independence from government control with respect to their export decisions in a separate rates analysis (*see Silicon Carbide*, 59 FR at 22586-87 and *Sigma* 117 F. 3d at 1405-06), the Department has examined the *de facto* criteria with respect to the AT&M single entity based on the components of the single entity which exported subject merchandise to the United States during the POI. The Department confirmed at verification that the AT&M single entity made no exports of subject merchandise to the United States other than those of BGY and HXF. *See* BGY Verification Report, at 6-7.
>
> Because AT&M is a single entity including BGY and HXF, and BGY and HXF have demonstrated a *de facto* independence from government control, we find that the AT&M single entity has demonstrated a *de facto* independence from government control with respect to its export activities.

Decision Mem. at 57.

      In the first paragraph quoted above, the Department describes its policy of examining "controls over the investment, pricing, and output decision-making process at the individual firm level . . . and not the activities of its owner, or its owner's parent company." The court can agree that the "activities" of a parent company with no bearing on such individual firm matters may not be relevant, but the parent company's *control* or influence would seem entirely relevant. More to the point, an exporter's attempted showing of *de facto* independence from government *qua* "government" is of dubious value if that exporter is not "*de facto*" independent from the influence

Consol. Court No. 09-00511                                                      Page 23

of its 100 percent PRC-government-owned parent company.  Yet the Department completely ignores

this possibility, instead concluding that DSMC's evidence is immaterial because it does not concern

"control [by] the PRC government at any level over the numerous individual export decisions of the

AT&M single entity."  Decision Mem. at 56.

   As shown in the chart below, the Department's government control analysis is strictly

limited to entities within the dotted line:



*See Affiliation Memo* at 6-9.

   The court is mystified by this approach.  First, the Department's refusal to make

findings on the parent company, or for that matter, *any* PRC company, leaves unrebutted the

presumption that "all companies within the NME entity," including parent companies, "are subject to government control."

      Second, the Department's position  is inconsistent with its recognition    even in this case    that controlling shareholders present a significant potential for manipulation.  Although controlling shareholders may be too remote to actually influence the first two questions in the *de facto* analysis, the last two factors are not easy questions.  Can a subsidiary show independence from a majority shareholder on matters concerning management selection and the disposition of profits and assets?  Evidence in this matter would seem to compel an answer in the negative.  Article 38 of the Company Law requires shareholder approval of most major board decisions, including the allocation of profits.  If it were determined that CISRI is the *only* ATM shareholder that may nominate candidates for the board of directors and holds [[   ]] percent of the voting shares, it would seem difficult to avoid the conclusion that CISRI controls the board as well as the shareholder vote.

      The Department justifies its determination as comporting with its "long established" methodology.  This is good news for the court, because long established methodologies typically generate a plethora of decisions applying and explaining that methodology, and greatly enhance the court's understanding of the questions involved.  Unfortunately, the court's research reveals a paucity of separate rate determinations involving parent-subsidiary relationships, and in spite of the notation "*see e.g.*," in the first paragraph noted above, the cited decisions (*Cut to Length Steel Plate* and *Tapered Roller Bearings*) do not involve companies with parent-subsidiary relationships.  The first part of the Department's stated investigational practice, which concerns firm-level decision

making, is stated in scores of decisions. The second part, *i.e.*, "and not the activities of its owner or its owners' parent company," which is the focus here, is not.

      Moreover, even where the "practice" is found, it is neither explained nor acknowledged as a practice. In the one case cited by ATM that does involve a parent-subsidiary relationship analogous to the situation at bar, *Foundry Coke From the People's Republic of China*, 66 Fed Reg. 13885 (Mar. 8, 2001) (preliminary LTFV determination) (awarding separate rate to an exporter "majority owned by a company which is in turn owned by the government"), the Department therein never addresses shareholder control or offers any explanation for its decision beyond a boilerplate recitation of the *Silicon Carbide* test. This is also the case in *Structural Steel Beams From the People's Republic of China*, 66 Fed. Reg. 67197, 67199 (Dec. 28, 2001) (preliminary LTFV determination) (awarding separate rate to a company that was 63 percent owned by a holding company wholly owned by a provincial governments because there was no evidence of *de facto* control) and *Synthetic Indigo from the People's Republic of China*, 65 Fed. Reg. 25706 (May 3, 2000) (final LTFV determination) (awarding separate rate when a state-owned enterprise held a minority interest in the company and appointed five of thirteen directors). And in the final analysis, the decisions that truly "take the cake" in terms of reasoning and support are the more recent determinations that cite *this case* as evidence of prior practice. *See*, *e.g.*, *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40485 (July 15, 2008) (final LTFV determination; stating in Issues and Decisions Memorandum at Comment 25 that "the mere existence of government-owned shares in the producer is not a basis for denying separate rate status . . .[t]he Department has previously granted separate rate status to . . . producers, like

GTC, whose stock was partially owned by a government state assets management company");

*Certain Cut-to-Length Carbon Steel Plate from the People's Republic of China*,  73 Fed. Reg.

67124 (Nov. 13, 2008) (new shipper preliminary review).

   *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837

(1984), requires deference to an agency's reasonable interpretation of an ambiguous statute it is

charged with administering, and such deference has previously applied to methodologies developed

by Commerce in antidumping duty contexts where no formal regulation was in place.  *Pesquera*

*Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001).  The court, however,

cannot decide reasonableness without the Department's full explanation of its practice, which is not

evident from this determination (or any other, for that matter).  Accordingly, the court finds that

DSMC is entitled to relief in its challenge to the Department's separate rates determination.

*Conclusion*

   Upon consideration of the arguments presented herein, it is hereby

   **ORDERED** that ATM's USCIT Rule 56.2 Motion for Judgment upon the Agency record challenging *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29303 (May 22, 2006) ("*Final Determination*")*, as amended*, 71 Fed. Reg. 35864 (June 22, 2006) be, and it hereby is, DENIED in part with respect to its challenges to Commerce's zeroing methodology and choice of surrogate financial data, and it is further

   **ORDERED** that DSMC's 56.2 Motion for Judgment upon the Agency Record challenging the *Final Determination*, be, and hereby is GRANTED in part with respect to Commerce's separate rates analysis and DENIED in part with respect to Commerce's determination on the country of origin of certain subject merchandise; it is further

   **ORDERED** that the defendant's consent motion for reconsideration of the valuation of steel inputs be, and hereby is GRANTED; it is further

   **ORDERED** that the *Final Determination* (as amended) be, and hereby is, remanded to the International Trade Administration, U.S. Department of Commerce ("Commerce") for

Consol. Court No. 09-00511                                                                 Page 27

reconsideration and further explanation in accordance with this Opinion and Order and all applicable laws; it is further

       **ORDERED** that, on remand, Commerce must further explain why its analysis of government control does not consider shareholder control, and why it deviated from its original test set forth in *Cased Pencils*; it is further

       **ORDERED** that the parties provide comment (or indication of none) on the sufficiency of the information to be redacted from the confidential version of this Opinion (above indicated by double bracketing) to the Clerk of the Court within seven (7) days, and it is further

       **ORDERED** that Commerce shall file the results of its remand redetermination with the court within sixty (60) days from the date of this Opinion and Order, plaintiffs and defendant-intervenor shall file any comments thereon within thirty (30) days thereafter, and defendant shall file any response thereto within fifteen (15) days thereafter.

 

                 /s/  R. Kenton Musgrave         
                 R. Kenton Musgrave, Senior Judge

Dated: October 12, 2011
      New York, New York

Slip Op. 12 - 147

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, and GANG YAN DIAMOND PRODUCTS, INC., | : : : : : | |
| Plaintiffs, | : : | Before: R. Kenton Musgrave, Senior Judge |
| BOSUN TOOLS GROUP CO. LTD, | : : | Consol. Court No. 09-00511 |
| Plaintiff-Intervenor, | : : | **PUBLIC VERSION** |
| v. | : : | |
| UNITED STATES, | : : | |
| Defendant, | : : | |
| and | : : | |
| DIAMOND SAWBLADES MANUFACTURERS COALITION, WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., and QINGDAO SHINHAN DIAMOND INDUSTRIAL. CO., LTD., | : : : : : : | |
| Defendant-Intervenors. | : : | |

## OPINION

[Remanding first results of remand of antidumping duty investigation of sales at less than fair value of diamond sawblades and parts thereof from the People's Republic of China.]

Dated: November 30, 2012

*Jeffery S. Neeley*, *Michael S. Holton* and *Stephen W. Brophy*, Barnes, Richardson & Colburn, of Washington DC, for the plaintiffs.

   *Delisa M. Sanchez*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant.  With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of Counsel on the brief was *Nathaniel J. Halvorson*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

   *Daniel B. Pickard* and *Maureen E. Thorson*, Wiley Rein, LLP, of Washington DC, for defendant-intervenor Diamond Sawblades Manufacturers Coalition.


   Musgrave, Senior Judge: This opinion considers the results of remand from the U.S. Department of Commerce, International Trade Administration ("Commerce" or "Department") on the investigation into sales from the People's Republic of China ("PRC") of diamond sawblades and parts thereof at less than fair value ("LTFV").[1]  *See* Slip Op. 11-122 (Oct. 12, 2011), familiarity with which is presumed.  The petitioners, Diamond Sawblades Manufacturers Coalition ("DSMC"), argue for further remand while the defendant and the three respondents comprising the "AT&M entity," Advanced Technology & Materials, Co., Ltd. ("AT&M"), Beijing Gang Yan Diamond Products Company ("BGY") and Gang Yan  Diamond Products, Inc., argue for sustenance.

   The standard of review requires "substantial" evidence on the record, 19 U.S.C. § 1516a(b)(1)(B)(I), which assesses the reasonableness of the agency's determination.  *E.g.*, *U.S. Steel Corp. v. United States,* 621 F.3d 1351, 1357 (Fed. Cir. 2010), citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  *See* Charles H. Koch, Jr., 3 *Admin. L. & Prac.* § 9:24 (3d ed.) (the standard requires the "court to assure that there is a relatively high probability that the agency is correct").  A determination "of less than ideal clarity" may be sustained "if the agency's path may

   [1] *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 71 Fed. Reg. 29303 (May 22, 2006) (final LTFV determination) *"Final Determination"*), *as amended*, 71 Fed. Reg. 35864 (June 22, 2006).  The period of investigation ("POI") is October 1, 2004, through March 31, 2005.

reasonably be discerned," but the determination is examined on that basis. *Bowman Transp. Inc. v. Arkansas-Best Freight System*, *Inc.*, 419 U.S. 281, 286 (1974). In other words, it will not be sustained upon a "reasoned basis for the agency's action that the agency itself has not given[.]" *Id.* at 285-86, referencing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). As explained below, the remand results will be remanded for further analysis.

*"Separate Rate" Analysis of the AT&M Entity*

I. Background

Previously discussed, Commerce employs a rebuttable presumption of governmental control over export operations in antidumping duty proceedings involving non-market economy ("NME") participants. *See*, *e.g.*, *Bicycles from the People's Republic of China*, 61 Fed. Reg. 19026 (Apr. 30, 1996) (final LTFV determination). To obtain a "separate" antidumping duty rate, a respondent must demonstrate that its export operations meet the three *de jure* and four *de facto* factors comprising the separate rate test announced in *Sparklers from the People's Republic of China*, 56 Fed. Reg. 20588 (May 6, 1991) (final LTFV determination), as modified by *Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22585 (May 2, 1994) (final LTFV determination) ("*Silicon Carbide*"). *See* Import Administration Policy Bulletin 05.1 (Apr. 5, 2005). The *de jure* factors are (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses, (2) any legislative enactments decentralizing control of companies, and (3) other formal measures by the government decentralizing control of companies. The *de facto* factors typically considered are (1) the ability to set export prices independently of the government and without the approval of a government authority, (2) the authority to negotiate and

sign contracts and other agreements, (3) the possession of autonomy from the government regarding the "selection" of management, and (4) the ability to retain the proceeds from sales and make independent decisions regarding the disposition of profits or financing of losses.

In answer to the question of how BGY sets its export prices, for the preliminary determination Commerce outlined that BGY certified in its August 25, 2005 questionnaire response that those prices are neither set by nor subject to the approval of a government agency, and that BGY had provided emails between its general manager and unaffiliated U.S. customers regarding price negotiation on U.S. sales as well as documents "demonstrating independent negotiation of contracts for purchases of raw materials" in addition to "documentation that both BGY and AT&M select their own management and boards of directors[.]" *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 70 Fed. Reg. 77121, 77127 (Dec. 29, 2005) (*inter alia*, preliminary LTFV determination). The petitioners DSMC challenged this, arguing that the AT&M entity, through shareholding, is controlled by the Central Iron and Steel Research Institute ("CISRI"), which is owned by one of the PRC's state-owned assets supervision and administration commissions ("SASAC"). Nevertheless, Commerce preliminarily granted a separate rate because, "[a]lthough Petitioner has stated that SASAC has the authority to hire and fire management and order asset sales and acquisitions at CISRI, it has provided no evidence on the record of this proceeding that SASAC had the ability to exercise such control over AT&M and BGY during the POI." *Id.*

For the final determination, the DSMC (re)iterated that Commerce's finding was contrary to "Decree of the State Council of the People's Republic of China No. 378: Interim Regulations on Supervision and Management of State-owned Assets of Enterprises (2003)" ("Interim

Regulations" or "IR"), the PRC law governing state-owned enterprises, which DSMC contended *de jure* undermined BGY's independence under the Company Law.   Commerce's essential response was that it "has consistently found an absence of *de jure* control when a company's operations were governed by the Company Law of the PRC, and when it supplied business licenses and export licenses, each of which have been found to demonstrate an absence of restrictive stipulations and decentralization of control of the company."   *Issues and Decision Memorandum for the Final Determination*, 71 ITADOC 29303 (May 15, 2006) (I&D Memo) (Comment 16).   Further explanation followed:

> The information submitted by Petitioner addresses a theoretical control by SASAC over CISRI, rather than any control of the PRC [G]overnment at any level over the numerous individual export decisions of the AT&M single entity that took place during the POI. BGY placed numerous documents on the record that were examined for the *Preliminary Determination. . . .*
> * * *
> . . . With respect to Petitioner's argument that the Department found at verification that four members of AT&M's board of directors are PRC [G]overnment officials, the Department notes that this is a misreading of the report which states merely that four members of AT&M's board were representatives of CISRI.   *See* BGY Verification Report, at 9.   Further, we note that these four individuals are a minority on the board of directors, of which two other members are representatives of AT&M, and three additional members are independently appointed by the stock exchange committee.   *See id*.

*Id*., referencing 70 Fed. Reg at 77126.

As part of this consolidated action, the DSCM's challenge to that determination was remanded to Commerce for clarification of the separate rate test in general and explanation of why Commerce essentially considered irrelevant the shareholder control over the AT&M entity that appeared traceable to the PRC Government, as argued by the DSMC.

Consol. Court No. 09-00511                                                      Page 6

## II.  Summary of Remand Results

On remand, Commerce continues to conclude that the government-owned status of AT&M's majority shareholder, CISRI, does not affect determining that the AT&M entity is eligible for a separate rate, and it offers three broad reasons therefor.  First, Commerce declares CISRI free of PRC control in its own right, *de jure*, by virtue of its corporate form, an "owned by all the people" company,[2] of the type Commerce has previously declared "insulated" from governmental control and to which state control has been "devolved," and therefore CISRI cannot "pass on" any governmental control to the AT&M entity through shareholding.

Second, Commerce finds the existence of legal "barriers" between PRC companies and their majority shareholders, such that even if CISRI is AT&M's majority shareholder, the AT&M entity is also free, *de jure*, of government control in its own right.  The legal matter relied upon for this conclusion includes AT&M's articles of association, the "Company Law of the People's Republic of China (1999 Amended)" ("Company Law" or "CL") and the "Code of Governance for Listed Companies."  Commerce notes the latter are among the PRC laws it has previously accepted as evidence of the "absence" of *de jure* governmental control over a company's export operations.  Commerce acknowledges that AT&M's board of directors is responsible for

---

[2]  Remand Results ("RR") at 3.   Specifically, Commerce relied on CISRI's articles of association to find CISRI able to conduct its own business operations "without any level of input from the PRC Government or the SASAC," able to control its own profits, losses, capital and assets despite being fully financed by SASAC, able to "elect" its president at the employee representatives meeting "without input or influence from the PRC Government or SASAC," and able to permit the employees to "democratically elect[ ]" CISRI's management, "actively participate in decisions" concerning business operations "through a democratic process," and "retain[ ] control of its business operations."  *Id.* at 3-4, referencing BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. 10-2 (CISRI's articles of incorporation).

selecting the general management including management over export operations and that only

shareholders owning a certain minimum percentage of shares (*i.e.*, CISRI) are permitted to nominate

candidates for board and management positions, but Commerce found that candidates nominated to

the board require the unanimous votes of the shareholders in order to gain appointment and reasoned

that the power of veto means CISRI does not "control" AT&M's board, as does the fact that CISRI's

representatives on the board are a minority in number.

      Third, with respect to *de facto* control over the AT&M entity, Commerce concludes

that its absence was established in the original investigation as well as by (re)analysis on remand of

copies of certain board resolutions documenting the voting and appointment of certain managers as

well as certain financial statements and board meeting minutes at which all board members discussed

and voted upon profit distribution. RR at 8, referencing BGY's Sep. 20, 2005 Supp. Q. Resp., at Ex.

SA-22. Commerce thereby reiterates that the AT&M entity has demonstrated the absence of both

*de jure* and *de facto* control regarding the selection of managers and the distribution of profits, and

that DSMC's information, in particular the Interim Regulations, is insufficient to undermine the

AT&M entity's entitlement to a separate rate.

### III. Discussion

      The court cannot sustain the remand results on the bases articulated by Commerce.

In particular, the court remains concerned that Commerce has failed to consider important aspects

of the problem and offered explanations that run counter to the evidence before it. *See Motor*

*Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In other words, the thread of analysis pretty much begins where left off. *See* Slip Op. 11-022 at 26.

A. Commerce Policy re Ownership of
Separate Rate Applicant; Form of Owner

The court requested explanation of why CISRI is considered irrelevant to the separate rate analysis. The stated answer is that "in keeping with precedent" CISRI was not required "to address the separate-rate criteria because the separate rates test applies only to exporters." That may be true, but it does not explain. There is no dispute that the focus of the separate rates test here is the AT&M entity's export operations, that Commerce's test applies only to exporters, and that CISRI is not an exporter, but CISRI is still an owner, and even the AT&M entity agrees consideration of that ownership is relevant. *See* AT&M Comments at 5.

Commerce did analyze CISRI to some degree nonetheless, and it concluded the corporeal form of CISRI effectively "insulated" CISRI from governmental control. As part of their argument concerning governmental control of AT&M, the DSMC pointed to the fact that CISRI defines itself as a "state-owned enterprise," however Commerce dismissed this point on remand as mere "designation that does not restructure or reformulate the corporate form," and because after promulgation of the Interim Regulations and the creation of the SASAC, CISRI did not file for a new business license or restructure or reformulate its articles of association. *See* RR at 18-19. The retort does not make sense. Commerce admits CISRI is a "state-owned enterprise," *see* RR at 20, and the advent of the Interim Regulations and the creation of SASAC would not have resulted in changes to CISRI's articles or license *unless* CISRI no longer intended to operate, *e.g.*, as state-owned.[3]

---

[3]  *See Global Economic and Technological Change: Former Soviet Union and Eastern Europe, and China*, S. Hrg. 102-586, Pt. 2, 129, 196  (Jun. 8 and Jul. 27, 1992) (*CIA Report on China's Economy*) ("'State-owned enterprise' is a short-hand term for the Chinese designator 'enterprise under the ownership of all the people'"); *see also Silicon Carbide* (relying on said report).

As to "insulation" from governmental control, Commerce essentially appeals to its "long standing" position with respect to "owned by all the people" companies, which is that the PRC Government has "devolved" control to them, which therefore "*demonstrat*[*es*] that CISRI is insulated from government control . . . and thus [is] not in a position to exercise government control over ATM as one of its shareholders[.]"  RR at 5-6 (italics added).  This is faulty logic.  Appeal to tradition may simply indicate ossification, undeserving of deference,[4] and, to the court's knowledge, corporate form in and of itself has never been found to "demonstrate" insulation from governmental control, or further *de jure* proof of the absence thereof in accordance with the separate rate test would serve no purpose.  Commerce here runs the risk of being interpreted as effectively disavowing its own test, when the prior opinion only observed that "government ownership by itself is not dispositive" of the issue of governmental control.  Slip Op. 11-122 at 14-15, quoting *Qingdao Taifa Group Co. v. United States*, 33 CIT ___, ___, 637 F. Supp. 2d 1231, 1242 (2009).  As stated in Import Policy Bulletin 05.1, "the test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level;" thus, the precise inquiry is governmental involvement in "decision-making."  The second of the *de jure* factors is "legislative enactments decentralizing control of companies."  And owners, of course, may be "companies" -- with obvious interests in the "decision-making process" to which their investments are being put -- which naturally leads to the following.

---

[4]  *See*, *e.g.*, *Butterbaugh v. Department of Justice*, 336 F.3d 1332 (Fed. Cir. 2003) (any deference to "traditional" administrative interpretation owed under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) does not outweigh contrary conclusions drawn from certain statutory text); *see also United States v. Mead Corp.*, 533 U.S. 218, 247 (2001) (Scalia, J., dissenting).  The court here could not previously discern Commerce's parent-subsidiary policy.  *See* Slip Op. 11-122 at 24-26.

B.  Further Analysis of the Interim
Regulations and Governmental Control

The circa-2003 creation of the SASACs and the Interim Regulations that intervened since issuance of *Silicon Carbide* are of some import to the matter at bar.  As with other PRC laws and regulations, the Interim Regulations evince corporeal identification of "ownership" and "management" for all companies covered thereby.  Those include state-owned enterprises, such as CISRI, and enterprises with state-owned equity, such as AT&M.  *See* IR, Art. 2.  The remand results' analysis of the Interim Regulations, however, raises more questions than answers as to the relevant distinctions of those concepts in the context of "governmental control" and this case.

Commerce maintains that the Interim Regulations changed nothing of relevance and that SASAC/CISRI essentially continue to act merely as passive owner/investors with respect to the AT&M entity.[5]  Thus, Commerce concludes that "the Interim Regulations do not automatically demonstrate *de jure* control of a state-owned enterprise[,]" *id*. at 20, and that the Interim Regulations "set[ ] aside particular protections for the autonomy of companies operating under SASAC, showing that SASAC *solely* provides oversight and is not intended to *direct* day-to-day business operations" and does not "interfere [in] or influence" the latter.  RR at 21 (italics added).  The court fails to discern from the record why that is the case, as various provisions among the Interim Regulations directly conflict with these observations.  The latter reasoning also rests on a slippery slope.

_____

[5]  *See*, *e.g.*, RR at 12-14 & 20-21, referencing IR at Arts. 3 & 4.  Commerce notes that the Interim Regulations provide for "separation of ownership from management."  *Id*. at 21 quoting IR, Art. 7.  Commerce further observed that "those companies operating under SASAC 'enjoy autonomy in their operation,' and that SASAC 'shall support the independent operation of enterprises according to law, and shall not interfere in their production and operation activities . . ..'" *Id*., quoting IR, Art. 10.  The DSMC justifiably criticize Commerce for omitting the remainder from Article 10: ". . . apart from performing the responsibilities of investor."

Consol. Court No. 09-00511                                                         Page 11

The Interim Regulations provide that SASAC's "invested enterprises shall accept the supervision and administration conducted by the State-owned assets and administration authority according to law[.]" IR, Art. 11.  This seems an obvious declaration of *re*-centralized *de jure* control, of "invested enterprises" including those that are wholly state-owned, such as CISRI, and those in which the state has an investment, such as AT&M.  *See, e.g.*, IR, Art. 1.  SASAC "is responsible for *directing* State-owned enterprises[,]" *id.*, Art. 20 (italics added).  Further substantial evidence of record does not support the inference that SASAC's "management"[6] of its "state-owned assets" is restricted to the kind of passive-investor *de jure* "separation" that Commerce concludes.

For example, the Interim Regulations confer upon SASAC the authority to appoint or remove (including proposals therefor) "the responsible persons of its invested enterprises" including the general manager, deputy general manager, and/or chief accountant of SASAC's state-owned enterprises "in accordance with the relevant provisions." *See* IR, Arts. 13, 17.  CISRI's February 23, 2000 articles of association state that to the extent they conflict with any PRC laws the

---

[6]  By way of background, the Interim Regulations provides that SASAC "manages" the "state-owned assets of enterprises," and the "state-owned assets supervision and administration authority of the government at a higher level guides and supervises according to law the management work of state-owned assets supervision and administration of the government at a lower level." IR, Art. 12.  The main responsibilities of a state-owned assets supervision and administration authority include performing "the responsibilities of investor for the invested enterprises" in accordance with the Company Law and other related laws and regulations and dispatching "supervisory panels to the invested enterprises," in addition to "appoint[ing] or remov[ing] the responsible persons of invested enterprises[.]" IR, Art. 13.  Article 14 states that SASAC shall "respect and safeguard the operational autonomy of State-owned enterprises and State-owned holding enterprises" but also obliges SASAC to more nebulous activity, such as "explore effective systems and ways for the management of State-owned assets of enterprises, enhance the work of supervision and management of State-owned assets of enterprises," "improve corporate governance, and advance the modernization of management," impel enterprises to "operate and manage according to law" *et cetera*.  Article 15 states that SASAC "shall report to the government at the corresponding level about the supervision and management work of State-owned assets of enterprises." *Cf.* IR, Art. 12.

latter control.  Thus, the DSMC were correct in pointing out that conflicting provisions in CISRI's

articles of association were abrogated upon promulgation of the Interim Regulations, at which point

SASAC had the right, *de jure*, to appoint/remove members of CISRI's board and management during

the POI despite the "democratic" election of CISRI's president stated in its articles of association.

      Further, "in accordance with the Company Law" SASAC has the authority to

nominate candidates "for the director of the board or supervisor to be dispatched" to a company with

state-owned equity such as AT&M[7] and instruct those directors/representatives to exercise voting

rights in accordance with SASAC's instructions, *id*., Art. 22.  "Voting rights" are made explicit with

respect to "major matters" (*e.g.*, division, merger, bankruptcy), but the authority of a *director* who

also happens to represent the state's interests is broader.  As Commerce is aware, those duties

explicitly encompass, *e.g,*, implementation of shareholder resolutions, deciding the company's

operational and investment plans, formulating annual budgets and plans for profit distribution and

recovery of losses, appointing or dismissing the company's general manager, *et cetera*.  *Cf*. Company

Law, Art. 46.  Also, Commerce recognizes that the board of directors of AT&M "is in charge of

overseeing . . . business matters[.]"  RR at 19.  That recognition is in direct contrast to Commerce's

declared position, from its analysis of *de jure* "control" in the Interim Regulations, *supra*, that a

director under SASAC/CISRI's dispatch is effectively absolved of responsibility for "directing."

Further, the exclusion of "day to day operations" from "oversight" responsibility is a straw man.

---

     [7] *Cf*. IR, Arts. 11, 12, 17.  Commerce regards Article 17 as "limited to those companies that are deemed 'invested enterprises" and thus "CISRI's majority ownership in ATM is not a vehicle by which SASAC or the PRC [G]overnment can exercise control over the ATM Entity's export activities," RR at 21, but that is a misreading.  Commerce acknowledges CISRI is fully financed by SASAC, RR at 4-5, CISRI's investment in AT&M is an "asset" of a state-owned enterprise, IR, Art. 3, and  as mentioned, SASAC/CISRI owns "state-owned equity" in AT&M.  *See id*., Art. 4.

Commerce's analytical assumptions are not based on common or business sense. They are particularly conspicuous when confronting the *de jure* possibility of a general manager appointed by a board under SASAC's effective control, as permitted (or declared) by the Interim Regulations. Commerce acknowledges from CISRI's articles of association that CISRI's president is "responsible for" business operations including any investment-related export operations (*e.g.*, CISRI's investment in the AT&M entity) in addition to production, research and development, and "human resources," and Commerce is also aware that CISRI, or possibly SASAC, dispatched at least four individuals, *de facto*, to AT&M's board and management. The record further shows two members of AT&M's management on the board including its chief executive officer, which opens up the possibility of subjugation, as well as three "independent" board members who appear to be directly answerable to another PRC Government agency apart from SASAC. *See infra*. Commerce's interpretation of the Interim Regulations, however, prevented it from acknowledging a *de jure* prospect of "governmental control" of AT&M or determining the full *de facto* actuality of CISRI's and AT&M's management -- by whom and how selected, nominated, dispatched, to whom answerable, and so forth -- in addition to approval or confirmation by board resolution.[8]

Commerce's last references to the Interim Regulations are to Article 27, which provides that "state-owned enterprises are able to enjoy the rights of an investor in those companies in which they hold shares, consistent with the Company Law," and which Commerce concludes means "CISRI's independence from the government with regard to its decisions as an AT&M

---

[8] *Cf.* Verification Report at 11 (providing cursory description(s) of management approval process). In that regard, it might not be unreasonable to deem such consideration unnecessary, *a fortiori*, if the only reasonable interpretation of the record on the issue of governmental control of AT&M's board is that only CISRI is relevant and only has "minority" power thereat and there is no other evidence of "governmental control," but those assumptions require re-examination. *See infra*.

investor are protected by the Company Law from any government interference," and to Article 42, which provides that "organizational form, organizational structure, rights and obligations . . . shall be governed by the Company Law," and which Commerce declares it "has previously found to demonstrate the absence of *de jure* control." RR at 22. The court does not understand these points. Even if CISRI had obtained State Council approval as required by Article 27 to act as an investment company, holding company or investment institution, either in general or with specific respect to its state-owned equity in AT&M, *see* IR, Art. 27, *see also id.* at 12 & 20, it remains the case that SASAC is CISRI's sole owner and enjoys all of the rights over CISRI and over CISRI's investment in AT&M that inhere in shareholders under the Company Law -- which, in and of itself, is not demonstrative on the issue of *de jure* governmental control.

            The Company Law rather appears neutral on that issue. As the DSMC point out, previous findings of the "absence" of *de jure* governmental control are mainly due to the significant rights the Company Law provides to *investors*, including the right to "enjoy the benefits of assets of the company, make major decisions, choose managers, *et cetera*, in accordance with the amount of capital they have invested in the company." *See* CL, Art. 4; *see, e.g., Certain Cased Pencils From the People's Republic of China*, 59 Fed. Reg. 55625, 55628 (Nov. 8, 1994) (final LTFV determination) (finding significant the percentage of private individual shareholdings of respondent). In other words, where the government or its agency is the controlling investor, *de facto*, the Company Law does not *free* the investee from governmental control, it is being used to *subject* the investee to governmental control -- with or without (but especially given) the Interim Regulations. *See* DSMC Comments at 18. Indeed, Commerce admits as much, having in other instances looked to whether the government has exercised its *de jure* control *de facto*. *See Qingdao Taifa Group*,

*supra*, 33 CIT at ___, 637 F. Supp. 2d at 1243 and determinations cited.  That amounts to conflation

of the *de jure* and *de facto* analyses, but here, at least, the court can agree Commerce's statement that

the Company Law has been "found to demonstrate an absence of *de jure* control," *e.g.* RR at 22, is

inadequate consideration of the DSMC's proposition, and it lacks, as above opined, common

business sense.[9]

---

[9]  Commerce appears to acknowledge much of the foregoing when it recast the DSMC's arguments in the original determination and on remand, *see*, *e.g.*, RR at 12-14, but Commerce's response seems based on numerous red herrings, such as the fact that minority shareholders have certain rights, *et cetera*.  Rejecting all such fallacious argument, the court remains unclear as to what this all means in the larger context of Commerce's separate rate policy.  For example, notwithstanding provisional reference in the Interim Regulations to corporeal "autonomy," *supra*, if SASAC is permitted to appoint and dispatch a "responsible person" pursuant to Articles 13 and 17 and directors pursuant to Article 22, then where is the bright-line "separation" of ownership and management that Commerce apparently perceives in such a circumstance?  And what, if any, "interference" is there in action undertaken by such individual, once seated to such position, in the sense contemplated by Article 10 of the Interim Regulations, or Article 21 of the Corporate Governance Code to the same effect?  Or, similarly, where is the "subordination relationship" ostensibly precluded by Article 26 of the Corporate Governance Code?  *See also* note 10, *infra*.  To the extent such person embodies SASAC's policies, objectives, and/or directives, how can the company's "independent" operation or interest be discerned, or has it rather been subsumed?  As mentioned above, Commerce concluded that "SASAC *solely* provides oversight and is not intended to *direct* day-to-day business operation" (italics added), but how can that be the case if any SASAC-appointed/nominated "responsible person" or director or even manager within SASAC's "invested enterprises" (including "a company with State-owned equity," *i.e.*, AT&M) has had a hand or vote that results in "guiding" or "supervising" or "overseeing" any of such enterprise's operational activities including its export activities?  That is, where does "oversight" end and "day-to-day business operation" begin, or does the exception swallow the rule?  And notwithstanding whether a controlling shareholder's board nominees are a minority of the board, based on whatever numerosity, if other board members also hold managerial offices within the company, then why does that not present a potential problem of subjugation that should be examined?  To whom are such persons and controlling shareholder nominees answerable?  And lest Commerce simply presume such persons to wear the kind of "separate hat" described in *United States v. Bestfoods*, 524 U.S. 51, 69 (1998), why would it be appropriate to project the operation of *U.S.* law onto the managerial operation of *PRC* companies, and how would that square with the presumption of state control that is supposed to be the context of the separate rate test in the first place?  On the other hand, given the imprecise treatment of the issue thus far, and begging the parties' indulgence, at this point the court has little confidence these are even the right questions to ask in moving towards proper disposition of this matter.

### C.  Further Analysis of the Company Law

Commerce's analysis of the Company Law adds little to assuage the *de jure* issue of governmental control of a company through ownership.  Commerce notes that Articles 16 and 20 of the Company Law allow state-owned enterprises to invest of their own accord in limited liability companies which, according to Commerce, ensures that the company will continue to operate under a "democratic management structure."  RR at 23 (citation omitted).  *See also* note 2.  But, Article 20 simply provides in relevant part that "a state-authorized investment institution or a department authorized by the state may invest on its own to establish a wholly state-owned limited liability company." CL, Art. 20; *see also* RR at 23.  On its face, this provision preserves state shareholding power by allocating state institutions, with appropriate governmental deputization, to create wholly state-owned companies in which the state's shareholding power is undiluted.  It does not appear that this may reasonably be construed to "limit" the power of the state in the companies in which the state invests.  Further, Commerce does not explain the significance of "ensure . . . a democratic management structure" or why such a "structure," *per se*, would be detached from governmental involvement.  In the absence of clarity in the context of the separate rate test, this seems gratuitous.

Article 38 of the Company Law, which is implicated by the Interim Regulations, "delimits," according to Commerce, the exact powers that shareholders can hold.  Commerce implies these are limited to "high level" powers only, such as the appointment of the board of directors, establishing the articles of association, and approving various financial decisions such as profit distribution and budget plans that are established by the board of directors.  Commerce omits  the ability "to decide on the company's operational policies and investment plans," but be that as it may,

the court remains unclear why Commerce has concluded, in effect, that the Company Law restricts the PRC Government from implementation of its own Interim Regulations and from becoming a company's controlling shareholder and acting in furtherance of such control of the company.

After analyzing various other provisions that basically support identification of limited liability companies as legal entities, Commerce concludes that "the Company Law *separates* the powers between the shareholders and the Board of Directors, where the primary purpose of the Board of Directors is to design plans related to business functions and to enact them as they are approved by the shareholders," and that Article 50 "provides for another degree of *separation*" by concentrating certain powers in the hands of a general manager. *Id.* (italics added). Once again, it is unclear what significance Commerce draws from this. The concern here is not over directorial liability,[10] and none of the points undermines or addresses the fact of CISRI as AT&M's controlling shareholder, or indicates that the operation of the board and general manager are "insulated" from the shareholders to the extent Commerce implies, or addresses in any way the fact that "shareholders representatives" may be, and often are, sitting as directors on the board itself.

Article 37 of the Company Law makes clear that the general meeting of all shareholders is the supreme organ of the company, as numerous legal commentators have noted. The boards of PRC limited liability companies are "responsible to the shareholders" pursuant to Articles 37 and 46. Shareholders have the ability to hire and fire each board member and decide their pay

---

[10] *But cf.* IR, Art. 38 ("Where, in violation of the relevant provisions, the State-owned assets supervision and administration authority . . . illegally interferes in the production and operation of the invested enterprises . . ." *et cetera*). Given that SASAC seems to have the authority to appoint or nominate a general manager in charge of operations, is the "illegal interference" of that provisional context rather with respect to any *SASAC* objective for production and operation?

pursuant to Article 38, and each board member is thereby beholden. That amounts to delegation, as opposed to separation,[11] as does Article 50, since the general manager, in point of fact, is selected by the same board of directors "in charge of overall business planning and the selection of upper management" that is "responsible to the shareholders" and can readily be replaced at their whim. CL, Arts. 38, 50.

The point here is that "governmental control" in the context of the separate rate test appears to be a fuzzy concept, at least to this court, since a "degree" of it can obviously be traced from the controlling shareholder, to the board, to the general manager, and so on along the chain to "day-to-day decisions of export operations," including terms, financing, and inputs into finished product for export. The other provisions of the Company Law generally cited by Commerce do not implicate shareholders in any clear way, or clarify why Commerce regards ownership and management as "separated" by the equivalent of a Great Wall, or what this all signifies, and its reading of general, hortatory language as limiting is perplexing. *See* RR at 22-23. For example, it is unclear why Commerce has determined that Article 6, which states that "a company implements an internal management structure," acts to "limit" the power of shareholders, in particular controlling shareholders, to influence that implementation or structure or what this implies. *See id*. at 23. To summarize: given that the separate rate test factors are not facially restricted to obvious "direct" control of export pricing, *e.g.*, via export licensing, the court, as mentioned, continues to be mystified

---

[11]  Taken as a whole, the PRC perspective of corporate ownership and management could be construed as rather in line with the general Anglo-Saxon jurisprudential view of corporations until the end of the 19th century, *i.e.*, that the board of directors is merely an agent of the company and its shareholders and serving at their pleasure. *See*, *e.g.*, *Isle of Wight Railway Co. v Tahourdin*, (1884) LR 25 Ch D 320.

as to why Commerce reflexively interprets the Company Law to *preclude* the PRC Government, *de jure*, from lawful control, *de facto*, through ownership of a company including its export operations. Repetition, to the point of mantra, that the Company Law "establishes an absence of *de jure* control," *et cetera* (*see* RR *passim*), does not transform incomplete analysis or *ipse dixit* conclusion.

### D.  Further Analysis of the Code of Corporate Governance

Commerce's analysis of the Code of Corporate Governance ("Code") also does not enlighten.  The Code applies only to stock market listed companies such as AT&M, and Commerce cites it mainly for the proposition that majority shareholders' powers in the companies in which they invest are particularly limited.  But, Commerce reading of certain provisions goes beyond their text and without explanation for broad interpretation.  For example, a provision Commerce cites as protecting "the rights of all shareholders, including minority shareholders" contains the caveat that minority shareholders' rights and duties are "based on the shares that they hold." *Compare* RR at 24 *with* Code, Art. 2.  And a provision Commerce cites as requiring complete separation between a listed company's personnel and its controlling shareholder in fact provides for listed company personnel to act as directors of the majority shareholder and *vice versa*. *Compare* RR at 24 *with* Code, Art. 23.  The court fails to understand how Commerce interprets these provisions to curtail in any manner a controlling shareholder's *de jure* control of a company.

Commerce also relies on Article 20 of the Code for the proposition that "majority shareholders must consult with all shareholders to appoint senior management." RR at 24.  Article 20 actually states that "controlling shareholders are forbidden to appoint senior management by circumventing the shareholders' meetings or the board of directors."  Apart from the fact that this

provision conflicts with Commerce's reading of the Company Law and AT&M's articles of association, pursuant to which management is not appointed by the shareholders at all but by the directors, *compare* RR at 24 *with id.* at 23, it is unclear how Commerce reads Article 20 as effectively limiting the controlling shareholder's powers when, for example, the controlling shareholder could simply call[12] a shareholders meeting to comply with relevant provision(s).

Elsewhere, Commerce attempts to bolster its decision by citing Articles 22-27 of the Code as further confirming the independence of listed companies from their majority shareholders and further confirming AT&M's autonomy from CISRI.  RR at 24-25.  Articles 22 and 23, for example, state that a listed company (such as AT&M) shall be "separate" and "independent" from controlling shareholders in such aspects as personnel, assets, and financial affairs.  But those concepts are not in a vacuum: when read as a whole, Articles 22-27 rather intend protections for minority shareholders by forbidding controlling shareholders from absconding with listed company assets, using listed company personnel to further the shareholders' own independent businesses, or engaging in business that competes with the listed companies' business, and such economic and fiduciary protections for minority shareholders do not appear to indicate why AT&M, *de jure*, is "independent" of its state-owned majority shareholder, which has the ability to nominate, hire or fire

---

[12] Moreover, it has been observed elsewhere that in practice the voting power of shareholders in PRC company shareholders' meetings is usually exercised by so-called "shareholders' representatives," who, for the controlling shareholder(s), is/are usually one or more of the directors of the company, so in such cases, when the board of directors signs its resolution and submits it to the shareholders' meeting for approval, the resolution has already been "approved" by the shareholders' meeting, since the controlling shareholder representatives/directors have already signed the resolution.  *See, e.g., Foreign Direct Investments in China -- Practical Problems of Complying with China's Company Law and Laws for Foreign-Invested Enterprises*, 20 NW. J. Int'l L. & Bus. 475, 486-87  (2000).

its directors, decide on profit allocations, *et cetera*.  They thus reveal little to an inquiry into "governmental control" in the running of a company including its export operations.

### E.  Further Analysis of the AT&M Entity

The court also fails to understand from the evidence of record that AT&M's articles of association, the Code, and the Company Law create legal "barriers" separating AT&M and CISRI as concluded by Commerce.  In addition to its analysis above, Commerce states that AT&M's articles require that nominees for the board of directors "may not be shareholders" and implies that shareholders are not permitted to be directors.  *See* RR at 19.  But, AT&M's articles of association only state that directors "need not be shareholders of the company."[13]  That is not a barrier.  Given CISRI's majority stake, this article rather appears to confirm CISRI's lawful control of AT&M's board.  Commerce also finds significant that AT&M's "Board of Directors operates independently of the shareholders and is in charge of overseeing the business matters of the company," RR at 19, but, once again, even to the extent this *de jure* declaration is true, it is no indication of a controlling shareholder's *de jure* and *de facto* ability to "control" the board of directors and the company itself.

Ultimately, Commerce finds that AT&M is not "controlled" by CISRI because there are numerous other AT&M shareholders who all have "protected rights" as minority shareholders including voting rights.  But facts drive the law, not *vice versa*.  AT&M *itself* identifies its

---

[13]  BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. SA-10(1) (AT&M articles of association), Art. 96.  *See also id.* at Art 29 (requiring directors to "regularly declare the number of shares he possesses").  And if the term had been "may not" instead of "need not," would that prohibit the appointment of "shareholder representatives" or other agents from becoming directors?

"controlling shareholder" as CISRI in its financial statements,[14] and the power to veto nomination

does not equilibrate the power of control *over* nomination.[15]  *See*, *e.g.*, *Metropolitan Washington*

*Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 268-70 & n.15

(1991) (appointments under Transfer Act "*must*" be made be made from the lists submitted by the

Speaker of the House; therefore, whether plaintiff has formal statutory power of appointment and

removal over board of review is irrelevant) (italics in original); *Biloxi Regional Medical Center v.*

*Bowen*, 835 F.2d 345, 352 (D.C. Cir. 1987) (any influence the "City" might exert through mayoral

veto power "falls well short" of establishing "control" under 42 C.F.R. § 405.427(b)(3)).

Curiously, Commerce acknowledges as part of its *de jure* analysis that "the Interim

Regulations provide that SASAC may intervene in certain business operations" but then it "notes

that there is no record evidence that SASAC acted upon this power and intervened in the selection

of management and board members."  RR at 21.  Apart from this further conflation of *de facto* and

*de jure* analysis and evisceration of the presumption of state control in "the selection of . . .

management," *et cetera*, the administrative proceeding does not appear to have advanced to such a

---

[14]  *See*, *e.g.*, BGY Section A Comments at Ex. 7; Letter to Sec'y of Comm. from Greenberg, Traurig, re: *Diamond Sawblades and Parts Thereof from China: Supplemental Questionnaire Response* at Ex. 4, p. 19 (notes to 2004 financial reports, sec. VI) (Dec. 5, 2005).

[15]  Furthermore, under Article 66 of AT&M's articles of association, only "eligible shareholders" -- whatever that means -- in addition to members of the board are permitted to "collect voting power."  Given that the presumption is of state control, in the absence of proof to the contrary (and the court's review of the record did not reveal proof to the contrary) whoever is elected to the board will necessarily have received CISRI's approval for nomination.  AT&M's board cannot "lawfully" act otherwise, *see* AT&M Art. of Assoc. 130, and this circumstance necessarily counters any inference of minority "control" that might otherwise be drawn from the requirement of unanimous voting, but if unanimity is still relevant, it may also be of some significance that voting is not anonymous at AT&M, *id.* Art. 83, although the remands results do not discuss this.

state that the onus had shifted to the DSMC on that burden.[16]  *Cf.*, *e.g.*, *Certain Paper Clips From the People's Republic of China*, 59 Fed. Reg. 51168, 51170 (Oct. 7, 1994) (final LTFV determination) (management nomination meeting minutes, appointment announcements and correspondence between respondent and state established that state involvement in respondent's management appointment process "reflects nothing more than an administrative formality").

Apart from *de jure* control, the overriding question is whether there is *de facto* governmental control over export operations.  As above indicated, Commerce recognizes that scrutiny of board and management is critical to that inquiry.  In the original final results and on remand, Commerce found four of the nine AT&M directors representatives of CISRI.  One of those is AT&M's chairman of the board.  Commerce also found five directors not "involved in CISRI's business functions in any way" during the POI.  The record excerpts provided by the parties, however, do not evince information that would permit construal to the extent of the latter.[17]

_____

[16]  As argued by the DSMC, albeit in the context of the absence of record information showing how CISRI's board members or managers were actually selected during the POI:

> In a situation in which the burden of proof is upon respondent to show a lack of state control (or, in this case, upon the agency to demonstrate that its determination of no state control is reasonable) a lack of record information regarding control cannot logically be adduced to show that the presumption has been rebutted.

DSMC Comments at 16-17.  At this point it would also seem appropriate to note the original determination's criticism, *supra*: "The information submitted by Petitioners addresses a theoretical control by SASAC over CISRI, rather than any control over the PRC Government at any level over the numerous individual export decisions of the AT&M entity that took place during the POI."  I&D Memo at Comment 16(C).  The statement's first part is precisely what *de jure* analysis is all about -- *theory*, of *meaning* -- and the second part is precisely of which the DSMC complain -- burden-shifting.

[17]  The remand results reference Exhibit SA-11 of BGY's supplemental questionnaire response dated September 20, 2005 as support for the assertion, which concerns "Ownership of AT&M" and reveals nothing of significance regarding board membership, although the record also contains the verification report for AT&M and BGY.

NON-PARTICIPANTS ONLY

Consol. Court No. 09-00511                                                      Page 24

　　　　　The verification report for AT&M notes that two of the "non-CISRI" directors

consisted of AT&M management, including the company's chief executive officer.  Verification

Report at 9 (Mar. 26, 2006).  The DSMC argue the verification report actually proves at least one

of those is also connected to CISRI  *See*, *e.g.,* DSMC Comments n.2.  The report also notes that the

three other "non-CISRI" directors are "independent," in that they are "subject to approval by the

independent stock exchange committee which will establish their independence."  The remand

results, however, do not delve into detail and thus do not resolve whether any of such individuals

embody "governmental control."

　　　　　Commerce's analysis of AT&M's board focuses only on CISRI's ability to control

it.  *See* RR at 19.  If the proper analysis concerns "governmental control" of AT&M's board, it is

unclear from this last statement or from the report itself whether the three "independent" directors

are free of such governmental control *in toto*.  *Cf.* Verification Report at 8 ("companies' conduct is

supervised by the independent China Stock Exchange Committee").  BGY declared that none of its

board members are "employed by" the PRC Government and it further declared that none of the

AT&M entity companies are affiliated, owned, or controlled by "individuals employed by" the PRC

Government, BGY's Sep. 20, 2005 Supp. Q. Resp. at 2, 6, 8, but apart from this and the statements

of company officials at verification, the court does not discern corroboration of "independence" from

"governmental control" of the five "non-CISRI" directors.  Their independence seems assumed.

　　　　　Regarding the two directors who are also members of AT&M management, the

DSMC also raise a second legitimate concern.  In their managerial capacity, those AT&M members

appear on the record, *de facto* as well as *de jure*, to be beholden to the board that controls their pay,

in particular to the chairman of the board as the *de facto* company head under the PRC model. If board members are properly presumed subject to governmental control, directly or indirectly, then true independence and autonomy remain in doubt until proven otherwise. If they are not so presumed, then the presumption of state control is without purpose or application. Examination of subjugation, therefore, ought to have been a necessary extension of any inquiry into "governmental control," a question not to be conflated with any *de jure* directorial obligations. *Cf.*, *e.g.*, Code, Art. 23 ("[a] listed company shall be separated from its controlling shareholders in such aspects as personnel") *with* Art.33 ("[d]irectors shall faithfully, honestly and diligently perform their duties for the best interests of the company and all the shareholders").

It may well be the case that there is evidence of record from which these five directors true independence from governmental control may reasonably be concluded, but the remand results, arguments, and record excerpts provided by the parties do not appear conclusive to this point. The court was tempted to revive and grant, *sua sponte*, DSMC's motion for oral argument, as the parties might be able to provide assistance, but in view of the resources this would have consumed and the fact that remand is required on other ground, the court considers that such questions are better left for Commerce and the parties to address on remand.

### F. Further Defendant Commentary

The defendant would here disagree, with all of the foregoing, in arguing that the separate rate analysis is not simply a "litmus test for government influence in general" but is rather a "particularized analysis" of a company's export activities. The separate rate test purports to "focus[ ] on *controls* over the decision-making process on export-related investment, pricing, and

output decisions at the individual firm level," Import Policy Bulletin 05.1 (italics added), and the

defendant argues this means an examination of the "degree" to which those activities are

"controlled" by a government or by the company itself. Def's Resp. at 6. The test "does not purport

to ensure that no government interests are promoted through the exporter's business venture, but

rather serves to ensure that the Government of China *itself* is not controlling the day-to-day export

activities of the exporter in question." *Id.* at 6-7 (italics added).

      Unfortunately, this does not clarify. The Interim Regulations, for example, provide

for more than mere "influence in general." *See supra*. Nonetheless, the defendant argues that when

all is said and done, the question is simply concerned with price variability: is the price of the

diamond sawblades that AT&M exports to the United States "set by" the PRC Government or by

AT&M; in other words, "does the price of AT&M's diamond sawblades exports to the United States

by AT&M vary depending on world market conditions or is the price set and orchestrated by the

PRC Government and only responds to changes ordered by the central government?" Def's Resp.

at 11. But this too does not clarify, as those concepts are not mutually exclusive. The price of an

arm's length transaction to a buyer in the market is always a "market" transaction by definition, and

regardless of any "setting" of or involvement in price by the seller's government. *See*, *e.g.*, Case

C-337/09, Judgment of the Court, ¶ 86 (Grand Chamber, European Court of Justice) (July 19,

2012).[18] For that matter, the actual setting of price is only one of the four *de facto* factors described

in the Policy Bulletin, whereas governmental manipulation of the cost of inputs, *see id.*, or

---

    [18] Available at http://curia.europa.eu/juris/document/document.jsf?text=&docid=125218& pageIndex=0&doclang=EN&mode=lst&dir=&occ=first&part=1&cid=375494 (last visited this date).

rationalization of industry or output are among numerous other scenarios of concern that can affect

seller pricing.

       In the end, the defendant concludes: "[b]ecause there is no record evidence indicating

that the [PRC] Government . . . sets the price of the diamond sawblades exported by AT&M,

Commerce correctly assigned AT&M a separate rate."   Given the presumption of state control,

however, the reviewing standard requires record evidence that the PRC Government (including any

agent thereof) did *not* "set" (however defined) the price of diamond sawblades exported by AT&M.

That still remains in doubt.  The obvious instance of  governmental control of price setting  would

be direct regulatory approval of a particular export price, but to what extent does the inquiry also

concern governmental "influence" in what might otherwise appear to be the company's decision?

The court cannot agree that is irrelevant.  The question to Commerce might thus be better phrased

as follows: what is the agency's definition of the "degree"of "governmental control" in the "setting"

of export prices that must *not* be shown in order for an applicant to receive a separate rate, and where

is the line drawn to exclude or include implementation of governmental influence or policy?  After

all, personnel is policy: it is axiomatic that inert entities (*e.g.*, corporations, governments) can only

*act* through agency,[19] concerning which "state" of affairs even socialistic European cousins recently

expressed a certain misgiving (without irony):

> [I]n the context of a non-market economy country, the fact that a company
> established in that country is *de facto* controlled by State shareholders raises serious
> doubts as to whether the company's management is sufficiently independent of the
> State to be able to take decisions regarding prices, costs and inputs autonomously and
> in response to market signals.

---

[19] Louis XIV cut to the chase: "*l'Etat, c'est moi*."

Consol. Court No. 09-00511                                                              Page 28

*Id.*

        For the above reasons, the court remains unclear as to the extent of "governmental control" that would preclude, or lack thereof permit, the grant of a separate rate, particularly with regard to the third and fourth *de facto* factors, as previously pondered. *See* Slip Op. 11-122 at 24. Specifically, it is unclear what the defendant means by "degree" or what Commerce means by "control," "separate," "autonomy," "independent," and so forth in the context of the separate rate policy, and one that lacks clarity in purpose or application borders on arbitrary and capricious. Whatever "degree" that is, Commerce's use of such terms to describe ownership and management in the context of this matter leads to confusion,[20] but it is at least clear that apart from the camel's nose of "guidance" or "oversight," Commerce concludes there is *no* degree of "control" or influence whatsoever by SASAC over CISRI or AT&M or by CISRI over AT&M, and that appears to be based on flawed analysis. The court must therefore await Commerce's reasonable explanation and analysis of "controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level," as previously requested. *See* Import Policy Bulletin 05.1.

---

    [20] For example, in addition to the foregoing, the finding that shareholders *lack* control over the board concerning their decisions including selection of management and distribution of profits appears to conflict with the finding that shareholders *have* control over the board in the form of veto power over CISRI's nominations thereto. For that matter, the remand results also give no indication that any *de jure* provisions permitting boards that include "shareholders representatives" were considered. *Cf*. note 12, *supra*.

### G.  Further Analysis of Governmental
### Control Over AT&M's Finances

The DSMC also argue the evidence in support of AT&M's right to distribute its profits without government interference is similarly lacking.  RR at 8; *see also* BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. SA-5.  The court agrees in part.  The evidence includes the records of a board meeting at which all discussions of profit distribution were explicitly accompanied by the caveat: "This resolution should be approved by the Shareholder's Meeting."  *Id*.  AT&M's controlling shareholder was CISRI, and shareholders' voting power is in proportion to their shares. *See id* at Ex. SA-10(1), Art. 35 & Ex. SA-11; *see also* BGY Section A Comments at Ex. 7.  The DSMC are correct in pointing out that CISRI had the power over any profit distribution regardless of what the board of directors decided.  However, the defendant is also correct in pointing out that CISRI's portion of AT&M's allocated profits is consistent with CISRI's role as a shareholder entitled to a proportionate share of the profits.

On the other hand, the defendant argues too narrowly that this "does not suggest or establish government control upon AT&M's export activities, nor did Commerce's review of the board minutes from the relevant AT&M's board meeting suggest any government control over export activities. Remand Redetermination at 8.  The DSMC's larger point here is that the financial statements to which Commerce cites are only balance sheets, without auditor's notes or other detail, *cf*. RR at 8 *with* BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. SA-22, and more complete versions that AT&M submitted in a later response clarify that CISRI had significant [[

]]. *See* BGY's Dec. 5, 2005 Supp. Q. Resp. at Ex. 4, p.48 (Notes to Main Items of Parent Company Financial Report at Item 23); *see also id*. at Ex. 2 (Footnotes, Section V.27 and

Consol. Court No. 09-00511                                        Page 30

XI.3).  The DSMC thus contend this indicates AT&M's [[

]].  *See*

*id*. at Ex. 4, p.48; *id*. at Ex. 2 (Footnotes, Section V.27 and XI.3).  *Cf*. Import Policy Bulletin 05.1

("the test focuses on controls over the decision-making process on export-related *investment*" *et*

*cetera*) (citations omitted; italics added).  That, of course, implicates profits and losses, because

money is fungible.  Therefore, in addition to the foregoing, Commerce will consider (or reconsider)

and address the DSMC's specific concerns on these points on remand, bearing in mind the

presumption of state control.[21]

---

[21]   In passing, the court also notes that in response to Slip Op. 11-122, Commerce distinguished the separate rates test as "unlike" the affiliation/collapsing test on the ground that the latter is premised on shareholders' ability to control a respondent's *future* acts, whereas the separate rates test is focused on evidence of control being exercised on *current* acts during the period of investigation or review. RR at 17-18 (the separate rate test "then prospectively applies to the results of this analysis until the next review period").  The DSMC point out that Commerce in 1997 explained that the purpose of the separate rates test is to "prevent an NME government from *later* circumventing an antidumping order by controlling the flow of subject merchandise through exporters which have the lowest margin[,]" which is clearly an implication of future behavior. *See Certain Cut-to-Length Carbon Steel Plate From Ukraine*, 62 Fed. Reg. 61754, 61757-60 (Dep't Commerce Nov. 19, 1997) (final determination of sales at less than fair value) (italics added). Furthermore, the DSMC contend, if the current results are allowed to stand, there will be no future review period since the results are *de minimis*.  AT&M comments that the policy bulletin "made even more apparent" that it is not the ability to shift sales among companies, as in the collapsing methodology, that is the basis of denying a separate rate, but is rather the independence from government control with regard to export activities.  AT&M Comments at 4-5.  At this point, the court regards the discussion as academic.  Whatever their motivation, both tests obviously overlap on such matters as level(s) of ownership, the extent to which companies are directed by the same employees or board members, and interdependency of intertwined operations such as through involvement in production and pricing decisions or financing, *et cetera*. *Cf*. 19 C.F.R. § 351.401(f) *with Sparklers*, *supra*, 56 Fed. Reg. at 20589 (respondent's argument "that there is no evidence of *coordination* among the companies on such matters as price setting, market division, and production practices") (italics added).  As to the DSMC's other concern, of whether there will be a future review period, they are, of course, aware that the court is bound to let the chips must fall where they must.

IV.  Conclusion

The court appreciates that Commerce labors under constraints, administrative and other, wise or not, in reaching determinations entitled to a presumption of administrative regularity,[22] but at this point the results may not be sustained on the bases articulated by Commerce.  Remand is

---

[22]  Cool and deliberate, true judgment is tied to the mast and impervious to seductive song. *But cf.*, *e.g.*, *An Analysis of State-owned Enterprises and State Capitalism in China* at 3, 92 (U.S.-China Economic and Security Review Comm., Oct. 26, 2011) (italics added):

> When it joined the WTO in 2001, China promised that the government would not influence, directly or indirectly, the commercial decisions of [state-owned enterprises ("SOEs")].  China does not appear to be keeping this commitment. *The state does influence the commercial decisions of SOEs* and the most recent five-year guidance does not herald a change in this regard.  If anything, China is doubling down and giving SOEs a more prominent role in achieving the state's most important economic goals.
>
> * * *
>
> The [PRC] government's prominent economic role, coming a decade after China joined the WTO, throws into doubt expectations that China's WTO membership would lead it to pull back from market interventions.  The back-and-forth between China's representative and the Working Party [of the WTO] on China's accession [to the WTO] is memorialized in the Working Party Report. As the following text from the report demonstrates, China itself encouraged these expectations:
>
> > The representative of China further confirmed that China would ensure that all state-owned and state-invested enterprises would make purchases and sales based solely on commercial considerations, *e.g.*, price, quality, marketability and availability, and that the enterprises of other WTO Members would have an adequate opportunity to compete for sales to and purchases from these enterprises on non-discriminatory terms and conditions. In addition, the Government of China [promised it] would not influence, directly or indirectly, commercial decisions on the part of state-owned or state-invested enterprises, including on the quantity, value or country of origin of any goods purchased or sold, except in a manner consistent with the WTO Agreement.
>
> The Working Party took note of these commitments.  But given the strong state direction embodied in the 12th Five Year Plan, as well as the incentive structure facing the leaders of China's SOEs, it is clear that SOEs will continue to be driven by government policies. . . ."

therefore necessary for reconsideration and clarification in accordance with the foregoing. As to

what that implies for purposes of remand, no opinion is here expressed, except that the court

emphasizes it is not here substituting judgment for that of Commerce on these issues or insisting

upon application of the separate rates test in a certain way in contravention of *Arkansas v. Oklahoma*,

503 U.S. 91, 113 (1992). The court simply seeks to discern the reasonableness of a determination,

and the wisdom to do so. If necessary, upon remand Commerce may re-open the administrative

record to gather additional information.

*Analysis of 30CrMo Steel Plate Valuation*

I. Background

In the original final results, based upon certain verification report exhibit records

Commerce calculated the surrogate values for the AT&M entity's 30CrMo steel plate inputs for the

manufacture of diamond sawblade cores using Indian Harmonized Tariff Schedule provisions

covering alloy steel plate both above and below 600mm wide, in a variety of thicknesses,. *See* RR

at 11-12; *see also* I&D Memo at 74. This decision was voluntarily remanded.

II. Summary of Remand and Results

On remand, Commerce accepted the AT&M entity's arguments and recalculated the

30CrMo steel input based only upon Indian HTS categories covering steel plate of widths of 600mm-

and-greater and rejected using the two categories for below-600mm. *See* RR at 11. Commerce

justified this result on the ground that the "raw material purchase documentation for 30CrMo steel

plate on the record only shows that the AT&M Entity purchased it in widths of either 1210mm or

l050mm," and on the ground that it its verification team was provided a worksheet by company

officials "demonstrating the total purchases of steel during the POI," from which the team noted "the

purchases of 30CrMo were clearly for steel sheets with dimensions listed on the invoices." *Id*. at 26-

27, referencing Verification Report at 27 & Ex. 12, and BGY's Nov. 3, 2005 Supp. Q. Resp. at Ex.

SD-4, 16-17. Commerce found that "the measurements in the column in the inventory-out log refer

to the diameters of the finished product being produced from the 30CrMo steel which was

withdrawn, as opposed to the widths of the 30CrMo steel plate input itself." *Id.* at 27.

### III. Discussion

This decision is not fully explained, and the record evidence upon which Commerce

relies does not fully support its conclusion. In large part, the analysis contradicts, without adequate

explanation, Commerce's analysis of record documents for similar inputs. The record indicates that

neither the invoices nor the other purchase documents on the record reflect all of the steel plate that

the AT&M purchased during the POI, therefore the fact that the record does not contain invoices

showing the purchase of 30CrMo steel less than 600 mm wide is not dispositive of whether such

goods were purchased. The referenced Exhibit 12, *supra*, consists in part of two pages of a purchase

subpedger memorializing purchases of steel plate in two non-consecutive months during the POI,

plus an invoice for 30CrMo steel matching to the first entry on the first page of the subledger. No

invoices are provided to match the entries on the second page of the subledger. The DSCM also

pointed out that the 30CrMo steel purchase documents provided in AT&M's questionnaire response

do not match, in either quantity or value, any of the entries on the purchase subledgers. Thus, it

would appear that the subledger pages on the record do not reflect all of AT&M purchases of steel

plate and that the invoices and other purchase documents on the record do not account for all such

purchases.  As such, the DSMC correctly argue that it is unreasonable for Commerce to rely on the

above purchase record evidence to find that "no" purchases of sheet under 600 mm wide occurred

and remark that the record is "bereft" of any indication that BGY purchased 30CrMo steel in widths

under 600mm, *see infra*, when other record evidence may be readily construed to indicate that such

purchases were in fact made.

      The DSMC argue it is "highly unlikely" that the dimensional values in AT&M's

inventory out-logs represent finished diamond sawblade widths as found by Commerce, rather than

the width of the input steel.  The DSMC in particular point to the fourth line item of the raw material

subledger referencing a particular quantity -- to the hundredth kilogram -- of 30CrMo steel and its

amount in renminbi.  *See* Ex. 12, *supra*, at 7.  Because the inventory-out record, Ex. 12 at 11, records

the removal of exactly those same amounts, it would seem clear, as the DSMC argue, "that the

inventory-out record refers to the same 30CrMo steel as the raw material subledger."  Commerce

accepted AT&M's explanation that the dimensional values described in the inventory-out record

reflect those not of the 30CrMo steel input but to the dimensions of the end product.  The DSCM

contend AT&M has not explained why it would record the dimensions of as-yet-unproduced finished

goods in its raw material inventory records.

      The DSMC also argue AT&M has conceded that the dimensional values recorded in

its inventory logs reflect the dimensions of input steel, not output cores.  Commerce confirmed that

AT&M uses 65Mn steel plate in widths under 600 mm by comparing a subledger showing the

purchase of a particular quantity of that steel in kilograms with an inventory-in log showing the

placement of that quantity of steel into inventory.  I&D Memo at 74; *see also* Ex. 12, *supra*, at 1, 4.

The purchase subledger did not indicate the dimensions of the purchased steel. *See* Ex. 12 at 1.

However, like the inventory-out log, Ex. 12 at 11, this inventory-in log contained a second column

with dimensional values. *See id.* at 4, 11. On the basis of these, Commerce determined that the

AT&M entity purchased 65Mn steel in dimensions less than 600mm wide. I&D Memo at 74. And

in its motion brief for judgment, the AT&M entity relied on the "validity" of this determination to

support its arguments, apparently since abandoned,[23] on the proper valuation of 65Mn steel.

AT&M's Brief at 42. This, the DSMC contend, indicates AT&M's concession that the dimension

values recorded in its inventory logs reflect the dimensions of input steel, not output cores.

       Even apart from that, the DSMC contend, the original determination regarding 65Mn

steel and the remand determination for the 30CrMo steel creates a logical contradiction that

Commerce has not addressed. Commerce found that with respect to inventory-out records for

---

[23] In their Rule 56.2 brief, AT&M also assigned error on the Indian HTS categories used in the original determination as surrogate values for its 65Mn steel. In the preliminary determination, Commerce valued the AT&M entity's 65Mn steel using an average of Indian HTS categories 7209.16,20, 7209.16,30, and 7209.16,50. The DSMC argued in their rebuttal brief that the facts of record justified using only Indian HTS 7211.29.50. Commerce agreed in part. For the final determination, Commerce dropped using HTS 7209.16,20, 7209.16,30, and 7209.16,50, and instead used 7211.29.50 -- as well as 7209.25.20, 7209.25.30, 7209.26.20, 7209.27.20, and 7209.27.30. Commerce reasoned these changes because "there was no information on the record to support the continued use of HTS numbers 7209.16.20 and 7209.16.30, as all items in inventory for 65Mn steel listed in BGY Verification Report at Exhibit 12, as well as invoices provided in BGY's second supplemental response dated December 5, 2005, are coils in widths less than 600 mm." I&D Memo at 74. In its 56.2 brief, AT&M pointed out that HTS heading 7209 covers "flat-rolled products of iron and non-alloy steel, of a width of 600 mm or more, cold-rolled (cold-reduced), not clad, plated or coated" while HTS heading 7211 covers "flat-rolled products of iron and non-alloy steel, of a width less than 600 mm, not clad, plated or coated," and argued that Commerce's refusal to use HTS 7209.16.20 and 7209.16.30 on the ground that the categories were for steel of 600 mm and above but adoption of five other categories under HTS 7209 which were for 600 mm and above is contradictory and unsupported by substantial evidence or plain logic and therefore required reconsideration. As mentioned, AT&M appears to have since abandoned this argument. *Cf.* Pls' Reply to Def. and Def-Int's Opp. to Pls' Rule 56.2 Mot. for J. on the Agency Record at 5-8.

30CrMo steel, the second column reflects the dimensions of as yet unproduced finished goods. *See*,

*e.g.*, RR at 11-12, 26-27. But, the record also contains inventory-out records for 65Mn steel plate,

with dimensional values matching to those seen in the inventory-in records for the same type of steel.

Verification Report, Ex. 12 at 4, 9-10.

Commerce dismissed the DSMC's argument with the following:

> [S]imply because some measurements overlap does not mean that any definitive
> conclusions can be drawn from such observation and then applied to the 30CrMo
> steel input. The inventory-in records for 65Mn steel clearly show purchases of less
> than 600mm in width, indicating BGY purchased this input in widths closer to the
> diameters of the finished product than it did for 30CrMo steel. In contrast, the record
> is absolutely bereft of any indication that BGY purchased 30 CrMo steel in widths
> under 600mm.

RR at 27.

At this point the court must ponder why the dimensions of input steel are recorded

in both the inventory-in and inventory-out records for 65Mn steel but not for 30CrMo steel, but

cannot speculate. The DSMC also point out that the fact that the dimensions recorded in the second

column of the 65Mn inventory-in and inventory-out records *match exactly* tends to discount the

argument that the inventory-out records show the dimensions of finished cores, because an exact

match between the figures would seem to leave no room for scrap or error whatsoever in cutting

cores from the input plates. The court must therefore agree with the DSMC that this situation

appears to be more than mere "overlap" -- after all, the -in and -out 65Mn steel records and the

30CrMo steel records are formatted nearly identically and record what appears to be the same kinds

of information, including dimensional values. *See* Verification Report, Ex. 12 at 4, 6, 9-11.

Consol. Court No. 09-00511                                          Page 37

## IV. Conclusion

For the above reasons, the matter of the 30CrMo steel inputs valuation will also be remanded for further explanation or reconsideration.

A separate and confidential order of remand to the above effect will be issued herewith.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: November 30, 2012
        New York, New York

Errata

*Advanced Technology & Materials Co. v. United States*, Consol. Ct. No. 09-00511, Slip Op. 12-147 dated Nov. 30, 2012.

Page 29, second full paragraph, second line, replace the comma after "activities" with a closed quotation mark ("), and on the fourth line, change "Remand Redetermination" to "Def's Resp. at 10, referencing RR".

Page 32, last line, delete "it".

**Confidential Material Deleted**

# THIS PAGE OF THE APPENDIX
# IS NOT SUSCEPTIBLE TO
# PUBLIC SUMMARIZATION

**Confidential Material Deleted**

# THIS PAGE OF THE APPENDIX
# IS NOT SUSCEPTIBLE TO
# PUBLIC SUMMARIZATION

# CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2014, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which will send

notification of the filing to all registered users of the CM/ECF system.  I further

certify that on February 21, 2014, I served a copy of the foregoing document on the

following party by hand delivery:

Daniel B. Pickard
Wiley Rein, LLP
1776 K Street, N.W.
Washington, DC 20006


/s/ Herbert C. Shelley
Herbert C. Shelley

## CERTIFICATE OF COMPLIANCE

I, Herbert C. Shelley, certify that the preceding Brief complies with the type and volume limitation prescribed in Rule 32(a)(5) and (7) of the Federal Rules of Appellate Procedure. Based on the word count performed by the word-processing system used to prepare the Brief, I have determined that it contains 13,082 words.


/s/ Herbert C. Shelley
Herbert C. Shelley

Dated: February 21, 2014